ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER P. SEEFER (201197)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
chriss@rgrdlaw.com
– and –
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
aprice@rgrdlaw.com

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
ckeller@labaton.com
jgardner@labaton.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re UBIQUITI NETWORKS, INC. SECURITIES LITIGATION | Master File No. 12-cv-04677-YGR |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

Page


I. INTRODUCTION ....................1

II. JURISDICTION AND VENUE ....................9

III. PARTIES ....................9

IV. RELEVANT NONPARTIES ....................12

V. DEFENDANTS VIOLATED THE 1933 ACT BY ISSUING AN INACCURATE AND MATERIALLY MISLEADING REGISTRATION STATEMENT AND PROSPECTUS ....................14

- A. Ubiquiti's Business Model Made it Particularly Susceptible to Counterfeit Product Sales that Could Harm the Company's Reputation and Financial Results ....................14
- B. An International Counterfeiting Scheme that Had Grown in Size from 2009 to 2011 Was Adversely Affecting Ubiquiti's Business at the Time of the IPO ....................16
  - 1. Pleadings and Documents Filed in the Kozumi Litigation Establish that Kozumi and Others Were Making and Selling Millions of Dollars of Counterfeit Ubiquiti Products that Were Causing Substantial Harm to Ubiquiti at the Time of the IPO ....................16
  - 2. A Former Ubiquiti Distributor Confirms the Counterfeiting Problems and Claims They Were Much More Widespread than Ubiquiti Alleges in its Lawsuit Against Kozumi ....................23
- C. Defendants Failed to Disclose the International Counterfeiting Scheme in the Registration Statement and Prospectus and Falsely Represented that the Sale of Counterfeit Products Was Just a Possibility that Could Adversely Affect Ubiquiti's Business ....................28

VI. DEFENDANTS VIOLATED THE 1934 ACT BY KNOWINGLY OR RECKLESSLY MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS AFTER THE IPO ....................32

- A. November 10 and 14, 2011: Defendants Report Ubiquiti's 1Q12 Results, Make the Same Misleading Statements in the 1Q12 Form 10-Q that Were Included in the Prospectus and Continue to Conceal the Growing Counterfeit Product Problems ....................32
- B. January 31, 2012: Defendants Report Ubiquiti's 2Q12 Results, Continue to Make Materially False and Misleading Statements and Conceal the Growing Counterfeit Problems and Their Adverse Impact on Ubiquiti ....................35
- C. February 1-April 30, 2012: Continued Sales of Counterfeiting Products and Other Events Force Defendants to Publicly Reveal Some of the

**Page**


Previously Concealed Counterfeiting Problems and Their Impact on the Company ....................42

D. May 1, 2012: Defendants Report Ubiquiti's 3Q12 Results and Reveal Some of the Previously Concealed Adverse Information but Make Additional Materially False and Misleading Statements ....................44

E. May 21, 2012-November 9, 2012: Ubiquiti Reveals Additional Adverse Impacts from the Counterfeiting, Which Causes Further Declines in the Company's Stock Price ....................48

VII. LOSS CAUSATION ....................52

VIII. CLASS ACTION ALLEGATIONS ....................54

IX. PRAYER FOR RELIEF ....................62

X. JURY DEMAND ....................63

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company; media reports about the Company; pleadings and documents filed in the Company's litigation against Kozumi USA Corp. ("Kozumi"); and information provided by former Ubiquiti distributors. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Ubiquiti between October 14, 2011 and August 9, 2012, inclusive (the "Class Period"), and/or who acquired shares of Ubiquiti common stock pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus issued in connection with its October 14, 2011 initial public offering ("IPO"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act").

2. Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide. The Company offers a portfolio of wireless networking products and solutions, including systems, high performance radios, antennas and management tools, designed for wireless networking and other applications in the unlicensed radio frequency ("RF") spectrum. The Company offers solutions that incorporate its RF technology, antenna design and firmware technologies, which it refers to as AirTechnologies and includes its proprietary AirMax systems.

3. The Company sold a majority of its products in emerging markets outside the United States (70% in 2011) and reported increasing revenues from 2009 ($63.1 million) through 2011 ($197.9 million).[1] The Company used contract manufacturers in China and Taiwan to manufacture

---

[1] The Company's fiscal year ends on June 30, so its first fiscal quarter runs from July 1 to September 30, its second fiscal quarter runs from October 1 to December 31, its third fiscal quarter runs from January 1 to March 31 and its fourth fiscal quarter runs from April 1 to June 30.

its products. In addition, the Company did not have a sales force and instead relied on distributors to sell its products. Distributors accounted for 97% of the Company's revenues in fiscal 2011 ("FY11").

4. On or about October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which formed part of the Registration Statement and which became effective on October 13, 2011. At least 7.038 million shares of Ubiquiti common stock were sold to the public at $15 per share, raising $105.6 million in gross proceeds for the Company and the selling shareholders. Ubiquiti's officers and directors signed the Registration Statement. The four Underwriter Defendants helped draft and disseminate the Registration Statement and Prospectus.

5. In the Registration Statement and Prospectus, defendants made materially inaccurate and misleading statements and omissions about Ubiquiti's business practices and financial results. They created the misleading impression that the sale of counterfeit Ubiquiti products was not a current problem by representing that Ubiquiti's ability to sell its products at competitive prices and to be the sole provider of its products ***might*** be adversely affected – and that its business, operating results and financial condition ***could*** be materially and adversely affected – ***if*** the Company were unsuccessful in stopping counterfeit products by monitoring and enforcing its intellectual property rights in China.

6. Other representations in the Registration Statement and Prospectus reinforced the misleading impression that the sale of counterfeit products was not a current problem. Defendants represented that Ubiquiti's ability to compete ***could*** be impaired ***if*** the Company failed to protect its intellectual property rights adequately, which in turn ***could*** reduce revenues and increase costs. They also represented that sales of counterfeit products ***could*** continue largely unimpeded ***if*** enforcement of the Company's intellectual property rights in China required an extensive amount of time. In addition, defendants represented that effective trademark protection ***might*** not be available in every country in which the Company sold its products, that others ***might*** develop technologies that infringed Ubiquiti's intellectual property and that the Company's legal efforts ***might*** not be successful against possible infringers.

7. These representations were important to investors because Ubiquiti was particularly susceptible to counterfeiting for several reasons. First, the Company had less control over the manufacturing process because it did not manufacture its own products and instead used contract manufacturers in China and Taiwan, where enforcement of intellectual property rights was more difficult. Second, the Company had less control over the sale and distribution of its products because it did not have a direct sales force and instead used third-party distributors that acquired Ubiquiti products from the contract manufacturers and then delivered them to resellers and end users. Third, a majority of the Company's products was sold in emerging markets outside the United States, where it was more difficult to detect counterfeit products and enforce intellectual property rights. Fourth, the Company did not have registered trademarks for its name or all of its products in the various countries in which its products were sold. Fifth, the Company was an attractive counterfeit target because it reported increasing sales and earnings from 2009 to 2011.

8. Information provided by the Company in litigation against Kozumi and its owner, Shao Wei Hsu ("Hsu"), establishes that, since November 2009 and at the time of the IPO, Ubiquiti was unable to adequately protect and enforce its intellectual property rights in China and other countries and that sales of counterfeit products by Kozumi and others were adversely affecting Ubiquiti's ability to sell its products at competitive prices and to be the sole provider of its products, which, in turn, adversely affected the Company's business, operating results and financial condition.

9. In its lawsuit filed in May 2012, Ubiquiti stated that Kozumi and Hsu had "masterminded an international counterfeiting scheme" by stealing source code and proprietary designs, manufacturing and selling millions of dollars' worth of counterfeit products throughout the world, demanding millions of dollars from Ubiquiti to stop the counterfeiting and spreading false rumors about Ubiquiti and defendant Robert J. Pera ("Pera"). Exs. 1-10.[2] *See Ubiquiti Networks,*

---

[2] All "Ex. __" references are to Exhibits 1-11 included in the Appendix of Exhibits filed herewith. Exhibits 1-10 are pleadings filed in the Kozumi litigation, including declarations filed by several Ubiquiti executives, Ubiquiti's counsel and Hsu. All "ex.__" references are to the exhibits attached to the declarations filed in the Kozumi litigation. Exhibit 11 is a compilation of e-mails provided by Asim Sajwani ("Sajwani"), a former Ubiquiti distributor, and portions of his blog.

*Inc. v. Kozumi USA Corp.*, No. 12-cv-2582 CW (JSC) (N.D. Cal. 2012). The Company also stated that the international counterfeiting scheme was causing substantial and irreparable harm to Ubiquiti's financial results – including lost sales and increased costs – and devastating damage to the Company's goodwill and reputation.

10. Sworn declarations by Ubiquiti executives and internal Company documents filed in that litigation establish that the counterfeiting problems were causing substantial, irreparable and devastating harm at the time of the IPO. Indeed, defendants had known about the counterfeiting problems since 2009 and had been taking numerous actions in an attempt to stop the counterfeiting since that time. The counterfeiting was particularly important to Pera, who e-mailed Hsu in December 2011 that he had "personally dedicated the last several months of [his] time focusing on [Kenny Deng]," the owner of Hoky Technology ("Hoky"), who was manufacturing thousands of counterfeit Ubiquiti products at a facility in Shenzhen, China.

11. Defendants also knew the efforts to stop the counterfeiting were unsuccessful and that increasing amounts of counterfeit product were being sold in more and more countries throughout the world, including China, Argentina, Paraguay, Turkey, Greece, Iran, Iraq, Saudi Arabia, Ukraine, Pakistan, Macedonia, Kosovo, India and Albania. By the time of the IPO, the problem had become so bad that Ubiquiti had retained Chinese counsel to prepare a criminal complaint and had made arrangements with Chinese law enforcement officials – the Shenzhen Public Security Bureau ("SPSB") – to raid and shut down the Hoky manufacturing facility. The actual raid occurred on November 17, 2011, a month after the IPO.

12. Other pleadings and documents filed by Ubiquiti in its lawsuit against Kozumi and Hsu establish that counterfeit products were being manufactured at the time of the IPO by at least one other facility in Huizhou, China owned by Huizhou China Eagle Electronic Technology Co. Ltd. According to Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, as many as 13 factories in China were manufacturing counterfeit Ubiquiti products. Sajwani also said that resellers told him there was a growing availability of counterfeit Ubiquiti products from 2010 to 2011 at prices 20% to 25% lower than Ubiquiti's prices.

13. Ubiquiti and its officers and directors were responsible for the content and dissemination of the materially inaccurate and misleading Registration Statement. The four Underwriter Defendants were paid more than $7 million to underwrite the IPO and failed to require disclosure of the international counterfeiting scheme, which was adversely impacting Ubiquiti's business at the time of the IPO. Public investors relied on the Underwriter Defendants to conduct a reasonable investigation, to obtain and verify the information contained in the Registration Statement and Prospectus and to make sure essential facts about the Company were disclosed. Indeed, the Underwriter Defendants had access to the adverse information at a critical time in Ubiquiti's corporate life – the first time it sought to raise capital from the public. The Underwriter Defendants either knew about the international counterfeiting scheme and its adverse impacts on the Company's business and failed to require disclosure or did not know by failing to conduct a reasonable investigation and independently verifying the representations in the Registration Statement and Prospectus. Either way, the Underwriter Defendants failed to meet their "gatekeeper" function of protecting investors.

14. Following the completion of the IPO, defendants Ubiquiti, Pera and John Ritchie ("Ritchie") violated §10(b) of the 1934 Act by knowingly or recklessly making statements that perpetuated the misleading impression that the sale of counterfeit products was not a current problem even though the international counterfeiting scheme and its adverse impact on the Company were growing. In November 2011, they reported Ubiquiti's results for the first quarter of fiscal 2012 ("1Q12"), the quarter ending September 30, 2011; made the same false statements that were included in the Registration Statement and Prospectus; and failed to disclose the counterfeiting problems and their impact on the Company.

15. On January 31, 2012, defendants Ubiquiti, Pera and Ritchie reported the Company's results for 2Q12, the quarter ending December 31, 2011, and made the same false statements that were included in the Registration Statement and Prospectus. They failed to disclose the counterfeiting problems even though the level of counterfeiting and its adverse effect on Ubiquiti had increased. The Hoky factory was raided on November 17, 2011, and its owner, Kenny Deng ("Deng"), was arrested by Chinese authorities. Pera, Ritchie and other Ubiquiti executives learned

that thousands of counterfeit Ubiquiti products were found at the Hoky plant during the raid along with documentation showing that thousands of additional counterfeit products had already been shipped. Further, defendants learned in December 2011 that Deng was released from prison and that he reopened and expanded the Hoky facility and resumed manufacturing counterfeit Ubiquiti products.

16. By January 31, 2012, Pera and Ritchie also knew additional facts that showed the international counterfeiting scheme and its adverse impacts on the Company were growing. Deng's relatives had opened other factories that made larger quantities and a wider variety of counterfeit Ubiquiti products; Hsu had fraudulently acquired a Ubiquiti trademark in Argentina; Hsu had told them that the manufacture and sale of counterfeit Ubiquiti products would not stop unless Hsu and Deng were paid millions of dollars; and Hsu had told them Deng could cause many problems for Ubiquiti if the Company continued to persecute him, including accusing the Company of both illegally importing products using smuggling companies from Hong Kong and bribing Chinese police to persecute Deng.

17. As Ritchie stated in his sworn declaration, defendants also knew that counterfeiting caused: (a) sales orders from Argentina to decline 88% from $6.3 million in 1Q12 to $726,734 in 2Q12; and (b) the book-to-bill ratio – the ratio of orders booked to orders invoiced – to decline 91% from 1.85 in 1Q12 to 0.16 in 2Q12. A book-to-bill ratio of less than 1 indicates falling demand, while a ratio of greater than 1 shows growth. Indeed, Ritchie stated that the counterfeiting caused great harm to Ubiquiti in 2Q12 because the $726,734 of Argentinean sales orders received was the lowest level received in the past three years and would have been $3.3 million absent the counterfeiting. Ritchie also stated that the harm was greater because counterfeit goods were being sold in countries other than Argentina.

18. During the January 31, 2012 conference call, Pera and Ritchie concealed the adverse impact of the international counterfeiting scheme on Ubiquiti's results. Moreover, despite knowing about the substantial decline in Argentinean sales orders in 2Q12 caused by the counterfeiting, Pera assured investors that Ubiquiti received international orders across the board for all product lines and that orders from the big hitters in the international regions, including Argentina, were consistent with

the previous quarter. The sworn statements made by Ritchie in Ubiquiti's lawsuit against Kozumi and Hsu establish that he and Pera knew or were reckless in not knowing that these statements were materially false and misleading.

19. After January 31, 2012, the price of the Company's stock continued to increase and traded at artificially inflated prices, reaching a Class Period high price of $35 per share on May 1, 2012. However, the continued sale of counterfeit Ubiquiti products and other events forced defendants to reveal some, but not all, of the previously concealed counterfeiting problems and their impact on the Company's business after the market closed on May 1, 2012. Ubiquiti announced disappointing 3Q12 results and publicly acknowledged the international counterfeiting scheme for the first time. The Company revealed that it planned to increase its legal efforts and financial commitment to aggressively defend its intellectual property and to protect its customers from counterfeiters. Ubiquiti also disclosed that it expected to see a meaningful increase in operating expenses of approximately $1.5 million and that the largest component of the increase related to costs to protect Ubiquiti's intellectual property.

20. After this unexpected negative news, Ubiquiti's stock price declined $6.10 per share to close at $28.90 per share on May 2, 2012, a one-day decline of 17.4% on volume of nearly 4.1 million shares. However, the stock price continued to be artificially inflated because defendants assured investors that the Company had the matter contained and minimized the effect the counterfeit activities would have on the Company's operations. Moreover, Pera and Ritchie continued to conceal the widespread nature of the counterfeiting activities and the serious adverse impact they had on the Company's 2Q12 and 3Q12 results and would have on the Company's future results. During the conference call on May 1, 2012, Ritchie told investors that Ubiquiti had not added any new markets but assured them the Company's existing markets – including Argentina – continued to do well in 3Q12. That representation contradicted Ritchie's sworn statements in the Kozumi litigation that sales orders from Argentina in 3Q12 were just $998,700, or $4.1 million less than expected, that the book-to-bill ratio was just 0.47 and that the drop in sales orders in 2Q12 and 3Q12 caused great harm to Ubiquiti.

21. On August 9, 2012, Ubiquiti announced its 4Q12 financial results and disappointing guidance for 1Q13. Ubiquiti admitted that the international counterfeiting scheme was more widespread than previously disclosed and would have a detrimental impact on the Company's future results. The Company reported that the counterfeiting was expected to impact Ubiquiti's business for the next two quarters; that total revenues in 1Q13 were expected to be $62 to $70 million, a substantial decline from the $94.9 million of revenues reported in 4Q12; and that 1Q13 EPS was expected to be $0.14 to $0.17, a substantial decline from the $0.30 EPS reported in 4Q12.

22. As a result of this unexpected negative news, Ubiquiti stock declined $6.30 per share to close at $8.71 per share on August 10, 2012, a one-day decline of nearly 42%, on volume of over 7.6 million shares. This represented a 42% decline in Ubiquiti's stock price from the IPO price of $15 per share and a 75% decline from the Class Period high stock price of $35 per share. Analysts downgraded the stock, lowered their price targets and reported that the Company's revelations on August 9, 2012 showed that the earlier statements about the counterfeiting had underestimated the magnitude of the challenges as it related to the prevalence of counterfeit products and concerns regarding Ubiquiti's business model.

23. On November 8, 2012, Ubiquiti reported its 1Q13 results, and investors learned that the counterfeiting adversely impacted revenues, operating expenses and earnings as Pera and Ritchie told investors on August 9, 2012. The Company reported that: (a) sales declined 35% from $94.9 million in 4Q12 to $61.5 million in 1Q13; (b) SG&A expenses increased 137% from $1.9 million in 4Q12 to $4.5 million in 1Q13; (c) operating income declined 54% from $34.1 million in 4Q12 to $15.8 million in 1Q13; (d) the operating margin declined from 35.4% in 4Q12 to 25.6% in 1Q13; (e) net income declined 54% from $28.5 million in 4Q12 to $13.2 million in 1Q13; and (f) EPS declined 55% from $0.31 in 4Q12 to $0.14 in 1Q13. The Company attributed the adverse results to the international counterfeiting scheme.

24. The following chart (which is also attached in foldout form) illustrates the primary events before, during and after the Class Period and their impact on Ubiquiti's stock price.




## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o], and §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the 1934 Act and §22 of the 1933 Act.

26. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

27. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III. PARTIES

28. Inter-Local Pension Fund GCC/IBT ("Inter-Local") and Bristol County Retirement System ("Bristol County") were appointed Lead Plaintiff by the Court on November 30, 2012. Dkt.

No. 30. As set forth in the certifications filed with the Court on November 6, 2012, Inter-Local purchased 18,910 shares during the Class Period (Dkt. No. 24-2) and Bristol County purchased 16,079 shares during the Class Period (Dkt. No. 10-1) and were damaged thereby.

29. Plaintiff Steven N. Bell, as set forth in the certification attached to a complaint filed on September 7, 2012, purchased the common stock of Ubiquiti during the Class Period and has been damaged thereby.

30. Plaintiff Brian Goecker, as set forth in the certification attached to a complaint filed on September 13, 2012, purchased the common stock of Ubiquiti and has been damaged thereby.

31. Defendant Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide. Ubiquiti's principal executive offices are located at 2580 Orchard Parkway, San Jose, California 95131. The Company's stock trades on the NASDAQ under the symbol UBNT.

32. Defendant Robert J. Pera founded the Company and serves as Chief Executive Officer ("CEO") and a director of Ubiquiti. Pera signed the false and misleading Registration Statement; was quoted in the Company's quarterly earnings releases issued on November 10, 2011, January 31, 2012, May 1, 2012 and August 9, 2012; spoke during the Company's quarterly earnings conference calls; and signed the Forms 10-Q and 10-K filed with the SEC.

33. Defendant John Ritchie is the Chief Financial Officer ("CFO") of Ubiquiti. In the IPO, Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2 million. Ritchie signed the false and misleading Registration Statement; signed the Forms 8-K filed with the SEC that attached the Company's quarterly earnings releases issued on November 10, 2011, January 31, 2012, May 1, 2012 and August 9, 2012; was quoted in the earnings releases issued on November 10, 2011 and May 1, 2012; spoke during the Company's quarterly earnings conference calls; and signed the Forms 10-Q and 10-K filed with the SEC. As detailed below, sworn statements made by Ritchie in his May 18, 2012 declaration filed in the litigation between Ubiquiti and Kozumi directly contradict statements made by Pera and Ritchie on January 31, 2012 and May 1, 2012. Ex. 7. On November 8, 2012, the Company announced Ritchie had resigned and would leave Ubiquiti at the end of the year. On December 28, 2012, the Company announced that Ritchie would stay through February 28, 2013.

34. Defendant Peter Y. Chung ("Chung") serves as a director of Ubiquiti. Chung signed or authorized the signing of the false and misleading Registration Statement.

35. Defendant Christopher J. Crespi ("Crespi") served as a director of Ubiquiti from October 2010 to December 1, 2011. Crespi signed or authorized the signing of the false and misleading Registration Statement.

36. Defendant Charles J. Fitzgerald ("Fitzgerald") serves as a director of Ubiquiti. Fitzgerald signed or authorized the signing of the false and misleading Registration Statement.

37. Defendant John L. Ocampo ("Ocampo") serves as a director of Ubiquiti. Ocampo signed or authorized the signing of the false and misleading Registration Statement.

38. Defendant Robert M. Van Buskirk ("Van Buskirk") serves as a director of Ubiquiti. Van Buskirk signed or authorized the signing of the false and misleading Registration Statement.

39. Pera and Ritchie are referred to herein as the "Officer Defendants."

40. Chung, Crespi, Fitzgerald, Ocampo and Van Buskirk are referred to herein as the "Director Defendants" and are named as defendants solely for violations of the 1933 Act.

41. Defendant UBS Securities LLC ("UBS") is a leading global investment banking and securities firm, and one of the largest global asset managers. UBS acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

42. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG. Deutsche Bank provides investment banking products and services. Deutsche Bank acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

43. Defendant Raymond James & Associates, Inc. ("RJA") is a financial investment advisory firm. RJA acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

44. Defendant Pacific Crest Securities LLC ("Pacific Crest") provides investment banking products and services. Pacific Crest acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

45. UBS, Deutsche Bank, RJA and Pacific Crest are referred to herein as the "Underwriter Defendants."

46. Defendant Ubiquiti and the Officer and Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement. The Underwriter Defendants drafted and disseminated the offering documents and were paid more than $7 million in connection therewith. UBS, Deutsche Bank and RJA acted as joint book-running managers for the IPO. Pursuant to an underwriting agreement, the four Underwriter Defendants agreed to purchase all of the shares in the IPO at a discounted price of $13.9875 per share and then sold them to the public. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## IV. RELEVANT NONPARTIES

47. Kozumi USA Corp. is a Florida corporation that was a Ubiquiti distributor from May 2008 until November 2009.

48. Shao Wei Hsu (who also goes by the names William Wu Hsu, William Hsu Wu and Guillermo Hsu, among others) is the founder, sole owner and director of Kozumi. As detailed below, Ubiquiti filed suit against Kozumi and Hsu in May 2012 alleging that Kozumi was substantially and irreparably harming Ubiquiti's business and goodwill by selling counterfeit Ubiquiti products. As also detailed below, Ubiquiti's allegations in its first amended complaint against Kozumi and Hsu, sworn statements made by Ubiquiti executives in declarations filed with the Court and internal Company documents filed as exhibits to the declarations establish that the manufacture and sale of counterfeit products by Kozumi was occurring from 2009 through 2012. Hsu filed a declaration in the Kozumi litigation, which included various exhibits. Ex. 9.

49. Kenny (Kai) Deng is the owner of Hoky and a manufacturing facility located in Shenzhen, China. As detailed below, Ubiquiti alleges in its lawsuit against Hsu and Kozumi that Hsu worked with Deng to steal Ubiquiti's proprietary product designs from one of the Company's approved contract manufacturers and then used the stolen designs to make counterfeit Ubiquiti products at the Hoky manufacturing facility from 2009 through July 2012. Ubiquiti also alleges that

it worked with Chinese law enforcement authorities to shut down the Hoky factory and detain Deng in November 2011 and July 2012. Ex. 1, ¶¶70-83.

50. Benjamin Moore ("Moore") is the Vice President of Business Development at Ubiquiti. As detailed below, the sworn statements made by Moore in his May 18, 2012 declaration filed in the litigation against Kozumi and Hsu, and the internal Company documents attached as exhibits to the declaration, establish that the manufacture and sale of counterfeit Ubiquiti products was occurring from 2009 through 2012. Ex. 3.

51. Yu Cheng Lin ("Lin") is a vice president of operations at Ubiquiti. As detailed below, Lin filed a declaration in the Kozumi litigation in which he stated that Pera told him in March 2011 that there was a potential counterfeit issue in China and asked him to assist in the investigation of counterfeiting operations taking place at the Hoky factory in Shenzhen, China. Ex. 4.

52. Mike Taylor ("Taylor") is a Senior Software Engineer at Ubiquiti. As detailed below, Taylor filed a declaration in the Kozumi litigation in which he stated that in August 2011 he analyzed products manufactured by Hoky and sold by Kozumi and confirmed they were counterfeit Ubiquiti products. Ex. 5.

53. Patrick G. Jabbaz ("Jabbaz") is a Hardware Manager at Ubiquiti. As detailed below, Jabbaz filed a declaration in the Kozumi litigation and attached as exhibits e-mails between Pera and Hsu in December 2011, April 2012 and May 2012. Ex. 6.

54. Asim Sajwani ("Sajwani") is the founder, owner, President, Chief Executive Officer and Chairman of X-Concepts. X-Concepts is a company registered to do business in the United Arab Emirates with a principal place of business in Dubai. X-Concepts was a Ubiquiti distributor from March 2008 through February 2011. As detailed below, in his blog (http://ubntfacts.blogspot.com/) and during conversations with lead counsel, Sajwani stated that multiple factories in China were manufacturing counterfeit Ubiquiti products that were sold to customers in numerous countries from 2009 to the present. Ex. 11.

## V. DEFENDANTS VIOLATED THE 1933 ACT BY ISSUING AN INACCURATE AND MATERIALLY MISLEADING REGISTRATION STATEMENT AND PROSPECTUS

### A. Ubiquiti's Business Model Made it Particularly Susceptible to Counterfeit Product Sales that Could Harm the Company's Reputation and Financial Results

55. Ubiquiti was particularly susceptible to counterfeiting for several reasons. First, the Company had less control over the manufacturing process because it did not manufacture its own products and instead used contract manufacturers in China and Taiwan, where enforcement of intellectual property rights was more difficult.

56. Second, Ubiquiti had less control over the sale and distribution of its products because it did not have a direct sales force and instead used a worldwide network of distributors to market and distribute its products. The distributors acquired Ubiquiti products from the contract manufacturers and then delivered them to resellers and end users. Distributors accounted for 93% of total revenues in FY10, 97% of total revenues in FY11 and 98% of total revenues in FY12.

57. Third, a majority of the Company's products were sold in emerging markets outside the United States, where it was more difficult to detect counterfeit products and enforce intellectual property rights. The Company's products are offered in the United States and in over 65 other countries, with a particular focus on emerging economies in South America, such as Argentina, Brazil and Paraguay. Ex. 1, ¶23. As shown in the following chart, the amount of revenues from outside North America grew from 55% in 2009 to 75% in 2012 ($s in 000s).

| Region | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| North America[3] | $28,476 (45%) | $56,995 (42%) | $61,920 (31%) | $88,309 (25%) |
| South America | $3,916 (6%) | $13,520 (10%) | $50,824 (26%) | $88,325 (25%) |
| EMEA | $27,801 (44%) | $55,089 (40%) | $68,297 (35%) | $130,494 (37%) |
| APAC | $2,928 (5%) | $11,348 (8%) | $16,833 (8%) | $46,389 (13%) |
| Total | $63,121 | $136,952 | $197,874 | $353,517 |

---

3 Revenue from sales in the United States was $28.2 million in FY09, $56.2 million in FY10, $60.0 million in FY11 and $84.3 million in FY12. During a November 17, 2011 presentation, Ritchie stated that about one-half of the product sold in the United States was subsequently shipped outside the United States.

58. Fourth, the Company did not have registered trademarks for all its products in the various countries in which its products were sold. In its lawsuit against Kozumi, Ubiquiti stated that it had made "substantial intellectual property investments" to protect its corporate name and product name, including the filing of numerous trademark applications in the United States and abroad. Ex. 1, ¶¶24-35. The Company alleged that it had registered various trademarks with the United States Patent and Trademark Office ("USPTO"), including AIROS, AIRMAX, UBNT, AIRGRID, AIRCONTROL, AIRVIEW, UNIFI and AIRVISION. *Id.*, ¶¶25-33. But it did not have approved trademarks in the United States for numerous other hardware and software products (Airblast, Aircam, Airfiber, Airmaxsync, Bullet 2, Edgemax, Innerstation, MFI, Msensor, Mpower, Mport, Nanobridge, Nanostation, Picostation, Powerbridge, Rocket and Unitel) or even the Company's name (Ubiquiti and Ubiquiti Networks). *Id.*, ¶34. The Company also did not have approved trademarks in the numerous countries outside the United States in which it sold a majority of its products. *Id.*, ¶35.

59. Fifth, as shown in the following chart, the Company reported increasing revenues and high margins, which made it an attractive target for counterfeiters. Revenues more than tripled from $63.1 million in 2009 to $197.9 million in 2011. The gross margin was approximately 40%, and the operating margin was about 30% excluding 2010. Counterfeiters could potentially generate even higher margins because they would not incur research and development costs, which totaled $31.7 million in 2010 and $11.4 million in 2011 for Ubiquiti. They could also produce counterfeit products at lower costs by using cheaper materials and not obtaining regulatory certifications for the products. Ubiquiti's products were certified by Underwriters Laboratories. *Id.*, ¶21.

| $ in 000s | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Revenues | $63,121 | $136,952 | $197,874 | $353,517 |
| Cost of Revenues | $37,181 | $82,404 | $117,062 | $202,514 |
| Gross Profit | $25,940 | $54,548 | $80,812 | $151,003 |
| Gross Margin | 41.1% | 39.8% | 40.8% | 42.7% |
| Operating Expenses | $8,112 | $49,866 | $18,732 | $25,711 |
| Operating Income | $17,828 | $4,682 | $62,080 | $125,292 |
| Operating Margin | $28.2% | 3.4% | 31.4% | 35.4% |

60. Ubiquiti was also an attractive target for counterfeiters because sales of its flagship AirMax product line were growing significantly. The AirMax product line consists of a number of products, including the Nanostation, NanoStation M, NanoStation Loco M, PowerBridge M series, PicoStation M series, AirGrid M series, Rocket M series, NanoBridge M series and Bullet M series. As shown in the following chart, Ubiquiti's AirMax product line generated an increasing amount of revenues and represented a majority of the Company's revenues in FY11 and FY12 ($ in 000s).

| Product | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| AirMax | $0 (0%) | $37,525 (27%) | $113,001 (57%) | $223,743 (63%) |
| Other Systems | $49,764 (79%) | $75,368 (55%) | $47,397 (24%) | $81,551 (23%) |
| Embedded Radio | $12,958 (20%) | $14,047 (10%) | $14,762 (7%) | $10,056 (3%) |
| Antennas/Other | $399 (1%) | $10,012 (8%) | $22,714 (12%) | $38,167 (11%) |
| Total | $63,121 | $136,952 | $197,874 | $353,517 |

### B. An International Counterfeiting Scheme that Had Grown in Size from 2009 to 2011 Was Adversely Affecting Ubiquiti's Business at the Time of the IPO

#### 1. Pleadings and Documents Filed in the Kozumi Litigation Establish that Kozumi and Others Were Making and Selling Millions of Dollars of Counterfeit Ubiquiti Products that Were Causing Substantial Harm to Ubiquiti at the Time of the IPO

61. On May 18, 2012, Ubiquiti filed suit against Kozumi and Hsu claiming that they had been masterminding an international counterfeiting scheme by manufacturing and selling millions of dollars of counterfeit Ubiquiti products – primarily AirMax products – that caused substantial and irreparable harm to the Ubiquiti brand and business. In the first paragraph of Ubiquiti's first amended complaint, the Company stated the following:

> Defendants have masterminded an international counterfeiting scheme to profit illegally from Ubiquiti's established trademarks and goodwill in the wireless and networking technology markets. Using stolen source code and proprietary

> designs, Defendants have been manufacturing millions of dollars' worth of counterfeit Ubiquiti products, packaging them in boxes that are virtually identical to genuine Ubiquiti packaging, and selling them to unsuspecting customers throughout the world. These customers are deceived into believing that they are purchasing genuine Ubiquiti products when they are actually buying substandard counterfeit goods. The availability of these counterfeit products in the marketplace is causing substantial harm to the Ubiquiti brand and needs to be stopped immediately.

Ex. 1, ¶1.

62. Ubiquiti stated in its lawsuit that each counterfeit product sold represented a lost sale of a genuine Ubiquiti product and also directly harmed the Company's goodwill because the counterfeit products experienced more malfunctions than genuine Ubiquiti products, which increased complaints from customers who believed they were purchasing genuine Ubiquiti products. The Company stated that malfunctions and customer complaints could easily escalate and destroy Ubiquiti's reputation while increasing costs because the Company processed all warranty claims on counterfeit product to protect its goodwill.

> Each counterfeit product sold by Defendants represents not only a lost sale of a genuine Ubiquiti product, but also direct harm to Ubiquiti's goodwill. On information and belief, the counterfeit products do not undergo testing and are made from low quality materials that are certain to cause a lot more product malfunctions than genuine Ubiquiti products. In fact, Ubiquiti recently received a report of a failure rate of 12% on counterfeit products purchased by a longstanding Ubiquiti customer. Because Ubiquiti is dependent on word of mouth promotion for many of its sales, increases in product complaints from customers who believe they are purchasing genuine Ubiquiti products could easily escalate and destroy Ubiquiti's reputation. Furthermore, customer who bought counterfeit products can send them back back [sic] to Ubiquiti for warranty returns because they believe that such products are genuine products. To protect its goodwill, Ubiquiti processes all warranty returns in the same fashion – regardless of whether the products are genuine Ubiquiti products or Defendants' counterfeit products. Each "return" of a counterfeit product thus results in an additional out-of-pocket cost to Ubiquiti [when] Defendants are the ones to have reaped the profits.

*Id.*, ¶69.

63. In a brief filed in support of the Company's application for a temporary restraining order ("TRO"), Ubiquiti stated that the international counterfeiting scheme stretched far beyond the United States, was growing like an epidemic and causing irreparable harm to the Company each day, including significant lost revenue and devastating damage to its goodwill and reputation.

> This is no ordinary trademark infringement action. This case is about an international counterfeiting scheme with a U.S.-based ringleader who has stolen, defamed, blackmailed, and is willing to do anything to further his illegal agenda, including manipulating the U.S. stock market. Through this application for a [TRO],

> Ubiquiti . . . is seeking to stop the irreparable harm being caused to it each day. The ring leader is [Hsu], who is orchestrating the counterfeiting together with his wife Lilia Kung and through his company Kozumi USA Corp. The counterfeiting is masterminded by Hsu but stretches far beyond the U.S. borders and is growing like an epidemic. In addition to significant lost revenue, it is causing devastating damage to the good will and reputation of San Jose-based Ubiquiti.

Ex. 2 at 1.

64. Sworn statements made by Ubiquiti executives in the Kozumi litigation and internal Company documents filed therein establish that the international counterfeiting scheme was causing substantial, irreparable and devastating harm to Ubiquiti's brand and business in 2010 and 2011. They also show that Company executives were making substantial efforts to stop the counterfeiting, including defendant Pera, who wrote in December 2011 that he had "personally dedicated the last several months of [his] time focusing on [Kenny Deng]," the owner of the Hoky facility in Shenzhen, China that was manufacturing thousands of counterfeit Ubiquiti products. Ex. 6, ¶3 & ex. A. The counterfeiting had become such a problem at the time of the October 14, 2011 IPO that defendants had retained Chinese counsel to prepare a criminal complaint and had made arrangements with law enforcement authorities in China – the SPSB – to raid the Hoky manufacturing facility. The raid occurred on November 17, 2011, just one month after the IPO.

65. **Ubiquiti terminates distributor agreement with Kozumi in November 2009 after learning Kozumi was selling counterfeit products.** According to Moore, Ubiquiti's Vice President of Business Development, in May 2008 Ubiquiti and Kozumi entered into a distribution agreement under which Kozumi was a nonexclusive distributor of Ubiquiti products in Latin America. Ex. 3, ¶¶41-42 & ex. L. In addition to its office in Florida, Kozumi had offices in Argentina, Paraguay, Peru, Europe, Taiwan, Columbia and Brazil. Ex. 1, ¶41. Hsu also owned, managed and/or operated Syntronic S.A. ("Syntronic"), Tech Depot S.A. ("Tech Depot") and Omega Technology, companies in Argentina; Redemax S.A. ("Redemax"), a company in Paraguay; and Netcom, Inc. ("Netcom"), a company in Asia. *Id*., ¶¶51, 64.

66. While a Ubiquiti distributor, Kozumi sold the Company's products in Argentina, Paraguay and Brazil through Syntronic and Redemax. *Id*., ¶¶50-51. Kozumi placed 12 orders with Ubiquiti for $1,487,891.50 of product while a distributor. Ex. 3, ¶50 & ex. R.

67. In November 2009, however, Moore terminated the distribution agreement after learning Kozumi was offering copycat Ubiquiti products under the Kozumi name. Ex. 3, ¶48; Ex. 9, ¶10 & ex. I. Moore stated that he terminated the distributor relationship with Kozumi because he was concerned Hsu would use the strength of the Ubiquiti brand to draw resellers to its product offerings but then actually sell them Kozumi-branded products. *Id*.

68. **Ubiquiti executives learn that Kozumi and others continue to sell counterfeit products in 2010.** According to the Company, Kozumi and Hsu devised a worldwide scheme to sell counterfeit Ubiquiti products after Ubiquiti terminated Kozumi's distributor agreement in November 2009. Ex. 1, ¶56. Hsu worked with Deng, the owner of the Hoky Technology manufacturing facility located in Shenzhen, China, and their scheme involved: (a) stealing Ubiquiti's proprietary product designs from one of its approved contract manufacturers; (b) manufacturing counterfeit Ubiquiti products at the Hoky manufacturing facility; (c) selling the counterfeit Ubiquiti products in South America; and (d) fraudulently obtaining the trademark rights to the Ubiquiti brand in South America and the United States. *Id*., ¶¶56-57.

69. Throughout 2010, Ubiquiti executives were told by the Company's distributors that counterfeit products were being sold throughout the world. On February 12, 2010, Moore received an e-mail from Pushker Tiwari, a Ubiquiti distributor in India, informing him that a company called GO.IP Global Services was advertising a Kozumi product that was very similar to Ubiquiti products. Ex. 3, ¶49 & ex. Q.

70. On March 13, 2010, Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, blind carbon copied Moore on his e-mail response to Hsu in which Sajwani wrote that X-Concepts could not sell Ubiquiti products to Kozumi because Kozumi was outside its distribution territory. *Id*., ¶52 & ex. S. In addition, Sajwani wrote that X-Concepts had been receiving e-mails from clients inquiring why "the shape of [Kozumi's] devices looks like [Ubiquiti's] M Series a lot so most of our resellers have returned devices to us." *Id*.

71. On May 7, 2010, Moore noticed that Netcom WISP, a company that placed an order for Ubiquiti products, had the same bank information for wire transfers that was used by Kozumi when Kozumi was a Ubiquiti distributor. *Id*., ¶53 & ex. T. Moore e-mailed Steve Shaw, Ubiquiti's

contact with Netcom WISP, and asked him if he were affiliated with Hsu. Shaw responded that Netcom WISP was not an affiliate of Hsu but did business with Hsu's Asian company, Netcom; that Hsu introduced him to Ubiquiti; and that Hsu was no longer with Kozumi. *Id.* Moore believed Shaw and fulfilled the order. *Id.*

72. On May 27, 2010, Moore received an e-mail forwarded from Dimitrios Sidiropoulos of Aerial, a Ubiquiti distributor in Greece. *Id.*, ¶54 & ex. U. The forwarded e-mail was from a Kozumi sales manager inquiring whether Aerial would be interested in helping Kozumi establish a market presence in Greece. *Id.*

73. Moore stated that he contacted Ubiquiti distributors and asked them not to do business with Kozumi in response to Hsu's attempts to covertly and improperly acquire Ubiquiti products through authorized Ubiquiti distributors. *Id.*, ¶55. However, Kozumi and others continued to engage in the counterfeiting scheme.

74. In the second half of 2010, Hsu and his affiliates filed various Ubiquiti trademark applications in Argentina. On August 20, 2010, Jung Hsin Ping (a relative of Hsu, former Syntronic employee and shareholder of Tech Depot) filed three trademark applications in Argentina for the marks NANOSTATION, NANOBRIDGE and AIRGRID. Ex. 1, ¶87; Ex. 8, ex. E.

75. On October 20, 2010, Hsu acquired the Argentinean registration for UBIQUITI NETWORKS & Design from Ditelco Informatica S.R.L. ("Ditelco"), which had registered the trademark in May 2008. Ex. 1, ¶¶85-86; Ex. 8, exs. C-D. The next month, Hsu filed documents with the Argentina Trademark Office to record the assignment of the UBIQUITI NETWORKS & Design trademark. Ex. 1, ¶86.

76. **In 2011, the counterfeiting problems escalate, and Ubiquiti works with Chinese law enforcement authorities to raid the Hoky factory.** After obtaining the UBIQUITI NETWORKS & Design trademark in October 2010, Hsu sent a letter to Chinese customs authorities from Syntronic on January 1, 2011, in which he wrote that "We request that this letter serve as notification to all customs authorities that Syntronic S.A. has authorized Hoky Technology Ltd. to manufacture and export Ubiquiti Networks and UBNT products." Ex. 10, ex. D; Ex. 1, ¶62.

77. On January 19, 2011, Moore received an e-mail from Federico Sanguinetti ("Sanguinetti") of Laufquen Internet, a Ubiquiti distributor in Argentina, informing him that a competitor of Laufquen Internet in Argentina was selling Ubiquiti products with "Kozumi" labels on them that were made with a cheaper Power Over Ethernet ("POE") adapter and were offered for sale at lower prices. Ex. 3, ¶56 & ex. V. Sanguinetti said the Kozumi products created confusion among consumers, expressed concern that the Kozumi products were harming his business and asked if Ubiquiti could do something about it. *Id.* Moore responded that the "Kozumi guys have been doing all sorts of sneaky stuff" and that Ubiquiti would try to get it stopped. *Id.*

78. On March 4, 2011, Moore received an e-mail from Sebastian Tabellione ("Tabellione") of Microcom, another Ubiquiti distributor in Argentina. *Id.*, ¶57 & ex. W. Tabellione asked whether Ubiquiti had an agreement with Kozumi because Kozumi was selling Ubiquiti products in Argentina at much lower prices than Tabellione was able to offer for Ubiquiti products. *Id.* He also wrote that the Kozumi sales were "causing huge discredit to the [Ubiquiti] brand." *Id.* Tabellione attached a spreadsheet of imports from Syntronic that showed the price differences. *Id.* Moore responded that Ubiquiti was not supplying products to Syntronic and that ***Ubiquiti was doing everything it could to stop the sale of Kozumi's knockoff products***. *Id.*

79. The increase in counterfeiting activities being communicated to Ubiquiti by its distributors caused Company executives to take additional steps to address the problem. In March 2011, Ubiquiti hired Lin as a vice president of operations. He previously worked at Cameo, a Ubiquiti contract manufacturer located in Taiwan. Ex. 4, ¶2. Lin stated that, after he joined Ubiquiti, Pera told him there was a potential counterfeit issue in China and asked him to assist in the investigation of counterfeiting operations taking place at the Hoky factory in Shenzhen, China. *Id.*

80. As Ubiquiti was increasing its efforts to address the growing counterfeiting problems, its distributors continued to inform the Company's executives that counterfeit products were being manufactured in China and sold throughout the world. In late March 2011 or early April 2011, Moore was contacted by an employee at Lanbowan, a Ubiquiti distributor in China, and was informed that Hoky was manufacturing counterfeit Ubiquiti products at its factory and using the Ubiquiti brand on the products. Ex. 1, ¶70; Ex. 3, ¶58.

81. Moore and Pera visited the Hoky factory in April 2011 to investigate the counterfeiting allegations and were initially told by Hoky owner Deng that Hoky was not making counterfeit Ubiquiti goods. Ex. 3, ¶¶59-60. However, Deng then told them that "everybody does it." *Id*. Moore and Pera suspected counterfeit Ubiquiti products were being manufactured by Hoky because, during their taxi ride to the Hoky factory, the taxi driver called the factory and warned them that he was bringing two Americans to the factory. *Id*.

82. According to Moore, those suspicions were confirmed in late summer 2011, when Ubiquiti sent someone to the Hoky factory who reported that Hoky was making counterfeit Ubiquiti products. *Id*., ¶61. Ubiquiti then arranged for a person to pose as a potential distributor for Hoky's Ubiquiti products and received Hoky-manufactured Ubiquiti products. *Id*. Moore also worked with authorized Ubiquiti distributors in Argentina to acquire fake products for inspection. *Id*., ¶62. On August 30, 2011, Moore provided the products manufactured by Hoky and sold by Kozumi to Taylor, Ubiquiti's Senior Software Engineer. *Id*., ¶63; Ex. 5, ¶2. Taylor analyzed the products and confirmed they were counterfeit Ubiquiti products. *Id*.

83. In October 2011, Lin acquired counterfeit products from Tech Depot, an Argentinean company affiliated with Hsu, and determined that they were produced at another factory in Huizhou, China owned by Huizhou China Eagle Electronic Technology Co., Ltd. ("CEE"). Ex. 4, ¶¶3-4. CEE told Lin that it produced four different models of Ubiquiti printed circuit boards ("PCBs") for Hoky and that CEE produced 30,000 Ubiquiti PCBs for Hoky from June 2011 to August 2011. *Id*. Lin then sent someone to investigate the Hoky facility, and she sent Lin pictures of products made at that facility. *Id*., ¶5 & ex. A.

84. According to the Company and Moore, in September 2011, Hoky shipped 15,000 counterfeit Ubiquiti products to Syntronic with a total value of $680,000; and in October 2011, Hoky shipped 31,000 counterfeit products with a total value of about $1 million to various countries in the Middle East and to Paraguay, Turkey, Ukraine and China. Ex. 1, ¶72; Ex. 3, ¶64.

85. Moore stated that after Ubiquiti confirmed the products manufactured by Hoky and sold by Kozumi were counterfeit, Ubiquiti retained a law firm in China that worked with the SPSB to shut down the Hoky facility. Ex. 3, ¶63. Lin stated the products obtained from Hoky were

"virtually indistinguishable" from genuine Ubiquiti products. Ex. 4, ¶8. The actual raid on the Hoky factory occurred on November 17, 2011.

86. As he had done in 2010, Hsu registered Ubiquiti trademarks in Argentina and the United States in 2011. In June 2011, Lilia Kung, Hsu's former wife, filed an application in the United States for the UBIQUITI trademark. Ex. 1, ¶94; Ex. 8, ex. G. The next month, Hsu filed another trademark application in Argentina for UBNT in International Class 9. Ex. 1, ¶88; Ex. 8, ex. F.

87. Thus, at the time of the IPO, the international counterfeiting scheme had become such a problem that Ubiquiti had retained Chinese counsel and was working with the SPSB to shut down the Hoky facility. Further, there were other facilities manufacturing and distributing counterfeit Ubiquiti products. Defendants misled investors by concealing the counterfeiting problems and their adverse impact on Ubiquiti's business and representing in the Registration Statement and Prospectus that the sale of counterfeit products was only a risk that could adversely impact the Company's business.

### 2. A Former Ubiquiti Distributor Confirms the Counterfeiting Problems and Claims They Were Much More Widespread than Ubiquiti Alleges in its Lawsuit Against Kozumi

88. Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, knew about the counterfeiting problems. Information provided by Sajwani indicates the counterfeiting problems were even more widespread than Ubiquiti claims in its lawsuit against Kozumi. X-Concepts was an exclusive master distributor for Ubiquiti from 2008 until February 2011 and sold over $40 million of Ubiquiti products in 27 countries in the Middle East.

89. Sajwani said that Pera told him in 2009 to not sell Ubiquiti products to Kozumi because Ubiquiti had terminated its distributor agreement with Kozumi after learning Kozumi was selling copycat products. According to Sajwani, however, Kozumi was just one of many companies in a counterfeiting ring that had registered a Ubiquiti trademark in Argentina and sold counterfeit products there beginning in 2009. Sajwani said that Hoky sold Ubiquiti product designs to two other factories in China and that there were as many as 13 factories in China manufacturing counterfeit

Ubiquiti products. Sajwani also said that he discussed counterfeiting with Pera and Moore in 2010 and 2011 and with Ritchie during a face-to-face meeting in April 2011 at Ubiquiti's San Jose offices.

90. Sajwani said that the owner of Airlink Systems, a distributor in Pakistan, told him in mid-2009 that duplicate Ubiquiti products were available in China for 75% of the price at which Ubiquiti sold product to X-Concepts. Sajwani reviewed the product, determined it was identical to Ubiquiti's product and immediately e-mailed Pera and Moore. Sajwani also said that from 2009 to 2010, he continued to hear from resellers in Iraq, Saudi Arabia, Turkey and Europe that there was a growing availability of counterfeit Ubiquiti products in China and that he had telephone conversations with Pera and Moore throughout 2009 and 2010 about the problem. Sajwani also said that, in 2010, duplicates of Ubiquiti's AirMax products became available for the Nano Station, Nano Station Loco and NanoBridge, and cost 20% to 25% less than Ubiquiti's products. Sajwani said the counterfeiting problems became so severe that Ubiquiti approached internet service providers ("ISPs") directly rather than through its distributors and offered the ISPs reduced pricing.

91. Emails provided by Sajwani (and the Company in the Kozumi litigation) show that he discussed counterfeiting with Ubiquiti executives in 2010. On March 3, 2010, Moore sent an e-mail to Sajwani in which he wrote that he saw Kozumi products at a trade show and that it made him sick seeing how similar the packaging and designs were. Ex. 11 at 25. Moore sent Sajwani a follow-up e-mail the next day and wrote that it did not look good for a Ubiquiti partner to support companies that were intentionally copying Ubiquiti products. *Id*. at 27.

92. Pera also sent Sajwani an e-mail on March 4, 2010, writing that he had been receiving "more and more information confirming [Sajwani was] supporting the introduction of Ubiquiti clone competitors" and that Sajwani should protect Ubiquiti's market interests, "especially against companies who steal and copy our product designs." *Id.* at 26.

93. On March 8, 2010, Sajwani emailed Moore that he had a serious complaint about Lanbowan, a Ubiquiti distributor in China, because Lanbowan was e-mailing customers that it could supply Ubiquiti product at very low prices. Ex. 11 at 28. He also wrote that one of his customers, Pakistan Airlinxsys, went to Lanbowan's warehouse and was offered original and "duplicate"

Ubiquiti products. *Id.* Sajwani reported that the "duplicate" products were almost 30% cheaper than the original products. *Id.* Moore responded that he would look into it. *Id.*

94. On March 13, 2010, Sajwani emailed Hsu (and blind copied Moore) that X-Concepts would not sell Ubiquiti product to Kozumi because Sajwani did not want any problems with Ubiquiti. Ex. 3, ¶52 & ex. S. Sajwani also wrote that he had been getting e-mails from clients in Iraq and Iran that the shape of Kozumi devices looked like Ubiquiti products and that it was a big problem. *Id.* In addition, Sajwani wrote that his sales team had complained that Kozumi's products looked exactly the same as Ubiquiti products. *Id.*

95. Sajwani posted documents to his blog showing that Pera and other Ubiquiti executives knew counterfeit products were also being sold in Iran. According to Sajwani, a company named Lavan Network ("Lavan") registered the Ubiquiti logo in Iran in November 2009. At that time, X-Concepts was Ubiquiti's exclusive distributor in Iran and sold product in Iran though a company named Alfa Technologies ("Alfa"). In November 2009, Iranian authorities confiscated Ubiquiti products Alfa tried to sell in Iran because of the Ubiquiti logo registered by Lavan.

96. As a result, Ubiquiti took steps to register its name and logo in Iran, as reflected in e-mail communications between Pera and others in 2009 and 2010. On December 24, 2009, Sajwani e-mailed Don Gibson at dgibson@patent-tech.com (and copied Pera and Moore) that Ubiquiti and X-Concepts wanted to file a complaint against a company that Senao/Engenius was supporting in Iran. Ex. 11 at 1. Pera authorized Gibson to conduct an Iranian trademark search on December 25, 2009. *Id.* Two days later, Pera forwarded to Gibson (and copied Sajwani and Moore) an e-mail received from Ariya, the manager of Alfa, asking Gibson to prepare documents for Ubiquiti to register its trademark in Iran and to prove Alfa was an authorized reseller of Ubiquiti product in Iran. *Id.* at 2.

97. On January 8, 2010, Ariya emailed the law offices of Dr. Laghaee & Associates Inc. Int'l located in Tehran, Iran and provided the firm with the Ubiquiti brand and trademark registration history. *Id.* at 3. On January 12, 2010, the Laghaee law firm responded that the documents were of no use in Iran and that the trademark owner must file a trademark application in Iran and then provide a certified and legalized version of the trademark certifications. *Id.* at 4. Ariya forwarded

the Laghaee response to Moore on January 14, 2010 and told him to contact the firm directly if he had any questions. *Id*. at 7. He also wrote that the person who had registered Ubiquiti's logo in Iran was trying to use it on low quality products, such as hub switches, passive products, etc., and that everyone was worried because this "scenario [was] becoming public all around the region & world," and that Ubiquiti needed to take "fast action" to "keep [its] brand top & clean from these types of dirty competition." *Id*.

98. On January 14, 2010, Sajwani emailed Moore and Ariya that all clients in the region were getting worried, suggested Ubiquiti hire a law firm to handle the case and noted that Ariya recommended the Laghaee law firm. *Id*. at 5. On January 15, 2010, Moore e-mailed Ariya that Ubiquiti's lawyers were preparing documents and asked why "they are stopping sale of products in Iran for this" and whether the next step was to register in Iran right away. *Id*. at 11. The next day, Ariya e-mailed Moore and Sajwani contact information for the Laghaee law firm and a list of documents needed from Ubiquiti. *Id*. at 13-14.

99. On January 19, 2010, Ariya e-mailed Moore and Sajwani to clarify the problem and explain what needed to be done. *Id*. at 16-17. Ariya wrote that a company named Lavan had registered the Ubiquiti brand name and logo in Iran to take advantage of Ubiquiti's name recognition. *Id*. He wrote that Ubiquiti product shipped to Iran by his company and X-Concepts was being held by the Iranian court because of the Ubiquiti registration by Lavan and that Ubiquiti needed to pursue the illegal registration so Ubiquiti could sell product in Iran and protect its name and reputation in Iran and the entire Middle East. *Id*. Moore responded that Ubiquiti would do what was necessary to get the problem resolved and had already started the process of getting registered in Iran. *Id*. at 18.

100. According to Sajwani, he, Moore, Ariya and representatives from Lavan met at the Atlantis Hotel in Dubai in January 2010 in an attempt to negotiate an agreement, but the parties were unable to reach an agreement. As a result, Ubiquiti, X-Concepts and Alfa retained legal counsel to invalidate the logo registered by Lavan.

101. On March 10, 2010, Pera, Moore and others received an e-mail from Ariya informing them that he had visited Ubiquiti's lawyer in Tehran and that "UBNT" had been registered in Iran

instead of Ubiquiti's known logo, which Ubiquiti needed to register. *Id*. at 29. Ariya also wrote that he was not getting cooperation from Ubiquiti's Tehran lawyer to get his goods released. Ariya concluded the e-mail by stating that Alfa had sold a huge quantity of Ubiquiti products and now felt that no one cared about it.

102. On April 12, 2010, Ariya e-mailed Moore steps that could be taken to get Ubiquiti's known logo registered in Iran. *Id*. at 30. On June 8, 2010, Ariya emailed Sajwani that Alfa was still trying to solve the problem, was asked by the Laghaee law firm to provide Ubiquiti invoices for Alfa purchases in 2008 and asked if Sajwani could provide the invoices. *Id*. at 31. On August 11, 2010, Moore e-mailed Sajwani that Ubiquiti had received confirmation that all was complete and that the Company was just waiting for certifications. *Id*. at 32. On September 3, 2010, Ariya e-mailed Moore (and copied Sajwani, Gibson and Fitzgerald) and asked for an update on the Ubiquiti registration in Iran. *Id*. at 33.

103. Sajwani stated that Pera and Moore stopped communicating with him at the end of 2010 and that Ritchie became his Ubiquiti contact. Ubiquiti terminated its distribution agreement with X-Concepts in February 2011 and reported in the Registration Statement and Prospectus that it did so after discovering X-Concepts was selling Ubiquiti's products in Iran in violation of U.S. export controls and economic sanctions laws. The Company acknowledged in the Registration Statement and Prospectus that it allowed sales to Iran until early 2010 and that it "overlooked" various emails from X-Concepts that showed X-Concepts (and another distributor) continued to sell Ubiquiti product in Iran in 2010 and 2011.

104. Sajwani stated that Pera and Ritchie knew X-Concepts was selling Ubiquiti product in Iran in 2010 and 2011 and that he personally discussed the sales with Ritchie in April 2011 at Ubiquiti's offices in San Jose. He received an e-mail from Ritchie on April 26, 2011 in which Ritchie claimed he was surprised about sales of Ubiquiti product in Iran. *Id*. at 34.

105. Sajwani also stated that Pera met him in Dubai in October 2011 and told him that: (a) Ubiquiti "played innocent" during the federal investigation of the Company's sales to Iran; (b) Ubiquiti blamed X-Concepts for the illegal sales to Iran; and (c) Pera would destroy X-Concepts, Sajwani and his family if Sajwani did not agree to shut down X-Concepts or if he disputed

Ubiquiti's claims that it was not aware of the sales to Iran. Sajwani said he reported the incident to Dubai authorities and that he was interviewed by the SEC and FBI in July 2012 about Ubiquiti's sales in Iran.

106. Although Ubiquiti terminated X-Concepts' distributorship in February 2011, the information provided by Sajwani shows that he and Ariya discussed the sale of counterfeit products in Iran and other countries with Pera, Ritchie and Moore in 2010 and 2011.

### C. Defendants Failed to Disclose the International Counterfeiting Scheme in the Registration Statement and Prospectus and Falsely Represented that the Sale of Counterfeit Products Was Just a Possibility that Could Adversely Affect Ubiquiti's Business

107. Defendants began preparing the Registration Statement and Prospectus months before the October 14, 2011 IPO while the international counterfeiting scheme was adversely affecting Ubiquiti's business. On June 17, 2011, Ubiquiti filed with the SEC a Form S-1 Registration Statement ("Registration Statement"). The Registration Statement was subsequently amended on July 28, 2011, August 12, 2011, September 16, 2011, October 4, 2011 and October 13, 2011. The October 13, 2011 amendment that Ubiquiti filed with the SEC on Form S-1/A was the fifth and final amendment to the Registration Statement and was signed by Ubiquiti's officers and directors. The four Underwriter Defendants helped draft and disseminate the Registration Statement and Prospectus.

108. The Registration Statement incorporated by reference all subsequently filed prospectuses. On October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which formed part of the Registration Statement and which became effective on October 14, 2011.

109. The IPO was successful for the Company, its insiders and the underwriter. At least 7.038 million shares of Ubiquiti common stock were sold to the public at $15 per share, raising $105.6 million in gross proceeds for the Company and the selling shareholders. In the IPO, several of Ubiquiti's officers and directors sold shares of their personally held Ubiquiti stock. Defendant Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2 million. John Sanford, the Company's Chief Technology Officer, sold 123,145 shares of his Ubiquiti stock for gross

proceeds of $1.8 million. Moore, Vice President of Business Development, sold 374,370 shares of his Ubiquiti stock for gross proceeds of $5.6 million.

110. However, defendants misled investors by failing to disclose the international counterfeiting scheme that had been adversely affecting Ubiquiti's business for two years and by falsely representing that the sale of counterfeit products was just a possibility that could adversely affect the Company's business. Those material misrepresentations and omissions created the false impression that counterfeiting was not a current problem in October 2011 but merely a potential risk. Specifically, defendants created that false impression by representing that Ubiquiti's ability to sell its products at competitive prices and to be the sole provider of its products ***might*** be adversely affected – and that its business, operating results and financial condition ***could*** be materially and adversely affected – ***if*** the Company were unsuccessful in stopping counterfeit products by monitoring and enforcing its intellectual property rights in China.

> ***If our contract manufacturers do not respect our intellectual property and trade secrets and if they or others produce competitive products reducing our sales or causing customer confusion, our business, operating results and financial condition could be materially adversely affected***.
>
> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge. Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, ***we may be unsuccessful in monitoring and enforcing our intellectual property rights in China. We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products. Although we take steps to stop counterfeits, we may not be successful*** and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand may be harmed. ***If such an impermissible use of our intellectual property or trade secrets were to occur, our ability to sell our products at competitive prices and to be the sole provider of our products may be adversely affected and our business, operating results and financial condition could be materially and adversely affected***.

111. Defendants also misled investors by representing that Ubiquiti's ability to compete effectively and to defend the Company from litigation ***could*** be impaired ***if*** the Company failed to protect its intellectual property rights adequately. They further perpetuated the false impression that counterfeiting was not a current problem by stating that unauthorized use of the Company's

intellectual property had occurred in the past, that it might occur in the future without the Company's knowledge and that the steps Ubiquiti had taken might not prevent unauthorized use of its intellectual property:

> ***If we fail to protect our intellectual property rights adequately, our ability to compete effectively or to defend ourselves from litigation could be impaired, which could reduce our revenues and increase our costs*.**
>
> ***We rely primarily on patent, copyright, trademark and trade secret laws, as well as confidentiality and non-disclosure agreements and other methods, to protect our proprietary technologies and know-how***. As of June 30, 2011, we had six patents pending in several countries, including the United States, and two issued patents. The prospective rights sought in our pending patent applications may not be meaningful or provide us with any commercial advantage and they could be opposed, contested, circumvented or designed around by our competitors or be declared invalid or unenforceable in judicial or administrative proceedings. Any failure of our patents to adequately protect our technology might make it easier for our competitors to offer similar products or technologies. In addition, patents may not issue from any of our current or future applications.
>
> Monitoring unauthorized use of our intellectual property is difficult and costly. ***Unauthorized use of our intellectual property has occurred in the past and may occur in the future without our knowledge. The steps we have taken may not prevent unauthorized use of our intellectual property***. Further, we may not be able to detect unauthorized use of, or take appropriate steps to enforce our intellectual property rights. Our competitors may also independently develop similar technology. ***Our failure to effectively protect our intellectual property could reduce the value of our technology in licensing arrangements or in cross-licensing negotiations, and could impair our ability to compete. Any failure by us to meaningfully protect our intellectual property could result in competitors offering products that incorporate our most technologically advanced features, which could seriously reduce demand for our products***. We may in the future need to initiate infringement claims or litigation. Litigation, whether we are a plaintiff or a defendant, can be expensive and time-consuming and may divert the efforts of our technical staff and managerial personnel, which could result in lower revenues and higher expenses, whether or not such litigation results in a determination favorable to us.

112. Similarly, defendants misled by representing that enforcement of Ubiquiti's intellectual property rights abroad, particularly in China, was limited and often difficult, which ***could*** allow intellectual property infringers to continue unimpeded:

> ***Enforcement of our intellectual property rights abroad, particularly in China, is limited and it is often difficult to protect and enforce such rights***.
>
> Patent protection outside the United States is generally not as comprehensive as in the United States and may not protect our intellectual property in some countries where our products are sold or may be sold in the future. Even if patents are granted outside the United States, effective enforcement in those countries may not be available. Many companies have encountered substantial intellectual property

> infringement in countries where we sell, or intend to sell, products or have our products manufactured.
>
> ***In particular, the legal regime relating to intellectual property rights in China is limited and it is often difficult to protect and enforce such rights***. The regulatory scheme for enforcing China's intellectual property laws may not be as developed as regulatory schemes in other countries. ***Any advancement of an intellectual property enforcement claim through China's regulatory scheme may require an extensive amount of time, allowing intellectual property infringers to continue largely unimpeded, to our commercial detriment in the Chinese and other export markets***. In addition, rules of evidence may be unclear, inconsistent or difficult to comply with, making it difficult to prove infringement of our intellectual property rights. As a result, enforcement cases involving technology, such as copyright infringement of software code, or unauthorized manufacture or sale of products containing patented inventions, may be difficult or not possible to sustain.
>
> These factors may make it increasingly complicated for us to enforce our intellectual property rights against parties misappropriating or copying our technology or products without our authorization, allowing competing enterprises to harm our business in the Chinese or other export markets by affecting the pricing for our products, reducing our own sales and diluting our brand or product quality reputation.

113. Defendants also misled by representing that effective trademark protection ***might*** not be available in every country in which the Company sold its products, that others ***might*** develop technologies that infringed Ubiquiti's intellectual property and that the Company's legal efforts ***might*** not be successful against possible infringers.

> We rely on a combination of patent, copyright, trademark and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect our proprietary rights. These laws, procedures and restrictions provide only limited protection and the legal standards relating to the validity, enforceability and scope of protection of intellectual property rights are uncertain and still evolving. Furthermore, ***effective patent, trademark, copyright and trade secret protection may not be available in every country in which our services and products are available***.
>
> * * *
>
> We endeavor to enter into agreements with our employees and contractors and with parties with whom we do business in order to limit access to and disclosure of our proprietary information. ***We cannot be certain that the steps we have taken will prevent unauthorized use or reverse engineering of our technology. Moreover, others may independently develop technologies that are competitive with ours or that infringe on our intellectual property***. ***The enforcement of our intellectual property rights also depends on the success of our legal actions against these infringers, but these actions may not be successful, even when our rights have been infringed.***

114. Each of the above representations was materially inaccurate and misleading, contained untrue statements of material fact and omitted other facts necessary to make the

representations not misleading. Specifically, the representations were materially inaccurate and misleading because they failed to disclose that: (a) Ubiquiti's business had already been adversely impacted by the growing international counterfeiting scheme occurring in China and elsewhere; (b) Kozumi and others were using the Company's intellectual property to manufacture and sell thousands of counterfeit Ubiquiti products at prices substantially lower than Ubiquiti's prices; and (c) Ubiquiti's efforts to enforce its intellectual property rights had not prevented the unauthorized use of its intellectual property by Kozumi and others that were selling counterfeit products largely unimpeded.

## VI. DEFENDANTS VIOLATED THE 1934 ACT BY KNOWINGLY OR RECKLESSLY MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS AFTER THE IPO

### A. November 10 and 14, 2011: Defendants Report Ubiquiti's 1Q12 Results, Make the Same Misleading Statements in the 1Q12 Form 10-Q that Were Included in the Prospectus and Continue to Conceal the Growing Counterfeit Product Problems

115. Pleadings and documents filed in the Kozumi litigation by Ubiquiti establish that the counterfeiting problems continued to plague the Company after the completion of the IPO in October 2011. Moore and Lin explained in their declarations that they obtained products from the Hoky factory, Tech Depot (a company in Argentina affiliated with Hsu) and Ubiquiti distributors in Argentina in October and November 2011 and confirmed they were counterfeit. Ex. 3, ¶¶61-63; Ex. 4, ¶¶3-4. The Company had also retained a law firm in China that was preparing a criminal complaint and working with the SPSB to shut down the Hoky facility. Ex. 3, ¶63.

116. On November 8, 2011, Ceren Muhendislik, a Ubiquiti distributor in Turkey, obtained counterfeit products from Hoky on Ubiquiti's behalf. Ex. 4, ¶6 & ex. B. According to Moore, in the first two weeks of November 2011, Hoky shipped over 8,000 counterfeit products valued at more than $350,000. Ex. 1, ¶72. According to Lin, on November 14, 2011, the Ubiquiti employee that Lin sent to Hoky told Lin that another 6,000 units of counterfeit Ubiquiti products were ready to ship to Kozumi. Ex. 4, ¶9. Lin stated that, with this information, the SPSB agreed to raid the Hoky factory when Deng was at the factory so they could detain him. *Id*. The raid occurred on November 17, 2011. *Id*., ¶10.

117. On November 10, 2011, Ubiquiti issued a press release announcing its financial results for 1Q12, the quarter ending September 30, 2011. The press release was also filed with the SEC on a Form 8-K signed by Ritchie. The Company reported revenue of $79.2 million, net income of $21.5 million and non-GAAP diluted earnings per share ("EPS") of $0.23. On November 14, 2011, Ubiquiti filed a Form 10-Q with the SEC reporting its 1Q12 results. The Form 10-Q was signed by Pera and Ritchie. In the Form 10-Q, defendants Ubiquiti, Pera and Ritchie misled investors by perpetuating the false impression that the sale of counterfeit products was not a current problem. As they did in the Registration Statement and Prospectus, defendants represented that the Company's business, operating results and financial condition ***could*** be materially adversely affected ***if*** counterfeit goods were being sold as Ubiquiti products.

> ***If our contract manufacturers do not respect our intellectual property and trade secrets and if they or others produce competitive products reducing our sales or causing customer confusion, our business, operating results and financial condition could be materially adversely affected.***
>
> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge. Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, ***we may be unsuccessful in monitoring and enforcing our intellectual property rights in China. We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products. Although we take steps to stop counterfeits, we may not be successful*** and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand may be harmed. ***If such an impermissible use of our intellectual property or trade secrets were to occur, our ability to sell our products at competitive prices and to be the sole provider of our products may be adversely affected and our business, operating results and financial condition could be materially and adversely affected.***

118. Defendants also made other representations that were included in the Registration Statement and Prospectus that further perpetuated the false impression that counterfeiting was not a current problem.

> ***If we fail to protect our intellectual property rights adequately, our ability to compete effectively or to defend ourselves from litigation could be impaired, which could reduce our revenues and increase our costs.***
>
> ***We rely primarily on patent, copyright, trademark and trade secret laws, as well as confidentiality and non-disclosure agreements and other methods, to***

***protect our proprietary technologies and know-how.*** The prospective rights sought in our pending patent applications may not be meaningful or provide us with any commercial advantage and they could be opposed, contested, circumvented or designed around by our competitors or be declared invalid or unenforceable in judicial or administrative proceedings. Any failure of our patents to adequately protect our technology might make it easier for our competitors to offer similar products or technologies. In addition, patents may not issue from any of our current or future applications.

Monitoring unauthorized use of our intellectual property is difficult and costly. ***Unauthorized use of our intellectual property has occurred in the past and may occur in the future without our knowledge. The steps we have taken may not prevent unauthorized use of our intellectual property.*** Further, we may not be able to detect unauthorized use of, or take appropriate steps to enforce our intellectual property rights. Our competitors may also independently develop similar technology. ***Our failure to effectively protect our intellectual property could reduce the value of our technology in licensing arrangements or in cross-licensing negotiations, and could impair our ability to compete. Any failure by us to meaningfully protect our intellectual property could result in competitors offering products that incorporate our most technologically advanced features, which could seriously reduce demand for our products.*** We may in the future need to initiate infringement claims or litigation. Litigation, whether we are a plaintiff or a defendant, can be expensive and time-consuming and may divert the efforts of our technical staff and managerial personnel, which could result in lower revenues and higher expenses, whether or not such litigation results in a determination favorable to us.

***Enforcement of our intellectual property rights abroad, particularly in China, is limited and it is often difficult to protect and enforce such rights.***

Patent protection outside the United States is generally not as comprehensive as in the United States and may not protect our intellectual property in some countries where our products are sold or may be sold in the future. Even if patents are granted outside the United States, effective enforcement in those countries may not be available. Many companies have encountered substantial intellectual property infringement in countries where we sell, or intend to sell, products or have our products manufactured.

***In particular, the legal regime relating to intellectual property rights in China is limited and it is often difficult to protect and enforce such rights.*** The regulatory scheme for enforcing China's intellectual property laws may not be as developed as regulatory schemes in other countries. ***Any advancement of an intellectual property enforcement claim through China's regulatory scheme may require an extensive amount of time, allowing intellectual property infringers to continue largely unimpeded, to our commercial detriment in the Chinese and other export markets.*** In addition, rules of evidence may be unclear, inconsistent or difficult to comply with, making it difficult to prove infringement of our intellectual property rights. As a result, enforcement cases involving technology, such as copyright infringement of software code, or unauthorized manufacture or sale of products containing patented inventions, may be difficult or not possible to sustain.

119. Defendants knew or were reckless in not knowing the above representations were materially false and misleading because the Company's business, operating results and financial

condition ***were*** being materially adversely affected by the sale of counterfeit products. Pera, Ritchie and other Ubiquiti executives had known about the international counterfeiting scheme for years; and the Company admitted in its lawsuit against Kozumi and Hsu that the sale of counterfeit products caused "irreparable harm," including "significant lost revenue" and "devastating damage to the good will and reputation of . . . Ubiquiti." Ex. 1, ¶1; Ex. 2 at 1.

120. Following the release of Ubiquiti's 1Q12 results, analysts issued positive reports on the Company that perpetuated the false impression that the sale of counterfeit product was not adversely affecting Ubiquiti's business. On November 23, 2011, Deutsche Bank initiated coverage with a Buy rating and a stock price target of $30 per share. It reported that Ubiquiti had developed a highly cost-effective model for providing internet access to the surprisingly large portion of the global population that had little or no internet access and that the rising demand for broadband access and the Company's established presence gave it a sizable advantage in the market. Deutsche Bank listed several key risks that could negatively impact Ubiquiti's future performance, but the risk of counterfeiting was not included.

121. Similarly, on January 6, 2012, Wunderlich Securities initiated coverage with a Buy rating and a 12-month price target of $25. It reported that the deployment of the Company's products by grass-roots operators had enabled Ubiquiti to achieve highly profitable growth and a unique scale among suppliers of outdoor WiFi equipment. Wunderlich Securities also reported that it expected Ubiquiti's strong growth and high operating margins to continue as network operators utilizing the Company's solutions delivered broadband to underserved or poorly served consumers.

### B. January 31, 2012: Defendants Report Ubiquiti's 2Q12 Results, Continue to Make Materially False and Misleading Statements and Conceal the Growing Counterfeit Problems and Their Adverse Impact on Ubiquiti

122. Pleadings and documents filed in the Kozumi litigation by Ubiquiti establish that Pera, Ritchie and other Ubiquiti executives learned additional adverse information about the international counterfeiting scheme and its adverse impact on Ubiquiti's business before the Company reported its 2Q12 results on January 31, 2012. On November 17, 2011, the SPSB raided the Hoky factory and took Deng into custody. Lin accompanied the SPSB on the raid and found

thousands of counterfeit products labeled with Ubiquiti trademarks. Ex. 4, ¶¶10-17. He obtained shipping records that showed: (a) 6,000 units of counterfeit product were shipped from Hoky to Kozumi on November 16, 2011 that were to be sent to Paraguay; and (b) 31,000 units of counterfeit product were shipped in October 2011. *Id.*, ¶11. Lin also saw boxes containing at least 1,200 units of counterfeit product in the back of the factory ready for shipment and a fraudulent plaque stating that Hoky was an authorized Ubiquiti distributor. *Id.*, ¶¶15-16.

123. At the end of the raid, the SPSB padlocked the doors to the Hoky factory and took Deng, the owner of the Hoky factory, into custody. Ex. 4, ¶17. Defendants also learned how Ubiquiti's proprietary information was stolen during the raid. Defendants learned that Hoky's process engineer, Zhang Ping, was formerly employed by two of Ubiquiti's contract manufacturers and therefore had access to all of Ubiquiti's proprietary plans, test files and other information needed to produce and replicate Ubiquiti products. *Id.*, ¶¶18-20. When contacted by Ubiquiti, Zhang reportedly said he knew everything about Hoky and would provide information if paid RMB 50,000. *Id.*, ¶22. However, the Company was subsequently unable to contact Zhang. *Id.*

124. On December 22, 2011, Pera sent an e-mail to Hsu informing him that Deng was in jail awaiting trial and that Pera had "***personally dedicated the last several months of my time solely focusing on him***." Ex. 6, ex. A. Pera also wrote that it appeared Hsu was unaware the products manufactured at the Hoky factory were counterfeit and that Pera needed Hsu's assistance in transferring to Ubiquiti all Ubiquiti trademarks registered in Argentina. *Id.* Following Pera's December 22, 2011 e-mail, the problems escalated.

125. Defendants learned that Hsu had acquired the UBIQUITI NETWORKS & Design trademark in Argentina, that Deng had been released from prison and that Kozumi and Deng would only stop manufacturing and selling counterfeit Ubiquiti product if they were paid millions of dollars. On December 22, 2011, Hsu responded to Pera's December 22, 2011 e-mail and informed Pera that Kozumi had acquired the "Ubiquiti Networks" trademark in Argentina from Ditelco for $350,000 and that he was trying to help Deng because Deng owed Kozumi $1.2 million. Ex. 6, ex. A; Ex. 9, ¶¶13-15 & exs. 3-4. After Pera responded and asked why Hsu was helping a criminal like Deng and again asked if Hsu would be assigning the trademarks in Argentina to Ubiquiti, Hsu wrote

that he would not absent assurances from Pera that Ubiquiti would help Kozumi cover its losses and permit Kozumi to be a Ubiquiti distributor. Ex. 9, ex. 5.

126. In December 2011, Pera, Ritchie and other Ubiquiti executives learned that Deng was released from custody because he produced documents showing that Hsu owned the trademark registration for Ubiquiti and that Deng reopened the Hoky factory and resumed making counterfeit Ubiquiti products. Ex. 3, ¶65. Moreover, according to the Company, the Hoky factory grew in size; and Deng's relatives opened other counterfeit factories that made larger quantities and a wider variety of Ubiquiti products, including Ubiquiti's more expensive products, such as AIRGRID and NANOBRIDGE. Ex. 1, ¶¶77-78.

127. On December 26, 2011, Hsu e-mailed Pera that Deng had been released from custody and that he would stop selling products with the Ubiquiti trademark if: (a) Ubiquiti withdrew all legal actions against Deng; (b) Ubiquiti guaranteed it would not take legal action against Deng, Hsu or Kozumi; and (c) Ubiquiti agreed to cover $2.5 million of losses incurred by Kozumi and Hoky. Ex. 6, ¶4 & ex. B.

128. On January 11, 2012, Hsu e-mailed Pera that Pera had not responded to his latest e-mails, that there were many reasons Pera should settle legal issues with Deng as soon as possible and that Deng would take many actions that would hurt Ubiquiti if the Company continued to persecute him. *Id.*, ¶5 & ex. C. Hsu wrote that Deng was claiming Ubiquiti and its distributors were not complying with laws and regulations in China; that there were many problems that Deng could cause Pera and Ubiquiti if Deng believed Pera's intent was to put him in jail; and that Deng had already collected strong evidence that distributors were illegally importing Ubiquiti products using smuggling companies from Hong Kong. Hsu warned that Deng's evidence could result in confiscation of Ubiquiti product, heavy penalties and jail time. Hsu also wrote that Deng's lawyers planned to denounce Ubiquiti's illegal sales in China without a license, which could result in heavy penalties, and claimed Deng had collected evidence that Ubiquiti lawyers bribed local police to illegally persecute him. Hsu concluded the e-mail by stating that Pera should consider reaching a peaceful settlement with Deng. *Id.*

129. After Pera did not respond to Hsu's e-mail, Hsu took actions to protect the Ubiquiti trademark in Argentina that he had previously acquired. On January 30, 2012, Hsu filed oppositions to Ubiquiti's pending Argentinean trademark applications for UBNT, Ubiquiti Networks & Logo and Ubiquiti Logo. Ex. 1, ¶¶86, 93. Pera and Ritchie also learned that Hsu's other companies in Argentina – Redemax, Netcom and Tech Depot – were offering counterfeit Ubiquiti products. *Id.*, ¶¶90-91.

130. As set forth in the sworn declaration of Ritchie, defendants also knew that the international counterfeiting scheme had caused sales orders in Argentina to plummet in 2Q12. Ritchie stated in his sworn declaration that: (a) sales orders from Argentina declined 88% from $6.3 million in 1Q12 to $726,734 in 2Q12, which was the lowest level of sales in Argentina in the last three years; (b) the book-to-bill ratio declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12; (c) the sales order drop caused great harm to Ubiquiti; (d) sales orders from Argentina would have been $3.3 million absent the counterfeiting; and (e) the harm to Ubiquiti was even greater because counterfeit goods were being sold in countries other than Argentina. Ex. 7, ¶¶5-8. As Ritchie explained in his declaration, the decline in the book-to-bill ratio to 0.16 reflected falling demand. *Id.*, ¶4.

131. Sajwani stated that he learned in January 2012 that customers could buy Ubiquiti products directly from Chinese factories at cheaper prices. Sajwani was told by WiFi Link, one of his Russian customers, that it was able to buy Ubiquiti products from one Chinese factory at a 6% discount and from another Chinese factory at a 25% discount.

132. Thus, by January 31, 2012, Pera and Ritchie knew that the counterfeiting problems were getting worse because: (a) Deng had been released from custody; (b) the Hoky factory had resumed manufacturing counterfeit products and had grown in size; (c) Deng's relatives opened other counterfeit factories that made larger quantities and a wider variety of Ubiquiti products; (d) Hsu was selling counterfeit Ubiquiti product through various companies in Argentina; (e) Hsu was demanding $2.5 million for Kozumi and Hoky to stop manufacturing and selling counterfeit Ubiquiti products; (f) Hsu was not transferring to Ubiquiti all Ubiquiti trademarks registered in Argentina and was opposing Ubiquiti's pending trademark applications in Argentina; and (g) sales orders of Ubiquiti product from Argentina had plummeted from 1Q12 to 2Q12.

133. Nevertheless, Pera and Ritchie failed to disclose any of the above adverse information when they reported Ubiquiti's 2Q12 results on January 31, 2012 and made statements that they knew or were reckless in not knowing were materially false and misleading. The press release reporting Ubiquiti's 2Q12 results was also filed with the SEC on a Form 8-K signed by Ritchie. Ubiquiti reported 2Q12 results that exceeded expectations, including $87.8 million of revenue, $24.7 million of net income and non-GAAP EPS of $0.27. During the conference call on January 31, 2012, Pacific Crest Securities analyst Brent Bracelin asked what countries in the Asia Pacific region and South America region drove the upside in 2Q12. Pera knowingly or recklessly misled investors by concealing the international counterfeiting scheme's impact on sales orders in Argentina and stating that orders from Latin America, including Argentina, were consistent with the prior quarter.

> We are seeing international orders across the board for all the product line. ***And in terms of the big hitters, in each of the regions they are consistent with the prior quarter***, with the exception of Asia. India – India moved up this quarter, but the ***other big hitters in Latin America remain Brazil, Paraguay, Argentina. Those are the big countries down there***.

134. Ubiquiti, Pera and Ritchie knew or were reckless in not knowing those representations were materially false and misleading because sales orders from Argentina – one of the Company's big hitters in Latin America – were not consistent with the prior quarter. As Ritchie stated in his sworn declaration, sales orders from Argentina had plummeted 88% from $6.3 million in 1Q12 to $726,734 in 2Q12, and the book-to-bill ratio declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12. Ex. 7, ¶¶5-7. Ritchie stated those declines caused great harm to Ubiquiti and that the actual harm to Ubiquiti was even greater because counterfeit goods were being sold in countries other than Argentina. *Id.*, ¶¶8-11.

135. On January 31, 2012, the Company also filed the 2Q12 Form 10-Q, which Pera and Ritchie signed. They misled investors by again representing that the Company's business, operating results and financial condition ***could*** be materially adversely affected ***if*** counterfeit goods were being sold as Ubiquiti products.

> ***If our contract manufacturers do not respect our intellectual property and trade secrets and if they or others produce competitive products reducing our sales or causing customer confusion, our business, operating results and financial condition could be materially adversely affected.***

> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge. Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, ***we may be unsuccessful in monitoring and enforcing our intellectual property rights in China. We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products. Although we take steps to stop counterfeits, we may not be successful*** and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand may be harmed. ***If such an impermissible use of our intellectual property or trade secrets were to occur, our ability to sell our products at competitive prices and to be the sole provider of our products may be adversely affected and our business, operating results and financial condition could be materially and adversely affected.***

136. Defendants made the other representations that were made in the October 2011 Registration Statement and Prospectus and the 1Q12 Form 10-Q filed on November 14, 2011 that also perpetuated the false impression that counterfeiting was not a current problem.

> ***If we fail to protect our intellectual property rights adequately, our ability to compete effectively or to defend ourselves from litigation could be impaired, which could reduce our revenues and increase our costs.***
>
> ***We rely primarily on patent, copyright, trademark and trade secret laws, as well as confidentiality and non-disclosure agreements and other methods, to protect our proprietary technologies and know-how.*** The prospective rights sought in our pending patent applications may not be meaningful or provide us with any commercial advantage and they could be opposed, contested, circumvented or designed around by our competitors or be declared invalid or unenforceable in judicial or administrative proceedings. Any failure of our patents to adequately protect our technology might make it easier for our competitors to offer similar products or technologies. In addition, patents may not issue from any of our current or future applications.
>
> Monitoring unauthorized use of our intellectual property is difficult and costly. ***Unauthorized use of our intellectual property has occurred in the past and may occur in the future without our knowledge. The steps we have taken may not prevent unauthorized use of our intellectual property.*** Further, we may not be able to detect unauthorized use of, or take appropriate steps to enforce our intellectual property rights. Our competitors may also independently develop similar technology. ***Our failure to effectively protect our intellectual property could reduce the value of our technology in licensing arrangements or in cross-licensing negotiations, and could impair our ability to compete. Any failure by us to meaningfully protect our intellectual property could result in competitors offering products that incorporate our most technologically advanced features, which could seriously reduce demand for our products.*** We may in the future need to initiate infringement claims or litigation. Litigation, whether we are a plaintiff or a defendant, can be expensive and time-consuming and may divert the efforts of our technical staff and managerial personnel, which could result in lower revenues and

higher expenses, whether or not such litigation results in a determination favorable to us.

***Enforcement of our intellectual property rights abroad, particularly in China, is limited and it is often difficult to protect and enforce such rights.***

Patent protection outside the United States is generally not as comprehensive as in the United States and may not protect our intellectual property in some countries where our products are sold or may be sold in the future. Even if patents are granted outside the United States, effective enforcement in those countries may not be available. Many companies have encountered substantial intellectual property infringement in countries where we sell, or intend to sell, products or have our products manufactured.

***In particular, the legal regime relating to intellectual property rights in China is limited and it is often difficult to protect and enforce such rights.*** The regulatory scheme for enforcing China's intellectual property laws may not be as developed as regulatory schemes in other countries. ***Any advancement of an intellectual property enforcement claim through China's regulatory scheme may require an extensive amount of time, allowing intellectual property infringers to continue largely unimpeded, to our commercial detriment in the Chinese and other export markets.*** In addition, rules of evidence may be unclear, inconsistent or difficult to comply with, making it difficult to prove infringement of our intellectual property rights. As a result, enforcement cases involving technology, such as copyright infringement of software code, or unauthorized manufacture or sale of products containing patented inventions, may be difficult or not possible to sustain.

137. Ubiquiti, Pera and Ritchie knew or were reckless in not knowing the above representations were materially false and misleading because the Company's business, operating results and financial condition ***were*** being materially adversely affected by the sale of counterfeit products. Pera, Ritchie and other Ubiquiti executives had known about the counterfeiting problems for years; and the Company admitted in its lawsuit against Kozumi and Hsu that the sale of counterfeit products caused "irreparable harm," including "significant lost revenue" and "devastating damage to the good will and reputation of . . . Ubiquiti." Ex. 2 at 1. As alleged above, the sworn statements by Ritchie in the Kozumi litigation quantified some of the lost revenue and irreparable harm in 2Q12 caused by the sales of counterfeit products – sales orders from Argentina declined 88% from $6.3 million in 1Q12 to just $726,734 in 2Q12, and the book-to-bill ratio declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12. Ex. 7, ¶¶5-6.

138. Following the release of Ubiquiti's 2Q12 results, Deutsche Bank and Wunderlich Securities issued positive reports on the Company that perpetuated the false impression that the sale of counterfeit product was not adversely affecting Ubiquiti's business. On January 31, 2012,

Deutsche Bank issued a report that maintained the Buy rating and increased the stock price target from $30 to $32. It reported that Ubiquiti's 2Q12 results exceeded expectations and that Deutsche Bank saw signs of continued solid execution and strong end markets. The risk of counterfeiting was not included on a list of several key risks that could negatively impact Ubiquiti's future performance.

139. On February 1, 2012, Wunderlich Securities issued a report that maintained the Buy rating and increased the stock price target from $25 to $28. It reported that Ubiquiti's 2Q12 results beat guidance with continued strong AirMax sales and some noteworthy additions by customers with large deployments.

### C. February 1-April 30, 2012: Continued Sales of Counterfeiting Products and Other Events Force Defendants to Publicly Reveal Some of the Previously Concealed Counterfeiting Problems and Their Impact on the Company

140. After defendants reported Ubiquiti's 2Q12 results on January 31, 2012, the continuation of the counterfeiting problems and other events forced defendants to reveal some, but not all, of the previously concealed facts about the counterfeiting problems and their impact on Ubiquiti's business. First, as Ubiquiti claims in its lawsuit against Kozumi and Hsu, the Hoky factory resumed operations in early 2012 and grew in size. Ex. 1, ¶78. Moreover, Deng's relatives opened other counterfeit factories that made larger quantities and a wider variety of counterfeit Ubiquiti products, including the Company's more expensive products, such as AIRGRID and NANOBRIDGE. *Id.*

141. On March 19, 2012, Ubiquiti announced that it had hired Jessica Zhou as its general counsel and vice president of legal affairs. Although not disclosed at the time, Pera subsequently wrote in a May 2, 2012 memorandum that hiring Zhou was part of Ubiquiti's ramped-up legal efforts to combat the international counterfeiting scheme and that she had aggressively built a team in China and put pressure on the counterfeiting criminals and their supply chains.

142. On March 20, 2012, Sanguinetti, Moore's contact at Laufquen Internet, a Ubiquiti distributor in Argentina, forwarded to Moore an e-mail he received from Hsu. In the e-mail, Hsu wrote that: (a) Ubiquiti had bribed a police official in China to shut down the Hoky factory; (b) the Hoky factory had the legal right to manufacture Ubiquiti product; (c) after one week, the factory

resumed normal production; and (d) Hsu had the Ubiquiti brand and logo registered in Argentina. Ex. 3, ¶66 & ex. X.

143. From March 30, 2012 to April 2, 2012, Pera and Hsu exchanged e-mails about the $2.5 million that Hsu asked for in his December 26, 2011 e-mail. Ex. 9, ex. 5. On April 1, 2012, Hsu e-mailed Pera that he would not stop sales of Ubiquiti products unless he were paid $2.5 million. *Id.* He also informed Pera that Kozumi was getting ready to produce a product to compete with Ubiquiti's Zonewave product that Kozumi would sell for a price that was 20% lower than Ubiquiti's price. *Id.* Pera's response indicated the problem would not be resolved: "Instead of talking out of your ass, why don't you stick to directly answering my questions so I can consider my options." *Id.* Hsu responded that Kozumi would not stop selling Ubiquiti products, including Zonewave, unless Ubiquiti paid him $7.5 million. *Id.*

144. On April 2, 2012, Ubiquiti commenced a trademark lawsuit in Argentina against Hsu seeking nullification of the trademark obtained by Hsu, dismissal of Hsu's opposition to Ubiquiti's trademark application, the approval of Ubiquiti's opposition to Hsu's recently filed Argentinean trademark applications, an injunction preventing further use of any Ubiquiti trademarks and damages. Ex. 8, ¶3.

145. Defendants learned of more counterfeiting two days later. On April 4, 2012, Moore received two emails from Sanguinetti enclosing Argentina customs office forms that detailed three separate Kozumi shipments of Ubiquiti products that were priced suspiciously low. Ex. 3, ¶67 & ex. Y. At least 5,900 of the products were listed as being exported by Kozumi and being sent to Tech Depot, a company in Argentina affiliated with Hsu. *Id.*

146. On April 17, 2012, Hsu and Ubiquiti engaged in a mandatory mediation session ordered by the Argentinean court after Ubiquiti filed the trademark lawsuit earlier that month. Hsu refused to give back the Argentinean trademark registration or to withdraw his oppositions to Ubiquiti's trademark filings. Ex. 1, ¶104.

147. On April 20, 2012, Moore received an e-mail from Dejan Dudeski of Overnet DMD, a Ubiquiti distributor in Macedonia, in which Dudeski wrote that he thought counterfeit products were being sold in Kosovo and Albania because Dudeski had been contacted by clients in Kosovo

and Albania who were buying Ubiquiti products at prices lower than the prices at which Ubiquiti sold product to its distributors. Ex. 3, ¶68 & ex. Z.

148. Defendants also learned in April of a widely distributed article accusing Pera of using the Chinese mafia to stop its competitors in China. On April 26, 2012, Moore received e-mails from Mohammed Majdi Hashim, a director of Alsafwa for Computers and Networking, a Ubiquiti distributor in Iraq, and from Roberto Ferreira of OIW Telecom Solutions, a Ubiquiti distributor in Brazil. *Id.*, ¶71 & exs. AA-BB. Both distributors forwarded identical e-mails they received from Ivan Mikhailov that were also sent to over 200 e-mail addresses, most of which belonged to authorized Ubiquiti distributors or resellers. The e-mails contained an article entitled "Public listed Ubiquiti Networks CEO Robert Pera under investigation by China authorities for using mafia ties to stop its competitors in China?" It was reported in the article that there were rumors from Shenzhen local authorities that some factories in China producing products that competed with Ubiquiti products had filed a claim with the local police claiming Pera sent the Chinese mafia to their factories to intimidate, harass and threaten the factories to stop producing the products. *Id.*

149. On April 27, 2012, Moore learned that the same article had been posted to the Ubiquiti Community forum page and received an e-mail from Pera in which Pera wrote that the article was also posted to http://k.ifeng.com. *Id.*, ¶¶72-73 & exs. CC-DD. On April 30, 2012, the article was posted to http://bbs.city.tianya.con/tianycity/content/338/1/24857.shtml, an internet forum that was also one of the most visited sites in China. *Id.*, ¶74.

**D. May 1, 2012: Defendants Report Ubiquiti's 3Q12 Results and Reveal Some of the Previously Concealed Adverse Information but Make Additional Materially False and Misleading Statements**

150. On May 1, 2012, Ubiquiti's stock price closed at $35 per share, the highest price during the Class Period. After the market closed, however, defendants reported the Company's 3Q12 results and began to reveal some of the previously concealed information about the counterfeiting and its adverse impact on the Ubiquiti's business. The press release reporting Ubiquiti's 3Q12 results was filed with the SEC on a Form 8-K signed by Ritchie. During the conference call, Pera told investors that Ubiquiti planned to increase its legal efforts and aggressively defend its intellectual property to protect the Company's brand and customers from counterfeiters,

and Ritchie reported that operating expenses would increase by approximately $1.5 million as a result.

> [PERA:] A key differentiator across all of our platforms is our IP, whether it is our proprietary technology or our highly regarded brands. We plan on increasing our legal efforts around IP and brand protection as well as to protect our customers from counterfeiters. The hiring of our new general counsel with significant experience in this area was a step in this direction.
>
> Going forward, we intend to aggressively defend our IP to the full extent of the law, especially in foreign markets, where our brand is particularly strong, but markets that tend to be less disciplined about IP protection. Whether through patent and trademark filing or seeking legal retribution from those that infringe on our patents and steal our technology and potentially damage our brand, we intend to increase our focus and financial commitment to this area.
>
> * * *
>
> [RITCHIE:] Now, a little more detail in terms of our forecasted expenses. As we look ahead to the fourth quarter, we expect to see a meaningful increase in operating expenses of approximately $1.5 million. The largest component of this increase relates to costs to protect our intellectual property, as Robert discussed earlier.
>
> As we become more and more successful, we have unfortunately become the subject of counterfeiting efforts. We intend to be aggressive in defending our IP and the Ubiquiti brand around the globe. After this increase, we expect our operating expenses to stay in the range of 8.5% to 9%, driven in the future primarily by increased R&D investments.

151. In response to this unexpected negative news, Ubiquiti's stock price declined $6.10 per share or 17.4% from $35 on May 1, 2012 to $28.90 on May 2, 2012, on volume of nearly 4.1 million shares.

152. Deutsche Bank analyst Brian Modoff issued a report on May 1, 2012 in which he maintained the Buy rating and wrote that Ubiquiti expected to use additional funds for legal services to protect its intellectual property, that the spending was reasonable and that the Company would maintain its long-term operating margin target of 32% to 34%. In contrast, Wunderlich Securities analyst Matthew Robison issued a report on May 2, 2012 in which he downgraded Ubiquiti's stock from Buy to Hold due to aggressive product line and intellectual property rights initiatives that were stunting prospects for continued operating margin expansion. Robison reported that the expense increases were a function of formalizing and enforcing intellectual property rights.

153. On May 2, 2012, the article accusing Pera of sending the Chinese mafia to competitors' factories to intimidate, harass and threaten them appeared in the United States on sites like Yahoo! Finance. Ex. 1, ¶97. After the market closed on May 2, 2012, Forbes reported that rumors were swirling on various blogs that Ubiquiti was mixed up with the Chinese mafia. Forbes also reported that Pera denied the allegations in an internal memorandum to employees. That memorandum was leaked and disclosed that Pera and Ritchie had known about the counterfeiting problems since before the IPO and that the counterfeiting problems were worse than Pera and Ritchie had reported during the Company's May 1, 2012 conference call.

> As you know, we have been battling counterfeiters in China. The criminals are very clever; both former Ubiquiti distributors. One is Chinese living in DongGuan, China where are [sic] contract manufacturers (CM's) are based, the other is Taiwanese living in the United States running a WISP distributor in Argentina. They are working as a team.
>
> In 2011, we stopped doing business with both individuals because they broke our distributor agreement rules.
>
> Later that year, we discovered they had setup a factory in DongGuan producing exact 100% identical versions of our products. We believe they had paid someone inside our CM's, stole our PCB design files, schematics, BOM's, artwork, Factory CD; everything. They even hired former production engineers from LIteOn (our largest CM) to setup their manufacturing testing and processes. And, they used their Ubiquiti reseller connections to blend the counterfeit products into the Ubiquiti sales channel. Because the counterfeit products were based on our designs, artwork, and manufacturing processes; customers were not able to tell the products were counterfeit. They thought they were buying genuine Ubiquiti products.
>
> When we discovered what was going on, we hired legal counsel in China to aggressively shut them down. We were successful and the Chinese individual (based in DongGuan, China) went to jail where he stayed awaiting trial.
>
> We tried our best to make the case public to remove the possibility the criminal could pay his way out of trouble, but unfortunately, the criminal was able to pay off the judge in DongGuan and was released early this year.
>
> Following the release, the criminals now feel empowered and are attempting to ramp up their operations. We also have ramped up our legal efforts to fight them. Jessica Zhou (our new General Counsel) was hired in March and she has been very aggressive in building a team in China and putting legal pressure on the criminals and their supply chains.
>
> Feeling the pressure, I had recently received emails from the criminals threatening to damage our public reputation if we continue to pursue them. I refused. It appears in the past several days, they have made good on their threats.
>
> I want everyone to know what is being said is not true. As a U.S. public company, we must obey FCPA (Foreign Corrupt Practices Act) which prohibits us

> from directly or indirectly using any form of bribery or illegal means to solve problems in China and we have been very careful in following the rules. The original story was posted by the criminals using a fake account on a China blogging site and inexplicably managed to get picked up by credible news sources (most likely with the help of those who are betting against our stock). We have been working today with most of the news sources and they have taken the story down. Additionally, we are pushing to have them post a formal apology for irresponsibly publicizing the unfounded allegations.
>
> Please do not get distracted by this; it will pass. I have very high confidence in Jessica Zhou and believe her team will have the case resolved soon.
>
> Please stay focused on your projects; we are behind on many of them and must accelerate our time to market.

154. On May 3, 2012, Ubiquiti issued a press release in which it reported that it had reiterated to its customers the discovery of counterfeit products and its worldwide campaign to aggressively defend its intellectual property and protect its customers.

> Ubiquiti Networks, Inc., a next-generation communications technology company reiterated with its customers the discovery of counterfeit products on the market and launched a worldwide campaign to aggressively defend its intellectual property and protect its customers.
>
> The company believes that as a result of the effectiveness of its campaign, it has become subject to malicious and false accusations posted on overseas websites by those infringing on its intellectual property, and these false accusations have subsequently been reposted by unwary media outlets and news aggregators.
>
> "While we do not normally comment on rumors, we take our business reputation very seriously and strive to conduct all of our activities in compliance with the law," said Jessica Zhou, General Counsel and Vice President of Legal Affairs of the company. "Our worldwide intellectual property protection efforts demonstrate that we take our customers' interest to heart and that we remain firmly committed to being a technology leader."

155. In response to this new negative news that revealed the counterfeiting problems were more severe than disclosed during the Company's May 1, 2012 conference call, Ubiquiti's stock price declined another 14% over the next three days, declining from $28.90 on May 2, 2012 to $24.91 on May 7, 2012. By comparison the CCMP declined 3.2% and the IXK declined 3.9%.

156. However, the Company's stock price continued to trade at artificially inflated prices because defendants made additional false and misleading statements and continued to conceal the true extent of the problems caused by the counterfeiting. In the Company's May 1, 2012 press release, Pera represented that Ubiquiti "***saw solid momentum across all elements of our business***, led by the AirMax platform which again posted double digit sequential growth."

157. In response to an analyst's question during the May 1, 2012 conference call, Ritchie stated that Argentina continued to do well for the Company.

> [Amitabh Passi – UBS Analyst:] I was hoping you could provide any more color in terms of – with any new geographies you managed to penetrate this quarter, any new distributors you added, just any color in terms of where this strength in both airMAX and also your new platforms.
>
> [Ritchie:] Yes. I think one of the things we're pleased with right now is how the EMEA region is doing. We saw very good growth there. It's probably one of our more established markets. But we're seeing – we're kind of seeing strength in the big markets – EMEA and South America.
>
> [Passi:] So basically, just in geographies, Poland, Brazil – ? I was just curious if there were any new markets you managed to add.
>
> [Ritchie:] No, it's the same cast of characters – Czech Republic, Poland, Brazil, ***Argentina. Those countries all continue to do well for us***.

158. The statements by Pera and Ritchie contradicted sworn statements by Ritchie in the Kozumi litigation that showed Argentina did not "continue to do well for [Ubiquiti]" and that there was not "solid momentum" in Argentina because sales orders from Argentina had declined substantially in 2Q12 and 3Q12. Ritchie stated in his sworn declaration that: (a) sales orders from Argentina declined 88% from $6.3 million in 1Q12 to just $726,734 in 2Q12; and (b) the book-to-bill ratio – the ratio of orders booked to orders invoiced – declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12. Ex. 7, ¶¶5-6. Indeed, Ritchie stated that the dollar amount of sales orders received from Argentina in 2Q12 was at the lowest level in the last three years. Ritchie also stated in his sworn declaration that sales from Argentina in 3Q12 were just $998,000, or $4.1 million less than expected, and that the book-to-bill ratio was just 0.47. *Id.*, ¶¶5, 8-9 & ex. A.

### E. May 21, 2012-November 9, 2012: Ubiquiti Reveals Additional Adverse Impacts from the Counterfeiting, Which Causes Further Declines in the Company's Stock Price

159. From May through November 2012, Ubiquiti took additional actions to combat the international counterfeiting scheme and revealed that it continued to adversely impact Ubiquiti's business.

160. On May 21, 2012, Ubiquiti announced that it had filed a lawsuit against Kozumi on May 18, 2012, and was seeking a TRO and permanent injunction against Kozumi to stop the counterfeiting ring from producing and distributing counterfeit Ubiquiti products. In the lawsuit, the

Company acknowledged that the decline in the value of Ubiquiti's stock earlier in the month was due to the market's realization of the counterfeit activities.

161. In May 2012, the Company also filed a copyright injunction lawsuit in Argentina against Hsu, Syntronic and Tech Depot. Ex. 1, ¶80. The injunction was granted on June 12, 2012. *Id.*

162. On June 21, 2012, Ubiquiti issued a press release announcing that it had obtained a TRO enjoining Kozumi and Hsu from using any Ubiquiti trademark.

163. On July 9, 2012, Ubiquiti issued a press release entitled "Ubiquiti Wins Preliminary Injunction Against Principal of Counterfeiting Operation," which stated in part:

> Ubiquiti Networks, Inc., a next-generation communications technology company, announced a major legal victory when a federal judge at the U.S. federal court for the Northern District of California last week granted a preliminary injunction enjoining Kozumi USA Corp. and its owner Shao Wei (William) Hsu from:
>
> - using in any manner any registered trademark owned by Ubiquiti, the UBIQUITI, UBIQUITI NETWORKS, and Ubiquiti logo mark, or any name or mark that wholly incorporates or is confusingly similar to these trademarks;
> - moving, destroying, or otherwise disposing of any items confusingly or deceptively similar to Ubiquiti's products and that bear any of Ubiquiti's trademarks;
> - moving, destroying, or otherwise disposing of any records or documents containing information related to the manufacturing, distributing, delivering, shipping, importing, exporting, marketing, promoting, selling, or otherwise offering for sale of items that bear any of Ubiquiti's trademarks; and
> - assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the above activities.

164. In July 2012, Chinese authorities arrested Deng, and the Company's copyright injunction obtained in Argentina the previous month was enforced through a seizure of counterfeit products at the warehouses of Syntronic and Tech Depot. Ex. 1, ¶¶81, 83. The same month, Ubiquiti filed another copyright infringement action in Argentina against Hsu, Syntronic and Tech Depot for copying the Company's AIROS software. *Id.*, ¶82. Ubiquiti also asked the court to order Hsu to immediately cease the use of the UBIQUITI, NANOSTATION, AIRMAX, AIROS and UBNT trademarks and to pay damages. *Id.*, ¶104.

165. On August 9, 2012, investors learned that the international counterfeiting scheme caused additional adverse impacts on Ubiquiti's business in 4Q12 and would continue to adversely impact the business in the future. That day, Ubiquiti issued a press release announcing its 4Q12 and FY12 financial results for the year ended June 30, 2012. The press release was also filed with the SEC on a Form 8-K signed by Ritchie. The Company reported net income of $28.5 million, non-GAAP diluted EPS of $0.30, and revenue of $94.9 million for 4Q12. Further, the Company reported net income of $102.6 million, non-GAAP diluted EPS of $1.09, and revenue of $353.5 million for the year ended June 30, 2012. Pera acknowledged that the international counterfeiting scheme had adversely affected Ubiquiti's business.

> Added Mr. Pera: "The Ubiquiti brand is dominant in our markets and demand for our technology is stronger than ever. This dominance has led to an unfortunate side effect whereby a few ***previously terminated distributors setup counterfeit AirMax manufacturing operations. Although they have impacted our sales channel and caused some marketplace confusion, we have made substantial and tangible progress in diminishing their activities through a comprehensive legal strategy that has resulted in imprisonment, injunctions, and asset freezes of the counterfeiters***. In addition, Ubiquiti has implemented sophisticated anti-counterfeit manufacturing processes to substantially protect all of our new platforms and new AirMax products against any future counterfeit attempts."

166. Pera and Ritchie also told investors that the international counterfeiting scheme would cause a substantial decline in 1Q13 revenues and earnings.

> **Business Outlook**
>
> Ubiquiti currently believes the demand environment in its end markets supports the following forecast for the Company's fiscal first quarter ending September 30, 2012:
>
> - Revenues of $62 million to $70 million
> - GAAP Diluted EPS of $0.14 to $0.17
> - Non-GAAP Diluted EPS of $0.14 to $0.17
> - ***We believe that the amount of counterfeited goods, combined with the impact it has on our distributor's inventory and the purchasing patterns of our customers, will impact our business outlook for the next two fiscal quarters.***
> - ***Ubiquiti has taken comprehensive legal actions to stop the counterfeiters and minimize the impact of their activities.***

167. During the conference call on August 9, 2012, Ritchie stated revenues from South America declined 40% from $27.7 million in 3Q12 to $16.6 million in 4Q12 due to the counterfeiting issues and that the counterfeiting would impact future sales in all regions except North America, which only generated 25% of 4Q12 revenues. Pera acknowledged that the counterfeiting had damaged Ubiquiti for the entire year, stating the counterfeiters had "made damage for three or four quarters that culminated into the situation we have now." He also acknowledged that the damage could continue for more than the next two quarters.

168. As a result of this unexpected negative news, Ubiquiti stock declined $6.30 per share to close at $8.71 per share on August 10, 2012, a one-day decline of nearly 42%, on volume of over 7.6 million shares.

169. Analysts reported that the Company's revelations showed they had underestimated the magnitude of the international counterfeiting scheme's impact on Ubiquiti's business. On August 9, 2012, Deutsche Bank downgraded its rating on the stock to Hold, lowered its stock price target from $30 to $12 and reported that it was disappointed by the guidance and felt there was long-term risk surrounding the counterfeiting issues.

170. On August 10, 2012, Wedbush Securities downgraded its rating on Ubiquiti from Outperform to Neutral, lowered its price target from $17.00 to $8.00 and reported that it "clearly underestimated the magnitude of the company's challenges as it relates to the prevalence of counterfeit products in the channel and concerns regarding Ubiquiti's distribution model." Capstone Investments and Wunderlich Securities also issued reports downgrading the stock and lowering price targets due to the uncertainty surrounding the counterfeiting issues.

171. On November 8, 2012, Ubiquiti reported its 1Q13 results, and investors learned that the counterfeiting adversely impacted revenues and operating expenses as Pera and Ritchie told investors on August 9, 2012. Sales declined 35% from $94.9 million in 4Q12 to $61.5 million in 1Q13; SG&A expenses increased 132% from $1.9 million in 4Q12 to $4.5 million in 1Q13; operating income declined 54% from $34.1 million in 4Q12 to $15.8 million in 1Q13; the operating margin declined from 35.4% in 4Q12 to 25.6% in 1Q13; net income declined 54% from $28.5

million in 4Q12 to $13.2 million in 1Q13; and EPS declined 54% from $0.31 in 4Q12 to $0.14 in 1Q13. The Company attributed the adverse results to the international counterfeiting scheme:

> We believe ***the overall decrease in revenues during the three months ended September 30, 2012 was primarily driven by lost sales due to the proliferation of counterfeit versions of our products, which has also created customer uncertainty regarding the authenticity of their potential purchases, and the effects of a buildup in channel inventory with our distributors. This has had the most significant impact on our airMAX platform which decreased $17.8 million.***
>
> * * *
>
> We believe ***the decrease in revenues in South American [sic] and Europe, the Middle East and Africa was primarily driven by the proliferation of counterfeit versions of our products, which has also created customer uncertainty regarding the authenticity of their potential purchases.***
>
> * * *
>
> Sales, general and administrative expenses increased $2.4 million, or 111%, from $2.1 million in the three months ended September 30, 2011 to $4.5 million in the three months ended September 30, 2012. As a percentage of revenues, sales, general and administrative expenses increased from 3% in the three months ended September 30, 2011 to 7% in the three months ended September 30, 2012. ***Sales, general and administrative expenses increased due largely to increased legal expenses associated with our anti-counterfeiting litigation, increased marketing and tradeshow activity and bad debt expense.*** As a percentage of revenues sales, general and administrative expenses increased primarily due to our overall revenue decrease in revenues. Over time, we expect our sales, general and administrative expenses to increase in absolute dollars due to continued efforts to protect our intellectual property and growth in headcount to support our business and operations.

## VII. LOSS CAUSATION

172. As detailed above, defendants' false representations and omissions of material facts about the sales of counterfeit products caused Ubiquiti's stock to issue and trade at artificially inflated prices and operated as a fraud and deceit on purchasers of the Company's securities. After closing at $17.50 on October 14, 2011, Ubiquiti's stock price traded between $17.44 and $34.35, reaching its Class Period high of $35 on May 1, 2012. After the market closed on May 1, 2012, Ubiquiti began to reveal some of the previously concealed adverse facts regarding the international counterfeiting scheme and its adverse impact on Ubiquiti's business and financial results. When Ubiquiti revealed additional adverse facts on May 2-3, 2012 and August 9, 2012, Ubiquiti's stock price declined further. Ubiquiti's stock price declined 75% from its $35 peak to $8.71 on August 10, 2012 as the artificial inflation was removed from the Company's stock price. Class members who

purchased Ubiquiti stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

173. Defendants' false and misleading statements were made without any reasonable basis and caused Ubiquiti's common stock to trade at artificially inflated levels through the Class Period. As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in Ubiquiti, the price of Ubiquiti's common stock declined. These drops removed the inflation from the price of Ubiquiti common stock, causing real economic loss to investors who had purchased Ubiquiti common stock during the Class Period.

174. After defendants made materially false and misleading statements and omissions about Ubiquiti on November 10, 2011, the Company's stock price increased $0.86, or 4.6%, from $18.60 on November 10, 2011 to $19.46 on November 11, 2011. By comparison, the NASDAQ Composite Index ("CCMP") and NASDAQ Computer Index ("IXK") each increased by only 2.0%.[4] The Company's stock continued to trade at artificially inflated prices after Ubiquiti filed its 1Q12 Form 10-Q on November 14, 2011, which included representations that perpetuated the false impression that counterfeiting was not a current problem.

175. After defendants reported the Company's 2Q12 results on January 31, 2012, Ubiquiti's stock price declined 0.7% on February 1, 2012, compared to a 1.2% increase in the CCMP and a 1.3% increase in the IXK. The stock price was still artificially inflated by defendants' materially false and misleading statements and their failure to disclose the counterfeiting problems and their adverse impact on Ubiquiti's business.

176. On May 1, 2012, Ubiquiti reported its 3Q12 financial results and began to reveal some of the previously concealed adverse information about the counterfeiting problems. The Company reported that Ubiquiti planned to increase its legal efforts and aggressively defend its intellectual property to protect the Company's brand and customers from counterfeiters, and Ritchie reported that operating expenses would increase by approximately $1.5 million as a result. In

[4] In Ubiquiti's 2012 Form 10-K, the Company compared its stock price to the CCMP and the IKX.

response to this unexpected negative news, Ubiquiti's stock price declined $6.10 per share, or 17.4%, from $35 on May 1, 2012 to $28.90 on May 2, 2012 on volume of nearly 4.1 million shares. By comparison, the CCMP and IXK each increased 0.3%.

177. On May 2, 2012, investors learned that the counterfeiting problems were worse than reported the previous day when an internal memorandum prepared by Pera was leaked. Pera wrote in the memorandum that Ubiquiti had been battling counterfeiters in China, that they were former distributors, that one of the counterfeiters had been released from custody and that the counterfeiters were attempting to ramp up their operations and threatening to damage the Company's public reputation. On May 3, 2012, Ubiquiti issued a press release in which it reported that it had reiterated with its customers the discovery of counterfeit products and its worldwide campaign to aggressively defend its intellectual property and protect its customers. In response to these disclosures that revealed the counterfeiting problems were more severe than reported by the Company during the May 1, 2012 conference call, Ubiquiti's stock price declined $3.99 per share, or 14%, from $28.90 on May 2, 2012 to $24.91 on May 7, 2012. By comparison, the CCMP declined 3.2% and the IXK declined 3.9%.

178. On August 9, 2012, Ubiquiti reported its 4Q12 and FY12 results and revealed more of the previously concealed information, including that the counterfeit products had impacted sales and would continue to do so for the next two quarters. As a result of disclosing the true condition of the effects of the counterfeiting scheme on Ubiquiti's business, the Company's stock price declined $6.30 per share or 42%, from $15.01 on August 9, 2012 to $8.71 on August 10, 2011. By comparison, the CCMP rose 0.1% and the IXK rose 0.2%

179. The declines in Ubiquiti's stock price following the partial disclosures compared to the changes in the CCMP and the IXK indices negate any inference that the losses suffered by class members were caused by changed market or industry conditions or Company-specific facts unrelated to the fraudulent conduct.

## VIII. CLASS ACTION ALLEGATIONS

180. Plaintiff bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Ubiquiti common stock on the open market

during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are defendants, directors and officers of Ubiquiti and their families and affiliates.

181. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, there was an average of 91.7 million outstanding shares owned by thousands of persons and institutions. Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

182. There is a well defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether the federal securities laws were violated by defendants;

(b) Whether the Prospectus and Registration Statement issued by defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Ubiquiti and its business;

(c) Whether defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts;

(d) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether defendants knew or recklessly disregarded that their statements were materially false and misleading;

(f) Whether the price of Ubiquiti common stock was artificially inflated during the Class Period;

(g) Whether defendants' fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(h) the extent of damages sustained by Class members and the appropriate measure of damages.

183. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class purchased Ubiquiti common stock during the Class Period and sustained damages from defendants' wrongful conduct. Plaintiff will adequately protect the interests of the Class and has retained

counsel who are experienced in class action securities litigation. Plaintiff has no interest that conflict with those of the Class.

184. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results. Class members have not indicated an interest in prosecuting separate actions as none have been filed. The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

185. In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

186. The market for Ubiquiti's common stock was open, well developed and efficient at all relevant times. Ubiquiti's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market. As a regulated issuer, Ubiquiti filed periodic public reports with the SEC. Ubiquiti regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

187. As alleged above, the change in the price of Ubiquiti's stock – compared to the changes in the two indices – in response to the release of unexpected material positive and negative information about the Company shows there was a cause-and-effect relationship between the public

release of the unexpected information about Ubiquiti and the price movement in the Company's stock. The average weekly trading volume of Ubiquiti's stock during the Class Period was approximately 2.4 million shares, or approximately 2.6% of the average total outstanding shares. Ubiquiti was followed by analysts who attended the Company's conference calls and issued reports throughout the Class Period. The average market capitalization of Ubiquiti was $1.793 billion. Institutional investors owned between 29 million and 33 million of Ubiquiti's shares during the Class Period, or between 31% and 36% of the average total outstanding shares. The "float" or shares not owned by insiders comprised 7.9%. The Class Period bid/ask spread median was $0.03.

188. As a result of the foregoing, the market for Ubiquiti common stock promptly digested current information regarding Ubiquiti from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Ubiquiti common stock during the Class Period suffered similar injury through their purchases of Ubiquiti common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

**COUNT I**

**For Violation of Section 11 of the 1933 Act**
**Against All Defendants**

189. Plaintiff incorporates ¶¶1-13, 25-114 and 172-188 by reference.

190. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

191. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that the Officer Defendants, Director Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

192. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

193. Ubiquiti is the registrant for the IPO. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

194. As issuer of the shares, Ubiquiti is strictly liable to Plaintiff and the Class for any misstatements and omissions.

195. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

196. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

197. Plaintiff acquired Ubiquiti shares pursuant and/or traceable to the Registration Statement for the IPO.

198. Plaintiff and the Class have sustained damages. The value of Ubiquiti common stock has declined substantially subsequent to and due to defendants' violations.

199. At the time of their purchases of Ubiquiti shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to May 1, 2012. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this complaint.

## COUNT II

### For Violation of Section 12(a)(2) of the 1933 Act Against Ubiquiti, the Officer Defendants and the Underwriter Defendants

200. Plaintiff incorporates ¶¶1-13, 25-114 and 172-199 by reference.

201. This Count is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l, on behalf of the Class against Ubiquiti, the Officer Defendants and the Underwriter Defendants.

202. This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this count. Plaintiff does not allege

that Ubiquiti, the Officer Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

203. This Count is predicated upon defendants' strict liability for making false and materially misleading statements and omissions in the Registration Statement and Prospectus and for making false and materially misleading oral statements in connection with the issuance of the Offering Materials, including during the roadshow for the IPO.

204. The Company, the Officer Defendants and the Underwriter Defendants were sellers, offerors and/or solicitors of purchasers of the shares offered pursuant to the Offering Materials. The Company, the Officer Defendants and the Underwriter Defendants issued or caused to be issued the Offering Materials in connection with the IPO. The Offering Materials were used to induce investors, such as plaintiff and the other members of the class, to purchase Ubiquiti securities.

205. The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The actions of the Company, the Officer Defendants and the Underwriter Defendants included soliciting Plaintiff and the class by means of these defendants' participation in the preparation of the false and misleading Offering Materials. As alleged herein, the Offering Materials contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

206. The Company, the Officer Defendants and the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there were no material omissions of facts required to be stated therein in order to make the statements contained therein not misleading. None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.

207. Plaintiff and the other members of the class did not know, nor could they have known, of the untruths or omissions contained in the Offering Materials.

208. The Offering Materials were issued in connection with an IPO; thus, the "safe harbor" for any purportedly forward-looking statements is inapplicable.

209. This action is brought within three years from the time that the securities upon which this cause of action is brought were sold to the public and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this cause of action is based.

**COUNT III**

**For Violation of Section 15 of the 1933 Act**
**Against Ubiquiti and the Officer and Director Defendants**

210. Plaintiff repeats and realleges ¶¶1-13, 25-114 and 172-209 by reference.

211. This Count is brought pursuant to §15 of the 1933 Act against Ubiquiti, the Officer Defendants and the Director Defendants.

212. The Officer Defendants and the Director Defendants each were control persons of Ubiquiti by virtue of their positions as a director and/or senior officer of Ubiquiti. The Officer Defendants and the Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Ubiquiti. Ubiquiti controlled the Officer Defendants, the Director Defendants and all of Ubiquiti's employees.

213. Defendants each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

214. Pera controlled Ritchie and Ubiquiti though his position of power and control as the Company's founder, director and CEO. He had supervisory authority over other Ubiquiti executives, including Ritchie. He also had the power to control Ubiquiti and exercised that power by signing the Registration Statement.

215. Ritchie controlled Ubiquiti through his position of power and control as the Company's CFO. He had supervisory authority over other Ubiquiti executives. He also had the power to control Ubiquiti and exercised that power by signing the Registration Statement.

216. The Director Defendants had the power to control and influence Ubiquiti, Pera, Ritchie and other Company executives through their powers set forth in the Company's Amended and Restated Bylaws adopted on June 25, 2010. It is stated in the Amended and Restated Bylaws that the business and affairs of Ubiquiti shall be managed by or under the direction of the board of directors and its committees. The Amended and Restated Bylaws also give the board the power to appoint, remove and designate the authority of the Company's officers. The Director Defendants exercised their power by appointing officers and signing the Registration Statement.

## COUNT IV

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against Ubiquiti and the Officer Defendants

217. Plaintiff incorporates ¶¶14-54 and 115-188 by reference.

218. During the Class Period, Ubiquiti and the Officer Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219. Ubiquiti and the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Ubiquiti common stock during the Class Period.

220. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ubiquiti common stock. Plaintiff and the Class would not have purchased Ubiquiti common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Ubiquiti's and the Officer Defendants' misleading statements.

**COUNT V**

**For Violation of Section 20(a) of the 1934 Act Against Ubiquiti and the Officer Defendants**

221. Plaintiff incorporates ¶¶14-54, 115-188 and 217-220 by reference.

222. Ubiquiti and the Officer Defendants acted as controlling persons of Ubiquiti within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Ubiquiti stock, the Officer Defendants had the power and authority to cause Ubiquiti to engage in the wrongful conduct complained of herein. Ubiquiti controlled the Officer Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

223. Pera controlled Ritchie and Ubiquiti though his position of power and control as the Company's founder, director and CEO. He had supervisory authority over other Ubiquiti executives, including Ritchie. He also had the power to control Ubiquiti and exercised that power by controlling the contents of the Company's press releases and SEC filings and speaking on behalf of the Company during the quarterly earnings conference calls.

224. Ritchie controlled Ubiquiti through his position of power and control as the Company's CFO. He had supervisory authority over other Ubiquiti executives. He also had the power to control Ubiquiti and exercised that power by controlling the contents of the Company's press releases and SEC filings and speaking on behalf of the Company during the quarterly earnings conference calls.

225. Ubiquiti had the power to control and influence Pera, Ritchie and other Company executives through its board of directors and its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding Plaintiff and the members of the Class damages and interest;

C. Awarding Plaintiff's reasonable costs, including attorneys' fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## X. JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: January 29, 2013

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER P. SEEFER

s/ Christopher P. Seefer
CHRISTOPHER P. SEEFER

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
ASHLEY M. PRICE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 29, 2013.

s/ Christopher P. Seefer
CHRISTOPHER P. SEEFER

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: chriss@rgrdlaw.com

# Mailing Information for a Case 4:12-cv-04677-YGR

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Timothy Paul Crudo**
  timothy.crudo@lw.com,susan.hope@lw.com,#sfdocket@lw.com
- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,bsperry@gibsondunn.com
- **Jonathan Gardner**
  jgardner@labaton.com,cvillegas@labaton.com,fmalonzo@labaton.com
- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com
- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com
- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com
- **Gavin Masuda**
  gavin.masuda@lw.com,#sfdocket@lw.com
- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Ashley Price**
  aprice@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,mmgoldberg@glancylaw.com,jcrowell@glancylaw.com
- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com
- **Christopher Paul Seefer**
  chriss@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,tcraig@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Michael Walter Stocker**
  mstocker@labaton.com
- **Danielle A Stoumbos**
  dstoumbos@finkelsteinthompson.com
- **Carol C. Villegas**
  cvillegas@labaton.com

- **Peter Allen Wald**
  peter.wald@lw.com,#sfdocket@lw.com
- **David Conrad Walton**
  davew@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Catherine J. Kowalewski**
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101