1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE: UBIQUITI NETWORKS, INC. SECURITIES LITIGATION** | **Case No.: 12-CV-4677 YGR** <br><br> **ORDER GRANTING MOTIONS TO DISMISS** |

**INTRODUCTION**

Defendant Ubiquiti Networks, Inc. ("Ubiquiti") is a publicly traded company that makes broadband wireless devices and sells them worldwide, primarily in emerging markets such as South America.  Plaintiffs are alleged purchasers of Ubiquiti stock who seek to represent a class of similarly situated individuals.  The gravamen of their allegations is that Ubiquiti knew of a wide-ranging counterfeit operation producing knock-offs of Ubiquiti devices and thereby damaging Ubiquiti's standing in the market, but that Ubiquiti, in statements made in connection with its October 14, 2011 initial public offering of stock ("IPO"), as well as later statements connected to its announcement of quarterly financial results, downplayed the extent of the counterfeiting and concealed its impact on Ubiquiti's business.  Plaintiffs allege that, once the market learned of the counterfeiting's true extent and impact, Ubiquiti's stock price fell, damaging them and the putative class.

All defendants move for dismissal of  plaintiffs' Consolidated Amended Complaint (Dkt. No. 54 ("CAC")).  The CAC groups the defendants in various sets and subsets, as set forth below:

- the "Ubiquiti Defendants," comprised of (i) Ubiquiti itself, (ii) Ubiquiti's chief executive officer ("CEO") Robert Pera and chief financial officer ("CFO") John Ritchie (jointly, the "Officer Defendants"), and (iii) Peter Y. Chung, Christopher J. Crespi, Charles J. Fitzgerald, John L. Ocampo, and Robert M. Van Buskirk, who allegedly were Ubiquiti directors at the time of the IPO (collectively, the "Director Defendants"); and

- the "Underwriter Defendants," four investment banking firms that allegedly underwrote Ubiquiti's IPO: UBS Securities LLC, Deutsche Bank Securities Inc., Raymond James & Associates, Inc., and Pacific Crest Securities LLC.

The CAC asserts five counts of securities violations, as against the defendants indicated:

*Count 1:* Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, as against all defendants;

*Count 2:* Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), as against Ubiquiti, the Officer Defendants, and the Underwriter Defendants;

*Count 3:* Section 15 of the Securities Act, 15 U.S.C. § 77*o*, as against all Ubiquiti Defendants;

*Count 4:* Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, as against Ubiquiti and the Officer Defendants; and

*Count 5:* Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as against Ubiquiti and the Officer Defendants.

The Ubiquiti Defendants seek dismissal with prejudice of the entire CAC. (Dkt. No. 57 ("Ubiquiti MTD").) The Underwriter Defendants seek dismissal with prejudice of the two claims asserted against them, that is, plaintiffs' Section 11 and Section 12(a)(2) claims. (Dkt. No. 56 ("Underwriter MTD").) Both motions are joined by all defendants, and are fully briefed. (Dkt. Nos. 65 ("Opp'n"), 67 ("Ubiquiti Reply"), 69 ("Underwriter Reply").)

Having carefully considered the papers submitted and the pleadings in this action, and having had the benefit of oral argument, for the reasons set forth below the Court hereby **GRANTS**

both motions to dismiss.  Plaintiffs have leave to amend in accordance with counsel's Rule 11 obligations and the guidance provided by this comprehensive opinion.  In summary, when analyzed closely, the CAC, while lengthy, pleads neither material omissions or misrepresentations upon which reasonable investors would have relied, nor that the accused statements were made with scienter.

ESSENTIAL BACKGROUND ALLEGATIONS

Located in San Jose, California, Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide.  It offers a portfolio of wireless networking products and solutions, including high performance radios, antennas, and management tools designed for wireless networking and other applications in the unlicensed radio frequency spectrum.  Ubiquiti's business focuses on developing economies, such as those in South America, the Middle East, and Asia.

Plaintiffs allege that, from 2009 through 2012, unbeknownst to the company's investors but known internally to the Ubiquiti Defendants, Ubiquiti was the target of a widespread international counterfeiting scheme that was growing in size and materially affecting its business.  At the center of the scheme were Kozumi USA Corp. ("Kozumi"), a former distributor of Ubiquiti products, and its owner, Shao Wei "William" Hsu.  Hsu allegedly used a factory in Shenzhen, China, called the "Hoky" factory and owned by Kenny Deng, to manufacture counterfeit Ubiquiti products.  Hsu then allegedly distributed the products through Kozumi or its subsidiaries to markets also served by Ubiquiti.

Ubiquiti completed its IPO on October 14, 2011.  Plaintiffs allege that, in statements leading up to and after the IPO, Ubiquiti knowingly or recklessly misrepresented the risk that counterfeiting presented to its business.  Specifically, plaintiffs identify six different allegedly misleading statements: (1) a registration statement filed with the Securities Exchange Commission ("SEC") in connection with Ubiquiti's IPO, which, plaintiffs allege, misrepresented the state of Ubiquiti's counterfeiting problem by characterizing it as a mere contingency when in fact it was an existing and growing problem; (2) & (3) earnings reports filed with the SEC which contained substantially the same warnings as the registration statement but were filed somewhat later, namely, in connection with financial statements covering the first quarter of fiscal year 2012 ("1Q12"), as

United States District Court
Northern District of California

1   well as the second quarter ("2Q12"); (4) a statement made in connection with Ubiquiti's 2Q12

2   announcement by Ubiquiti CEO Pera, in which Pera stated that the performance of Ubiquiti's "big

3   hitters" in 2Q12 was consistent with that of the previous quarter; (5) a press release Ubiquiti issued

4   in connection with its financial results for the third quarter of fiscal year 2012 ("3Q12") which

5   quoted Pera saying there was "solid momentum across all elements" of the company's product

6   lines; and, finally, (6) a May 1, 2012 statement made by Ubiquiti's CFO Ritchie representing that

7   Argentina, among other South American countries, "continue[d] to do well" for Ubiquiti.

8          Seventeen days after this last statement, on May 18, 2012, Ubiquiti filed a trademark action

9   in this Court against Hsu and Kozumi, seeking, among other things, a temporary restraining order

10   halting Hsu and Kozumi's encroachment on Ubiquiti's intellectual property rights.[1]   In support of

11   Ubiquiti's application for a temporary restraining order, Ritchie filed a declaration stating, among

12   other things, that sales orders for Argentina had declined by 88 percent between 2Q12 and 3Q12,

13   and that Argentina's book-to-bill ratio (a measure of demand for goods) had also declined severely.

14          The Court will supply further details as pertinent in the analyses that follow.

15   **APPLICABLE LEGAL STANDARD**

16          A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

17   the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  "Dismissal can be

18   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

19   cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

20   All allegations of material fact are taken as true and construed in the light most favorable to the

21   plaintiff.  *Johnson v. Lucent Techs.*, Inc., 653 F.3d 1000, 1010 (9th Cir. 2011).  To survive a motion

22   to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

23   relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

24   *Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

---

25
26   [1] Ubiquiti obtained the requested temporary restraining order, as well as, later, a preliminary
injunction.  *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, C 12-2582 CW, 2012 WL 2343670
27   (N.D. Cal. June 20, 2012) (Wilken, C.J.) (temporary restraining order); *Ubiquiti Networks, Inc. v.
Kozumi USA Corp.*, C 12-2582 CW, 2012 WL 2598997 (N.D. Cal. July 5, 2012) (Wilken, C.J.)
28   (preliminary injunction).  The parties ultimately settled, stipulating to a permanent injunction.  N.D.
Cal. Case. No. 12-cv-2582, Dkt. No. 168.

## DISCUSSION

The Court turns first to Counts 1 and 2 of the CAC, which arise under the Securities Act. The Court then skips to Count 4, brought under the Exchange Act.  The Court addresses Counts 3 and 5 in tandem at the end of this opinion, because those counts require plaintiffs to plead an underlying violation of the securities laws and, as set forth herein, the Court finds that plaintiffs have failed to do so.

## I.    COUNT 1: SECTION 11 OF THE SECURITIES ACT

Section 11 "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).  To state a claim under Section 11, plaintiffs must adequately plead "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)).  Section 11 is a strict liability statute that does not require fraudulent intent.  *Daou*, 411 F.3d at 1027.  However, claims that lack the element of fraud are still subject to the heightened pleading requirements of Rule 9(b) if they "sound in fraud." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996).

For purposes of the instant motion, the parties raise two fundamental issues regarding plaintiffs' Section 11 claim: (a) whether plaintiffs' allegations satisfy the Section 11 standing requirement that their shares be "traceable" back to the IPO; (b) assuming standing, whether the heightened pleading standing of Rule 9(b) applies to plaintiffs' Section 11 claim; and (c) whether plaintiffs have pled a prima facie Section 11 claim under the applicable pleading standard.  As set forth below, the Court answers the first two questions in the affirmative and the last in the negative. Accordingly, the Court **GRANTS** the motion to dismiss plaintiffs' Section 11 claim.

### A.    Whether Plaintiffs' Shares Are "Traceable" to Establish Standing

To have standing to bring a Section 11 claim, plaintiffs must be able to trace their shares back to an allegedly misleading registration statement. *Century Aluminum*, 729 F.3d at 1106 (citing

1    *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1080 (9th Cir. 1999); *Lee v. Ernst & Young,*

2    *LLP,* 294 F.3d 969, 978 (8th Cir. 2002)).   *Century Aluminum* outlined two types of situation in

3    which the tracing issue arises, and explained what both require of a plaintiff seeking to allege

4    standing.  In the first situation, "all of a company's shares have been issued in a single offering

5    under the same registration statement." *Id.*  In such circumstances, the tracing requirement

6    "generally poses no obstacle." *Id.*  Simply pleading that the plaintiff's shares "are directly traceable

7    to the offering in question states a claim 'that is plausible on its face.'" *Id.* at 1107 (quoting

8    *Twombly*, 550 U.S. at 570).  "No further factual enhancement is needed because by definition *all* of

9    the company's shares will be directly traceable to the offering in question." *Id.* (emphasis in

10   original) (citing *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003)).

11        The second situation occurs when "a company has issued shares in multiple offerings under

12   more than one registration statement." *Id.*  In such scenarios, "the plaintiff must prove that her

13   shares were issued under the allegedly false or misleading registration statement, rather than some

14   other registration statement." *Id.* at 1106.  "Courts have long noted that tracing shares in this

15   fashion is 'often impossible,' because 'most trading is done through brokers who neither know nor

16   care whether they are getting newly registered or old shares,' and 'many brokerage houses do not

17   identify specific shares with particular accounts but instead treat the account as having an

18   undivided interest in the house's position.'" *Id.* at 1107 (quoting *Barnes v. Osofsky*, 373 F.2d 269,

19   271-72 (2d Cir. 1967)).  At the pleading stage, then, a plaintiff must allege facts from which the

20   court can "reasonably infer that their situation is different." *Id.* at 1108.  The court may require "a

21   greater level of factual specificity" in the complaint before it may "reasonably infer that shares

22   purchased in the aftermarket are traceable to a particular offering." *Id.* at 1107.  "Making this

23   determination is 'a context-specific task that requires the reviewing court to draw on its judicial

24   experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

25        Here, plaintiffs adequately allege their statutory standing to bring a Section 11 claim.  They

26   allege the existence of, and the Court incorporates by reference, the Form S-1 Registration

27   Statement that Ubiquiti filed in connection with its IPO.  (CAC ¶ 107; Dkt. No. 58 ("Masuda

28

Decl."),  Ex. 1 ("Registration Statement").)[2]  Further, they allege that they "acquired Ubiquiti shares pursuant and/or traceable to the Registration Statement for the IPO."  (CAC ¶ 197.)  The Registration Statement contained a lock-up provision that prevented resale of the shares offered in the IPO for 180 days thereafter.  (Reg. Stmt. at 126.)  Two of the named plaintiffs allegedly purchased their Ubiquiti shares in March 2012—about five months after the October 14, 2011 IPO, thus within the 180-day post-IPO lock-up period.  (CAC ¶ 28 (citing Dkt. No. 10-1 at 3; Dkt. No. 24-2 at 4).)[3]  Plaintiffs contend, relying on the first *Century Aluminum* approach, that these shares must be traceable to the IPO and the accused registration statement because there were no other shares available.

---

[2]  Gavin Masuda, co-counsel for the Ubiquiti Defendants, submitted a declaration in support of their motion to dismiss.  The Masuda Declaration attaches 19 exhibits.  The Ubiquiti Defendants submitted a request for judicial notice in support of their motion, which request is partly opposed and fully briefed.  (Dkt. Nos. 59, 66, 68.)  Plaintiffs state that they do not oppose the Court's taking judicial notice of Exhibits 1 through 3, 5 through 8, 10 through 16, and 18, because those exhibits "are referenced in" the CAC.  (Dkt. No. 66 at 1.)  Though plaintiffs frame their statement in terms of judicial notice, the applicable doctrine is actually incorporation by reference.  *Compare Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation by reference doctrine applies in situations where "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint") *with United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (court ruling on Rule 12(b)(6) motion may take judicial notice of "matters of public record," regardless of whether they are attached to the complaint, "but not of facts that may be subject to reasonable dispute").  Courts taking judicial notice of documents generally take notice only of their existence, not the truth of their representations (unless beyond reasonable dispute).  However, where a document is incorporated by reference, it becomes part of the complaint and the court accordingly assumes the truth of its contents for the purposes of ruling on motion to dismiss pursuant to Rule 12(b)(6).  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Here, the Court incorporates by reference Exhibits 1 through 3, 5 through 8, 10 through 16, and 18 of the Masuda Declaration.  As to the remaining exhibits, the Court takes judicial notice of them as matters of public record.  Three of the exhibits are news stories which plaintiffs do not dispute appeared in the press.  (Masuda Decl., Exs. 4, 9, 19.)  The Court takes judicial notice of the stories' existence, but does not assume the truth of their contents.  The fourth and final exhibit is an SEC filing by Defendant and Ubiquiti CEO Pera.  (*Id.*, Ex. 17.)  The Court takes judicial notice of both its existence and its contents, the truth of which plaintiffs do not contest.  The Court rejects plaintiffs' argument that taking judicial notice of the Pera filing necessitates discovery and conversion of the Rule 12(b)(6) motions at bar into summary judgment motions.  *Ritchie*, 342 F.3d at 908.

[3]  The Court incorporates by reference the factual allegations set forth in the certifications filed by Inter-Local Pension Fund GSS/IBT and Bristol County Retirement System.

1    The Underwriter Defendants respond that the second *Century Aluminum* approach is the

2  appropriate one because, they say, something less than all of Ubiquiti's shares were locked up.

3  (Underwriter Reply at 4.)  The Underwriter Defendants aver that, under the Prospectus, which the

4  CAC incorporates by reference, some 26,000 shares out of 87 million were not subject to the lock-

5  up agreement and that, moreover, it provided an exception to the lock-up agreement such that any

6  holders of locked-up stock could dispose of their shares "if they received permission to do so."

7  (*Id.*)  The Underwriter Defendants' brief does not represent how many, if any, exceptions were

8  granted, and at oral argument counsel acknowledged that the number is unknown.  (*Id.*; Dkt. No. 74

9  ("Transcript") at 12:23-24.)  Nevertheless, the Underwriter Defendants contend that plaintiffs lack

10  standing because "[t]here is no way to know whether the shares plaintiffs purchased originated in

11  the IPO."  (Underwriter Reply at 4.)[4]

12    If defendants' figures are true, then plaintiffs' allegations would not prove their standing to a

13  certainty.  Under *Century Aluminum*, however, the bar plaintiffs must clear to plead their claim is

14  set only as high as "plausibility," not, as defendants would have it, certain knowledge.  *See* 729

15  F.3d at 1107-08.  Even assuming defendants are correct about the number of unrestricted shares

16  available at the time plaintiffs purchased their shares, plaintiffs' theory of standing is

17  straightforward, eminently plausible, and, indeed, highly likely.  Defendants' alternate

18  explanation—that plaintiffs chanced to purchase some of the 26,000 unrestricted shares buried in a

19  haystack of over 87 million—is plausible, but not as plausible as plaintiffs' explanation.  This case

20  is not like *Century Aluminum*, where some 46 million shares were already available on the public

21  market at the time plaintiffs bought in a secondary offering of 24.5 million shares.  729 F.3d at

22  1106.  Rather, here, the CAC and documents incorporated therein allege that all or very nearly all

23  the shares of stock available publically at the time plaintiffs bought in March 2012 were traceable

24  to the registration statement for the only offering that had been made at that time, Ubiquiti's IPO.

25

26  ────────────

[4] Defendants cite page 126 of the Registration Statement as support for their contention that 26,000

27  shares of stock were available to the public on the date of the IPO.  (Underwriter Reply at 4 (citing
   Reg. Stmt. at 126).)  However, as plaintiffs pointed out at oral argument, the page does not contain

28  the proffered data.  The Court assumes arguendo, for purposes of this discussion only, that defense
   counsel's representation regarding the 26,000 shares, which was made pursuant to Rule 11, is true.

1   Under *Century Aluminum*, plaintiffs satisfactorily allege their standing to pursue a Section 11

2   claim.  Accordingly, the Underwriter Defendant's motion is **DENIED** to the extent it challenges

3   plaintiffs' Section 11 standing.

4        **B.    Given Standing, Whether Plaintiffs' Section 11 Claim Must be Pled with**
         **Particularity**

5

6        "Although the heightened pleading requirements of the [Private Securities Litigation

7   Reform Act ("PSLRA")] do not apply to section 11 claims . . . , plaintiffs are required to allege

8   their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their

9   complaint 'sounds in fraud.'"  *Rubke*, 551 F.3d at 1161 (citation omitted) (quoting *Daou*, 411 F.3d

10  at 1027).  Courts normally ascertain whether a complaint sounds in fraud by determining, "after a

11  close examination of the language and structure of the complaint, whether the complaint 'allege[s] a

12  unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a

13  claim.'"  *Id.* (alteration in original) (quoting *Vess,* 317 F.3d at 1103-04).  If a complaint employs

14  "the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent

15  conduct under section 10(b) of the Exchange Act," the court may "assume that it sounds in fraud."

16  *Id.* (citing *Daou,* 411 F.3d at 1028).  However, "[a] plaintiff 'may choose not to allege a unified

17  course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some

18  non-fraudulent conduct.'"  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012)

19  (quoting *Vess,* 317 F.3d at 1104).  That said, "a plaintiff's nominal efforts to disclaim allegations of

20  fraud with respect to its section 11 claims" should be deemed "unconvincing where the gravamen

21  of the complaint is fraud and no effort is made to show any other basis for the claims."  *Id.* at 885

22  (citing *Stac,* 89 F.3d at 1405 n.2).  "Fraud can be averred by . . . alleging facts that necessarily

23  constitute fraud (even if the word 'fraud' is not used)."  *Vess*, 317 F.3d at 1105.

24       Here, plaintiffs' basis for their Section 11 claim is a set of representations made in the

25  Registration Statement.  (*See* CAC ¶¶ 107-14.)  Language from the Registration Statement set forth

26  in paragraph 110 of the CAC is illustrative:

27          **If our contract manufacturers do not respect our intellectual**
            **property and trade secrets and if they or others produce competitive**
28          **products reducing our sales or causing customer confusion, our**

**business, operating results and financial condition could be materially adversely affected**.

> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge.  Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, we may be unsuccessful in monitoring and enforcing our intellectual  property rights in China.  *We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products.*  Although we take steps to stop counterfeits, we *may* not be successful and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand *may* be harmed.  If such an impermissible use of our intellectual property or trade secrets *were to occur*, our ability to sell our products at competitive prices and to be the sole provider of our products *may* be adversely affected and our business, operating results and financial condition *could* be materially and adversely affected.

(CAC ¶ 110 (quoting Reg. Stmt. at 20-21) (boldface in original; italicization supplied).)

Plaintiffs allege, in essence, that Ubiquiti's statements regarding the risk posed by counterfeiting were misleading because the company and its officers knew of an *existing* counterfeiting problem but concealed that information by characterizing counterfeiting as a merely *possible* risk.  (*See, e.g.*, CAC ¶ 10 ("defendants had known about the counterfeiting problems since 2009"), 87 ("Defendants misled investors by concealing the counterfeiting problems and their adverse impact on Ubiquiti's business and representing in the Registration Statement and Prospectus that the sale of counterfeit products was only a risk . . . .").)  That is, plaintiffs aver that Ubiquiti privately knew one thing to be true but purposefully concealed the truth in their public statements.  Whatever label plaintiffs would attach to it, that is the very substance of fraud.

Plaintiffs assert that their Section 11 claim does *not* sound in fraud because they do not allege a "unified course of fraudulent conduct" and do not make a "wholesale adoption" of their securities fraud allegations—that is, they do not rely on the exact same allegations for both a Section 10(b) claim and the subject Section 11 claim.  (Opp'n at 7 (quoting *Daou*, 411 F.3d at 1027-28).)  Plaintiffs point to paragraph 191 of the CAC, which states:

> This Count [i.e., Section 11] does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  Plaintiff does not allege that the Officer Defendants, Director Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a § 11 claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (CAC ¶ 191.)  Plaintiffs also rely on the fact that, when pleading their Section 11 misrepresentation

2  claim, they did not incorporate all of the allegations relied on for their Section 10(b) fraud claim.

3  (Opp'n at 8; *compare* CAC ¶ 189 (first paragraph in Section 11 claim, pleading that "Plaintiff

4  incorporates ¶¶ 1-13, 25-114 and 172-188 by reference") with *id.* ¶ 217 (first paragraph in Section

5  10(b) claim, pleading that "Plaintiff incorporates ¶¶ 14-54 and 115-188 by reference").)

6  While it is true that plaintiffs have not pled a unified course of fraudulent conduct or

7  engaged in a "wholesale adoption" in a punctilious, hypertechnical sense, their Section 11 claim

8  still sounds in fraud, for three reasons.  First, alleging a unified course of fraudulent conduct is but

9  one way that a Section 11 claim can sound in fraud, not, as plaintiffs state, the "only" way.  (Opp'n

10  at 7.)  *Daou*, on which plaintiffs rely, stands for the proposition that a unified course of conduct is a

11  sufficient condition for finding that a Section 11 claim sounds in fraud; it does not establish that a

12  unified course of fraudulent conduct is *necessary* to plead a claim that sounds in fraud.  411 F.3d at

13  1027-28.  Second, under *Rigel Pharmaceuticals*, plaintiffs' nominal effort to exclude allegations of

14  fraud is unconvincing in light of their failure to articulate any other characterization of Ubiquiti's

15  alleged wrongdoing.  (*See* Opp'n at 10 (describing "international counterfeiting scheme" as

16  "known" to Ubiquiti Defendants); Transcript at 7:3-15 (stating that plaintiffs have pled Ubiquiti

17  Defendants' "knowledge" of the counterfeiting scheme).)  Finally, plaintiffs' effort to plead around

18  their own allegations of fraud is undermined by their use of allegations incorporated into their

19  Section 11 claim alone when defending their Section 10(b) securities fraud claim.  (*See* Opp'n at 20

20  (citing paragraphs 61-63, 83, 85, 115, 116, and 122 of the CAC in support of their Section 10(b)

21  claim, which incorporates only paragraphs 14-54 and 115-188).)

22  The Court acknowledges that an entire complaint is not subject to Rule 9(b) merely because

23  some allegations sounding in fraud are found next to allegations that do not.  *Vess*, 317 F.3d at

24  1104.  However, here, plaintiffs seek merely to allege fraud without uttering the word.  That

25  exercise in artful pleading does not entitle them to the relatively lower pleading standard of Rule 8.[5]

26  The Court holds that plaintiffs' Section 11 claim, as pled in the CAC, sounds in fraud.

27
28  [5] Plaintiffs' pleading approach is objectionable for another reason as well: by failing to articulate which allegations of fraud it purports to "specifically exclude[]" (CAC ¶ 191), it imposes an unfair burden on defendants and this Court. *Cf. McHenry v. Renne*, 84 F.3d 1172, 1179-80 (9th Cir.

11

**C.      Whether Plaintiffs Have Pled a Prima Facie Section 11 Claim**

A plaintiff states a prima facie Section 11 claim by pleading "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Daou,* 411 F.3d at 1027 (quoting *Stac,* 89 F.3d at 1403-04). "No scienter is required for liability under section 11; defendants will be liable for innocent or negligent material misstatements or omissions." *Id.*

As explained above, plaintiffs' Section 11 claim sounds in fraud, so they are required to "set forth what is false or misleading about a statement, and why it is false." *Rubke*, 551 F.3d at 1161 (quoting *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999)).  "This requirement can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Id.* (internal quotation marks omitted).  Where "particular averments of fraud are insufficiently pled under Rule 9(b)," the Court will "'disregard' those averments or 'strip' them from the claim" and "then examine the allegations that remain to determine whether they state a claim." *Daou,* 411 F.3d at 1028 (quoting *Vess*, 317 F.3d at 1105).

The Ubiquiti Defendants attack both the "omission or misrepresentation" and the "material" prongs of plaintiffs' Section 11 claim.  As set forth below, plaintiffs fail to plead a false or misleading omission or representation and, accordingly, the Court need not address the Ubiquiti Defendants' attack on the element of materiality.

Plaintiffs base their Section 11 claim on statements contained in the "Risk Factors" section of the Registration Statement Ubiquiti initially filed with the SEC on June 17, 2011 and which came into its final form on October 14, 2011, the day of the IPO.  (CAC ¶¶ 107-13; *see also*

1996) (criticizing complaint that fails to identify in a "short and plain statement" which allegations support which claim against which defendant).  Plaintiffs may not shift onto "litigants and judges" their own burden of articulating what, exactly, it is they have pled. *See id.*  Plaintiffs appear to expect that defendants, as well as this Court, will pick through the allegations of the CAC and then weigh each fact set forth therein to determine whether *plaintiffs* would believe that it goes to "fraud or fraudulent conduct and/or motive."  This will not do.  In any further complaint, plaintiffs shall give a short *and plain* account of which facts they rely upon for each count.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Registration Statement at 20-21, 24-26.)  The crux of plaintiffs' claim is that the Registration

2    Statement's "characterization of the counterfeiting scheme as a mere potential risk or contingency

3    was misleading" because the counterfeiting scheme was an actual and growing problem.  (Opp'n at

4    10-11; *see also* CAC ¶¶ 110-13 (enumerating ways defendants allegedly "misled investors".)  The

5    difficulty with this position, as defendants point out, is that the Registration Statement divulges that

6    Ubiquiti had, at the time of the Registration Statement, "found and expect[ed] in the future to find

7    counterfeit goods in the marketplace being sold as Ubiquiti products."  (CAC ¶ 110 (quoting Reg.

8    Stmt. at 20).)  The Registration Statement elaborates:

9            Although we take steps to stop counterfeits, we may not be successful and
             network operators and service providers who purchase these counterfeit
10           goods may have a bad experience and our brand may be harmed.  If such an
             impermissible use of our intellectual property or trade secrets *were* to occur,
11           our ability to sell our products at competitive prices and to be the sole
             provider of our products *may be* adversely affected and our business,
12           operating  results and financial condition *could* be materially and adversely
             affected.
13
     (*Id.* (emphasis supplied).)  Similarly, at page 26, the Registration Statement stated:
14
             Monitoring unauthorized use of our intellectual property is difficult and
15           costly.  *Unauthorized use of our intellectual property has occurred in the
             past and may occur in the future without our knowledge.* The steps we have
16           taken *may not prevent* unauthorized use of our intellectual property.  Further,
             we *may* not be able to detect unauthorized use of, or take appropriate steps to
17           enforce our intellectual property rights.

18   (*Id.* ¶ 111 (quoting Reg. Stmt. at 26) (emphasis supplied).)

19           Not all of plaintiffs' cited passages from the Registration Statement contain reports of actual

20   counterfeiting, however.  Paragraph 112 of the CAC describes risks pertaining to limited

21   intellectual property enforcement regimes abroad, but does not state that Ubiquiti had suffered

22   actual difficulties with enforcement, only that "[m]any companies" had.  (CAC ¶ 112 (quoting Reg.

23   Stmt. at 26).)  Likewise, paragraph 113 describes Ubiquiti's reliance on "a combination of patent,

24   copyright, trademark[,] and trade secret laws, as well as confidentiality procedures and contractual

25   restrictions, to establish and protect [Ubiquiti's] proprietary rights," and states that (i) "effective

26   patent, trademark, copyright[,] and trade secret protection *may* not be available in every country in

27   which our services and products are available," (ii) "others *may* independently develop technologies

28   that are competitive with ours or that infringe on our intellectual property," and (iii) Ubiquiti's

1    enforcement of its intellectual property rights "depends on the success of [Ubiquiti's] legal actions

2    against these infringers, but these actions *may* not be successful, even when [Ubiquiti's] rights have

3    been infringed."  (*Id.* ¶ 113 (quoting Reg. Stmt. at 12) (emphasis supplied).)

4        Plaintiffs do not establish with the requisite particularity why these statements are false or

5    misleading.  Plaintiffs argue that the statements are misleading because events described as

6    contingencies had already occurred.  But several of the statements acknowledge this fact, stating

7    that counterfeit "Ubiquiti" goods already had been found in the marketplace and that Ubiquiti's

8    intellectual property rights already had been infringed.  This latter risk, of intellectual property

9    infringement, is the same risk described in paragraphs 112 and 113, stating the risks attendant upon

10   the difficulty of intellectual property enforcement in some foreign jurisdictions.

11       Plaintiffs' allegations of the scope of the counterfeiting scheme at the time the Registration

12   Statement issued—October 14, 2011, concurrent with the IPO—do not establish with the requisite

13   particularity why the statements in the Registration Statement are false or misleading.  To show

14   why, it is necessary for the Court to review those allegations in some detail:

15       In November 2009, Ubiquiti terminated a distribution agreement with Kozumi and its

16   owner, Hsu.  (CAC ¶ 65.)  Through subsidiaries also controlled by Hsu, Kozumi had been a

17   distributor of legitimate Ubiquiti products in Argentina, Paraguay, and Brazil, but Ubiquiti's Vice

18   President of Business Development, Benjamin Moore, learned that Kozumi also "was offering

19   copycat Ubiquiti products under the Kozumi name."  (*Id.* ¶ 50, 67.)  Plaintiffs allege that, after

20   Ubiquiti terminated Kozumi's distributorship, Hsu then masterminded a worldwide scheme to sell

21   counterfeit Ubiquiti products.  (*Id.* ¶ 67-68.)  Hsu's alleged partner in the scheme was a Chinese

22   national called Kenny Deng, who owned the Hoky factory, a manufacturing facility in Shenzhen,

23   China.  (*Id.* ¶ 68.)

24       In early 2010, Moore received three emails from different Ubiquiti distributors indicating

25   that Kozumi was selling products similar to Ubiquiti products and that Kozumi was trying to

26   acquire Ubiquiti products through Ubiquiti distributors.  (CAC ¶¶ 69-72.)  Moore allegedly asked

27   the distributors to refrain from doing business with Hsu and Kozumi.  (*Id.* ¶ 73.)  In the latter half

28   of 2010, Hsu obtained the Argentine trademark for "UBIQUITI NETWORKS & Design from third-

party Ditelco Informatica S.R.L. . . . , which had registered the trademark in May 2008" (the "Argentine Trademark") and filed Argentine trademark applications for other marks associated with three Ubiquiti products.  (*Id.* ¶¶ 74-75 (capitals in original).)

On January 1, 2011, armed with the Argentine Trademark, Shu represented to customs authorities in China that Hoky was authorized to "manufacture and export" Ubiquiti and other products.  (CAC ¶ 76.)

In early 2011, Ubiquiti received two more emails from different Argentine distributors apprising of Kozumi products similar or identical to Ubiquiti products.  (CAC ¶¶ 77, 78.)  In March 2011, Ubiquiti hired a new vice president of operations, Yu Cheng Lin ("Lin").  (*Id.* ¶ 79.)  Ubiquiti CEO and founder Pera told Lin of "a potential counterfeit issue in China" and tasked him with investigating counterfeit operations at the Hoky facility.  (*Id.*)  In "late March 2011 or early April 2011," Moore received word from a Chinese Ubiquiti distributor that "Hoky was manufacturing counterfeit Ubiquiti products at its factory and using the Ubiquiti brand on the products."  (*Id.* ¶ 80.)

In April 2011, Moore and Pera traveled to Shenzhen to investigate the Hoky factory.  (CAC ¶ 81.)  On the taxi ride to Hoky, "the taxi driver called the factory and warned them that he was bringing two Americans," which led Moore and Pera to suspect Hoky's manufacture of counterfeit goods.  (*Id.*)  At the factory, Moore and Pera met Deng, the Hoky factory's owner, who denied making counterfeit goods but also stated that "everybody does it."  (*Id.*)

Following the visit by Moore and Pera, Ubiquiti investigated further, sending "someone to the Hoky factory who reported that Hoky was making counterfeit Ubiquiti products."  (CAC ¶ 82.)  Ubiquiti then contrived to have persons in Argentina and China acquire Hoky-manufactured products bearing Ubiquiti's name, and, on August 30, 2011, confirmed through internal analysis that those products were counterfeit.  (CAC ¶ 82.)  Ubiquiti thereafter retained a law firm in China, which worked with Chinese authorities to shut down the Hoky factory in a raid that occurred a month on November 17, 2011, roughly one month *after* Ubiquiti's October 14, 2011 IPO.  (CAC ¶ 86.)  Later, Ubiquiti learned that, prior to the raid on Hoky, in September and October of 2011,

1   Hoky had shipped about 46,000 counterfeit Ubiquiti products with a total value of roughly $1.7

2   million to countries in South America, the Middle East, and Asia.  (*See id.* ¶ 84.)

3          It is on the strength of these allegations that plaintiffs argue that the Registration Statement

4   was misleading because it failed to express the full magnitude of the counterfeiting problem the

5   company faced from 2009 to the October, 14 2011 IPO.  However, to plead a misleading statement

6   under the securities laws, it is not enough merely to allege a failure to make a full disclosure.

7   *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *In re Cutera Sec. Litig.*,

8   610 F.3d 1103, 1109 (9th Cir. 2010).  Rather, to be actionably misleading, an omission "must

9   affirmatively create an impression of a state of affairs that differs in a material way from the one

10  that actually exists."  *Brody*, 280 F.3d at 1006 (citing *McCormick v. The Fund American Cos.*, 26

11  F.3d 869, 880 (9th Cir. 1994)); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-88

12  (9th Cir. 2008) (where company chose to "tout" its backlogged projects as future revenue,

13  company's failure to warn that stop-work orders had issued on certain backlogged projects and

14  therefore likely never would produce revenues was misleading).

15         Here, the activities alleged in November 2009 through October 2011 amount to nothing

16  more than what the Registration Statement ultimately warned of in synoptic form: a present

17  problem with counterfeiting, against which Ubiquiti was taking action, and which could prove

18  difficult to detect and combat for the reasons described in the Registration Statement.  While it is

19  true that the Registration Statement sometimes employs the subjunctive mood, which indicates

20  possibility and other counterfactual states, the Registration Statement also reports that counterfeit

21  goods *had* been found in the marketplace and that Ubiquiti's intellectual property rights *had* been

22  infringed.  The import of those statements is unmistakable, notwithstanding the statements of

23  contingency beside which they sometimes appear.  Read as a whole, the Registration Statement

24  apprises the marketplace that counterfeiting and intellectual property violations have occurred and

25  are expected to reoccur, that these slights to Ubiquiti's brand are difficult to police, and that they

26  may prove deleterious to Ubiquiti's standing in the market.  Plaintiffs offer no persuasive reason

27  why the accused statements are false or misleading simply because they sometimes, though not

28  always, described counterfeiting as a contingency rather than an actuality.  *See*, *e.g.*, *In re*

United States District Court
Northern District of California

16

United States District Court
Northern District of California

*Convergent Technologies Sec. Litig.*, 948 F.2d 507, 515-16 (9th Cir. 1991) (finding adequate disclosure of risk that had already materialized to some extent where risk statement was "substantive" and "repeatedly emphas[ized] significant risk factors"; warning that the "securities laws do not require management to bury shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking" (internal quotation marks omitted)); *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (holding that "defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors [in their risk statements] 'are' affecting financial results rather than 'may' affect financial results"; collecting citations).  Further, plaintiffs offer no persuasive reason why the accused statements are false or misleading in the absence of further detail.  "Often, a statement will not mislead even if it is incomplete or does not include all relevant facts. . . .  No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not."  *Brody*, 280 F.3d at 1006.

For the foregoing reasons, the Court determines that plaintiffs have failed to plead adequately the "false or misleading" element of their Section 11 claim, and **GRANTS** defendants' motion to dismiss that claim without prejudice to further amendment.[6]

## II.   COUNT 2: SECTION 12(A)(2) OF THE SECURITIES ACT

The Underwriter Defendants challenge plaintiffs' statutory standing to bring a Section 12 claim, as well as plaintiffs' pleading of the "seller" prong of a prima facie Section 12(a)(2) claim.  The Court dismisses this claim because plaintiffs concede that the CAC fails to allege their statutory standing for purposes of bringing a Section 12 claim.

A plaintiff establishes standing to sue under Section 12 by showing she purchased its shares in a public offering, as opposed to the secondary market.  *Gustafson v. Alloyd Co., Inc.*, 513 U.S.

---

[6] The Court need not and does not resolve the Ubiquiti Defendants' challenge to plaintiffs' pleading of the "materiality" prong of their Section 11 claim.  The Court notes, however, that the materiality for Section 11 purposes is rarely appropriate to decide at the motion to dismiss stage.  *See Siracusano v. Matrixx Initiatives*, *Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009) aff'd, 131 S. Ct. 1309 (U.S. 2011)) (explaining that materiality is only appropriately resolved as a matter of law "where the omissions are so obviously important to an investor[] that reasonable minds cannot differ on the question of materiality" (internal quotation marks omitted)).

United States District Court
Northern District of California

561, 577 (1995); *see also In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007) (explaining that "the majority of the cases appear to hold that, based on *Gustafson*, § 12 is limited to transactions purchased pursuant to a public offering and, therefore, does not extend to *any* after market transactions" (emphasis in original)).  The Underwriter Defendants assert that plaintiffs fail to allege that they purchased their shares in the IPO directly.  (Underwriter MTD at 5-7.)  Plaintiffs concede the point by stating that they "can" allege standing if given leave to amend their complaint to add Gregory Osborn as plaintiff.  (Opp'n at 18.)  Plaintiffs aver that Osborn purchased his shares in the IPO.  (*Id.*; *Id.* Ex. A. (Osborn certification of stock purchases).)

The Underwriter Defendants argue that it would be futile to permit plaintiffs to add Osborn to their complaint because Osborn's certificate establishes he did not buy his stock in the IPO.  They argue that, first, his certificate indicates that bought stock the day *before* the IPO, and, second, his certificate says he bought shares at the price of $17.72, when the IPO price was set between $15.00 and $17.00.  (Underwriter Reply at 5-6; *see also* Transcript at 12:1-14-18.)  The Court concludes that the Underwriter Defendants raise, at most, the possibility that Osborn *may* not have standing for Section 12 purposes.  However, their arguments range outside the pleading presently before the Court and marshal no judicially noticeable facts to support their challenge to Osborn's suitability as a Section 12 plaintiff.  Accordingly, defendants have not made the "strong showing" of futility that would warrant denial of plaintiffs' request for leave to amend.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

The Court **GRANTS** the Underwriter Defendants' motion to dismiss plaintiffs' Section 12(a)(2) claim and **DISMISSES** that claim without prejudice.[7]

## III.   COUNT 3: SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5

Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the

---

[7] The Court need not and does not reach the Underwriter Defendants' argument that plaintiffs failed to allege that they were statutory "sellers."

protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making

it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state

a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

In 1995, Congress enacted the PSLRA as a check against abusive litigation[8] by private

parties. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Heightened

pleading is one of the control measures Congress included to advance "the PSLRA's twin goals:  to

curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on

meritorious claims." *Id.* at 322.  Under the PSLRA's heightened pleading requirement, to state a

Section 10(b) claim, plaintiffs must allege facts sufficient to establish (i) that the defendant made a

material misrepresentation or omission of fact; (ii) that the misrepresentation was made with

scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a

security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic

loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  Here,

the Ubiquiti Defendants contest only the first two elements, that is, whether the CAC adequately

pleads (a) material misstatement and (b) scienter.  The Court addresses those elements in order.

### A.        First Challenged Element: Material Misstatement

Under the "total mix" approach of *Basic*, a statement is material "when there is a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available.'"  *Reese v.

Malone*, --- F.3d ---, 2014 WL 555911, at *6 (9th Cir. Feb. 13, 2014) (quoting *Basic Inc. v.

Levinson*, 485 U.S. 224, 231-32 (1988)).  "To plead materiality, the complaint's allegations must

'suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the

materiality requirement, and to allow the court to draw the reasonable inference that the defendant

---

[8] Members of the House and Senate "observed that plaintiffs routinely were filing lawsuits 'against issuers of securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action[.]'"  *In re Silicon Graphics*, 183 F.3d at 978 (quoting H.R. Conf. Rep. 104–369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730) (alterations in original).

United States District Court
Northern District of California

19

United States District Court
Northern District of California

is liable.'"  *Id.* (quoting *Matrixx*, 131 S. Ct. at 1323).  "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Id.* (quoting *Cutera*, 610 F.3d at 1108).

The CAC bases its Section 10(b) claim on five allegedly material misstatements.  First, plaintiffs point once more to the very statements made in the Registration Statement, but this time to those set forth in (1) Ubiquiti's SEC Form 10-Q for 1Q12, filed on November 14, 2011, and (2) Ubiquiti's SEC Form 10-Q for 2Q12, filed on January 31, 2012.  Next, plaintiffs identify (3) Ubiquiti CEO Pera's statement on a January 31, 2012, conference call with analysts that Argentina was a "big hitter" driving growth in Latin America, even though at some point in time Ubiquiti discovered that demand for Ubiquiti's products in Argentina had softened considerably.  Plaintiffs also identify (4) Ubiquiti's May 1, 2012 press release, issued in conjunction with its 3Q12 report, which quoted Pera saying there was "solid momentum across all elements" of the company's product lines.  Finally, plaintiffs identify (5) the statement of Ubiquiti CFO Ritchie on a May 1, 2012 conference call where Ritchie stated that Argentina, among other South American countries, "continue[d] to do well for" Ubiquiti.  The thrust of plaintiffs' claim is that these statements are materially misleading (and, as discussed below, were made with scienter) because, on May 18, 2012, seventeen days after the last statements identified above, Ubiquiti filed suit in this Court against Kozumi and Hsu seeking to halt their counterfeiting activities and, as part of the lawsuit, Ritchie filed a declaration (CAC, Ex. 7 (the "Ritchie Declaration")) in which he testified to the negative impact that Kozumi and Hsu's counterfeiting activities were having on Ubiquiti, a negative impact felt particularly acutely in Argentina.[9]

///

---

[9] Plaintiffs allege that the Ritchie Declaration stated that: "(a) sales orders from Argentina declined 88% from $6.3 million in 1Q12 to just $726,734 in 2Q12; and (b) the book-to- bill ratio—the ratio of orders booked to orders invoiced—declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12. . . . Indeed, Ritchie stated that the dollar amount of sales orders received from Argentina in 2Q12 was at the lowest level in the last three years.  Ritchie also stated in his sworn declaration that sales from Argentina in 3Q12 were just $998,000, or $4.1 million less than expected, and that the book-to-bill ratio was just 0.47. "  (CAC ¶ 158 (citations omitted).)

1

> 1.     Ubiquiti's SEC Form 10-Q for 1Q12, filed on November 14, 2011

On November 14, 2011, Ubiquiti filed a Form 10-Q with the SEC which reported its financial its results for 1Q12, the quarter ending September 30, 2011 (the "1Q12 10-Q").  (CAC ¶ 117.)  The 1Q12 10-Q included, plaintiffs allege, statements identical to those in the Registration Statement, which had the alleged effect of "perpetuat[ing] the false impression that counterfeiting was not a current problem."  (*Id.* ¶¶ 117-18.)

The Registration Statement became effective the day of the Ubiquiti IPO, October 14, 2011. Plaintiffs identify no events that transpired between that date and the filing, one month later, of the Form 10-Q that would make the Court's analysis of the Registration Statement inapplicable here. Accordingly, for the same reasons applicable to the Registration Statement, plaintiffs fail to allege a material misstatement in Ubiquiti's Form 10-Q of November 14, 2012.

> 2.     Ubiquiti's SEC Form 10-Q for 2Q12, filed on January 31, 2012

Ubiquiti filed its Form 10-Q for 2Q12 on January 31, 2012 (the "2Q12 10-Q").  The 2Q12 10-Q, like the 1Q12 10-Q, repeats statements about counterfeiting made in the Registration Statement.  (CAC ¶¶ 135-36.)  While a number of additional events allegedly occurred following the filing of the 1Q12 10-Q, none of the allegations from that period, when added to what had transpired before, render the statements in the 2Q12 10-Q actionable.

Specifically, the following occurred.  On November 17, 2011, three days after Ubiquiti filed the 1Q12 10-Q, Chinese custom authorities raided the Hoky factory in Shenzhen.  (CAC ¶¶ 63, 122.)  Following the raid, the doors of the Hoky facility were padlocked; the factory's owner, Deng, was taken into custody; and Ubiquiti learned the manner in which its intellectual property had been compromised: an engineer formerly employed by one of Ubiquiti's contract manufacturers had gone to work for Hoky.  (*Id.* ¶ 123.)

About a month later, on December 22, 2011, Ubiquiti CEO Pera and Kozumi owner Hsu began an email colloquy that would last several weeks, the substance of which was, in essence, a negotiation in which Hsu offered to exchange the Argentine Trademark in exchange for Pera and Ubiquiti's withdrawal of legal action against Deng; a promise from Pera not to pursue later legal action against Hsu, Kozumi, or Deng; and a seven-digit payment from Pera/Ubiquiti to

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1  Hsu/Kozumi.[10]  (CAC ¶¶ 124-28.)  Sometime in December 2011, Ritchie, Pera, and other Ubiquiti

2  executives allegedly learned that the Chinese authorities had released Deng from prison, apparently

3  "because he produced documents showing that Hsu owned the [Argentine Trademark]," and that

4  Deng had subsequently reopened the Hoky factory.  (*Id.* ¶ 126.)  Plaintiffs allege that the Hoky

5  factory "grew in size" and that "Deng's relatives opened other counterfeit factories that made larger

6  quantities and a wider variety of Ubiquiti products," including more expensive product lines.  (*Id.*)

7  The CAC does not, however, allege when or how plaintiffs learned these latter facts.

8          In the CAC, plaintiffs reprise their argument that the statements contained in the 2Q12 10-Q

9  were misleadingly incomplete because they failed to characterize counterfeiting as an extant and

10  worsening problem rather than a mere contingency.  (CAC ¶ 137.)  The Court rejects this argument

11  with respect to the 2Q12 10-Q for the same reasons that it rejected it with respect to the

12  Registration Statement and the 1Q12 10-Q.  Ubiquiti's omission of the minutia of its struggle

13  against counterfeiters did not render its statement of the risks counterfeiting posed either false or

14  misleading, given Ubiquiti's disclosure that counterfeiting had occurred in the past and was

15  expected to occur in the future.

16                      3.      Pera's January 31, 2012 conference call statement

17          The third statement plaintiffs challenge stems not from an SEC filing but rather a statement

18  Pera made on a conference call with analysts held on January 31, 2012, concurrent with Ubiquiti's

19  announcement of its 2Q12 financial results.  Pera had the following exchange with an analyst:

20          [Analyst:] [. . .] And then I guess my last question, outside of North
            America, Asia Pac look like that's on fire, South America really strong, what
21          countries in Asia Pac and South America kind of drove the upside?  And
            then obviously, if you look at product lines, is that still largely airMAX only
22          or you're starting to see some international orders for UniFi and AirVision?

23          [Pera]: I think—I'll answer the last question first.  We're seeing international
            orders across the board for all the product line.  And in terms of the big
24

25  [10] Ubiquiti filed a trademark action against Hsu and Kozumi in which it sought and obtained a
    temporary restraining order and, ultimately, preliminary injunction, in part on the basis of the facts
26  alleged in the CAC.  *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, C 12-2582 CW, 2012 WL
    2343670 (N.D. Cal. June 20, 2012) (temporary restraining order); *Ubiquiti Networks, Inc. v.*
27  *Kozumi USA Corp.*, C 12-2582 CW, 2012 WL 2598997 (N.D. Cal. July 5, 2012) (preliminary
    injunction).  The parties ultimately settled, stipulating to a permanent injunction.  N.D. Cal. Case.
28  No. 12-cv-2582, Dkt. No. 168.

United States District Court
Northern District of California

1
2

> hitters in each of the regions, they're consistent with the prior quarter with the exception of Asia.  India, India moved up this quarter, but the other big hitters in Latin America remain Brazil, Paraguay, Argentina, those are the big countries down there.

3   (Masuda Decl., Ex. 17, at 52 of 71; *see also* CAC ¶ 133 (quoting in part).)

4   Plaintiffs allege that Pera's remarks were knowingly or recklessly misleading because they

5   "conceal[ed] the international counterfeiting scheme's impact on sales orders in Argentina and

6   stating that orders from Latin America, including Argentina, were consistent with the prior

7   quarter."  (CAC ¶¶ 133-34.)  Plaintiffs' basis for this characterization is the Ritchie Declaration,

8   filed in the Kozumi litigation on May 18, 2012, more than three months after Pera made the subject

9   statement.  Plaintiffs cite the Ritchie Declaration in alleging that, contrary to Pera's statements on

10  the January 31 conference call:

11
12
13
14

> sales orders from Argentina had plummeted 88% from $6.3 million in 1Q12 to $726,734 in 2Q12, and the book-to-bill ratio declined 91% from 1.85 in 1Q12 to 0.16 in 2Q12. . . .  [The Ritchie Declaration] stated those declines caused great harm to Ubiquiti and that the actual harm to Ubiquiti was even greater because counterfeit goods were being sold in countries other than Argentina.

15  (*Id.* ¶ 134 (citing Ritchie Decl. ¶¶ 5-11).)

16  Leaving aside for now what Pera knew of these facts and when he knew it, the Court must

17  determine whether plaintiffs have adequately pled that the statements Pera made on the January 31

18  conference call were materially misleading.  The Court concludes that one is: Pera's statement that

19  all of the "big hitters" but Asia, a group which included Argentina, had seen growth from quarter to

20  quarter.  The analyst asked two questions, neither of which are models of clarity but which are

21  reasonably intelligible in context: (1) which countries in "Asia Pac"—apparently Asia Pacific—and

22  South America "drove the upside," that is, contributed to Ubiquiti's strong financial showing, and

23  (2) whether "that"—apparently, the upside—stemmed from Ubiquiti's airMAX product only or also

24  from "international orders for UniFi and AirVision" products.  Pera stated that he would answer the

25  second question first.  He then apparently did so, answering question 2 by stating that *all* of

26  Ubiquiti's product lines "drove the upside."  He then answered question 1, which sought

27  identification of the countries that were driving the upside.  Pera identified those countries as all of

28

United States District Court
Northern District of California

the "big hitters" but Asia; represented that India's revenues had increased; and then said that the rest of the big hitters, including Argentina, had remained "consistent with the prior quarter."

Pera's statement does not expressly answer the obvious question: consistent with what? Plaintiffs assert that Pera was speaking of declining sales orders in Argentina. (CAC ¶¶ 133-34; Opp'n at 25.)[11]  As the Ubiquiti Defendants point out, it is Pera's answer to the second question concerning product lines in which he expressly references "orders," not the answer to the first question regarding countries "driving the upside."  (Ubiquiti MTD at 17-18; Ubiquiti Reply at 8.) The Ubiquiti Defendants, however, do not offer a competing interpretation of Pera's declaration of "consistent" results; instead, they argue that plaintiffs' interpretation is merely "possible," not "plausible." (Ubiquiti Reply at 8.)   The Court disagrees.  Plaintiffs' reading of Pera's second answer as referring to sales orders is plausible in view of Pera's having just invoked the notion of orders in his first answer.  Defendants regard each statement in artificial isolation, but the salient question is how a listener would have apprehended Pera's statements.  Common sense and experience suggest that a reasonable listener may have taken Pera's reference to sales orders to carry over to his second answer.  Defendants have not offered another interpretation, let alone an equally or more plausible one.  *See Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).  Nor have defendants established that plaintiffs' allegations concerning Pera's January 31 statement is the sort of conclusory allegation or unwarranted inference that should not be let to the trier of fact.  *See Cutera*, 610 F.3d at 1108.  The Court concludes that plaintiffs have satisfactorily identified a plausible basis for a reasonable person to find Pera's statement false or misleading.[12]  However, as

___

[11] Though plaintiffs' Opposition brief speaks only of declining sales orders in Argentina, the CAC speaks of both declining sales orders *and* a declining book-to-bill ratio. (*Compare* Opp'n at 25 *with* CAC ¶¶ 133-34.)  Any amended complaint should clarify the basis of plaintiffs' claim.

[12] The Court need not address the parties' arguments concerning whether Pera's description of Argentina as one of the "big hitters" was non-actionable puffing because the Court does not take plaintiffs' claim to rest on that statement. (CAC ¶¶ 133-34.)  Rather, plaintiffs appear only to object to any suggestion—which defendants appear not to have made—that the Court view the "big hitter" statement "in isolation and out of context." (Opp'n at 25-26.)  The Court's analysis focuses on Pera's statement regarding consistent results between quarters and does not fundamentally depend on the "big hitter" label.

24

set forth below, the Court ultimately concludes that plaintiffs fail to carry their burden of

demonstrating that the statement was made with scienter.

### 4.   Ubiquiti's May 1, 2012 Press Release

On May 1, 2012, Ubiquiti issued a press release that quoted Pera saying that Ubiquiti "saw

solid momentum across all elements of our business, led by the AirMax platform which again

posted double digit sequential growth."  (Masuda Decl., Ex. 13, at 2 of 8; CAC ¶ 156 ("Press

Release Statement").)  Plaintiffs rest their Section 10(b) claim in part on the Press Release

Statement, alleging that "there was not 'solid momentum' in Argentina because sales orders from

Argentina had declined substantially in 2Q12 and 3Q12."  (CAC ¶ 158.)  Plaintiffs support this

assertion by citing the decline in sales orders and book-to-bill ratio set forth in the Ritchie

Declaration.  (*See id.*)

The Ubiquiti Defendants offer two alternative grounds for dismissal of the Section 10(b)

claim, as premised on the Press Release Statement.  They contend, first, that the Press Release

Statement was non-actionable "puffing," or, second, that if it was not puffing, it was a true

statement because the statement refers not to sales orders or revenues, only to the company's

"technology platforms," that is, its product lines, and those indeed had "solid momentum."

(Ubiquiti MTD at 19-20; Ubiquiti Reply at 10-11.)  Plaintiffs rejoin that the statement is false

because Pera "represented that there was solid momentum across *all* elements of [Ubiquiti's]

business, not just [its] technology platforms."  (Opp'n at 27.)

The Ubiquiti Defendants are correct.  A claim of "solid momentum" across "all" elements of

a business is the sort of vague, generalized statement of corporate optimism that courts in the Ninth

Circuit have consistently held to be non-actionable "puffery."  *See City of Royal Oak Ret. Sys. v.

Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063-64 (N.D. Cal. 2012) (collecting cases).

Plaintiffs' argument that Pera's reference to "all" elements makes the statement false is untenable: if

Pera referred to "all" elements of the business, then his statement is too vague and generalized to be

actionable, but if Pera referred only to product lines, plaintiffs have raised no challenge to the

statement's accuracy.  (*See* Opp'n at 27.)  Plaintiffs do not argue that Pera meant, by "all elements,"

to refer to all the countries Ubiquiti reached (*see id.*), nor could the Court find that interpretation

25

1  plausible, given the entirety of the press release's quotation of Pera.[13]  The Court holds that the

2  Press Release Statement of May 1, 2012, is non-actionable puffing, and thus, as a matter of law,

3  can supply no basis for a Section 10(b) claim.

4              5.    Ritchie's May 1, 2012 Conference Call Statement

5          The final statement on which plaintiffs base their Section 10(b) claim is an answer Ritchie

6  gave to an analyst's question on the quarterly conference call announcing Ubiquiti's 3Q12 results.

7  The statement of which plaintiffs complain is set forth in boldface type herein:

8          [Analyst]: [] And then I was hoping if you could provide any more color in
           terms of were there any new geographies you managed to penetrate this
9          quarter, any new distributors you added?  Just any color in terms of where
           the strength came in both AirMax and also your new platforms.
10
           [Ritchie]: I think one of the things we're pleased with right now is how the
11         EMEA region's doing.  We saw very good growth there.  It's probably one of
           our more established markets.  But we're seeing—we're kind of seeing
12         strength in the big markets, EMEA and South America.
13         [Analyst]: So basically existing geographies, Poland, Brazil—I'm just
           curious if there were any new markets you managed to add?
14
           [Ritchie]: No, it's the same cast of characters.  Czech Republic, Poland,
15         Brazil, **Argentina, those countries all continue to do well for us.**

16  ─────────────────────

17  [13] Pera's complete statement in the press release concerned product lines:

18         We saw solid momentum across all elements of our business, lead [*sic*] by the
           AirMax platform[,] which again posted double digit sequential growth.  In addition,
19         our new platforms[,] which include Unifi, our enterprise WLAN offering[,] and
           AirVision, our IP video surveillance offering, showed combined sequential growth
20         of more than 100% . . . .  In addition, Air[F]iber, our fourth technology platform,
           was announced during the quarter.  The AirFiber platform represents the latest
21         application of Ubiquiti's unique R&D strategy and business model for disrupting
           markets.  We believe AirFiber will fundamentally redefine the cost/performance[,]
22         as well as user-experience expectations[,] in the wireless backhaul market.  While
           we continue to advance the performance and offerings in our current technology
23         platforms, we also plan on announcing three more disruptive technology platforms
           targeting new markets; one each quarter for the remainder of the calendar year.  Our
24         confidence in Ubiquiti's long term opportunity continues to grow as we work to
           aggressively expand our total addressable market[.]
25

26  (Masuda Decl., Ex. 13, Page 2 of 8.)  Pera's statement, distilled to its essence, boasts of the strong

27  performance of its three extant product lines (AirMax, Unifi, and AirVision); expresses optimism

28  about the prospects of a fourth product line, AirFiber; and signals intent to announce another three
    product lines on a particular schedule.  Pera's statement focuses entirely on Ubiquiti's product lines.

United States District Court
Northern District of California

(Masuda Decl., Ex. 8, at 41-42 of 71; *see also* CAC ¶ 157 (quoting in part).)

Plaintiffs allege that the statement that Argentina "continue[d] to do well" for Ubiquiti is false or misleading because, as the Ritchie Declaration, executed 17 days later, reported, sales orders in Argentina had declined by 88 percent and the book-to-bill ratio for Ubiquiti's products in that nation had plummeted.  The Ubiquiti Defendants contend that the statement is puffing. (Ubiquiti MTD at 18-19; Ubiquiti Reply at 9-10.)  The Ubiquiti Defendants are correct.  The context in which Ritchie proffered the representation that certain countries, Argentina among them, "continue to do well" for Ubiquiti was an answer to a question asking Ritchie to identify, not the countries that were continuing to perform well, but rather any "new markets" where Ubiquiti had "managed to add" distributors.  Ritchie's answer was, essentially, that there were no new markets, but that the old markets were doing "well."  As the Ubiquiti Defendants aptly note, Ritchie omitted any mention of "why, how, under what standard, or compared to what" those markets were doing well.  (Ubiquiti Reply at 10.)  No reasonable investor would rely on such a statement when considering the total mix of information available to her.  Accordingly, the Court holds that Ritchie's May 1, 2012 conference call statement is non-actionable puffing.

### 6.   Conclusion Regarding First Challenged Element of Section 10(b) Claim

With respect to Ubiquiti's 1Q12 10-Q form and 2Q12 10-Q form, Plaintiffs fail to plead a material misstatement or omission.  Plaintiffs' Section 10(b) claim is therefore **DISMISSED WITH LEAVE TO AMEND** to the extent it is premised on alleged false or misleading misstatements or omissions on the 1Q12 or 2Q12 10-Q forms.

With respect to Pera's representations of January 31, 2012 regarding consistent results that "drove the upside" in 2Q12, plaintiffs adequately plead a material misstatement because it is plausible that a reasonable listener could interpret Pera's statement to mean that sales orders in Argentina had remained consistent between 1Q12 and 2Q12 when, plaintiffs allege, they in fact had dropped.  As set forth in the following Section of this Order, however, the Court ultimately concludes that plaintiffs fail to plead that Pera made the accused statement with scienter.

With respect to the accused statements in Ubiquiti's press release of May 1, 2012, as well as that allegedly made by Ritchie on the quarterly conference call held that same day, the Court

United States District Court
Northern District of California

1    concludes the statements are non-actionable puffing and thus, as a matter of law, may not form the

2    basis of a Section 10(b) claim.  Plaintiffs' Section 10(b) claim is therefore **DISMISSED WITH**

3    **PREJUDICE** to the extent it is premised on the statement in Ubiquiti's May 1, 2012 press release that

4    the company "saw solid momentum across all elements of our business," or Ritchie's statement on

5    the May 1, 2012 quarterly conference call that Argentina "continue[s] to do well for us."

6          **B.      Second Challenged Element: Scienter**

7          Defendants challenge a second element of plaintiff's Section 10(b) claim, namely, scienter.

8    (Ubiquiti MTD at 22-25; Ubiquiti Reply at 11-15.)  Scienter is "a mental state embracing intent to

9    deceive, manipulate, or defraud."  *See Tellabs*, 551 U.S. at 319.  Under the PSLRA, a complaint

10   of securities fraud must state with particularity "facts giving rise to a strong inference that the

11   defendant acted with the required state of mind," that is, with scienter.  15 U.S.C. § 78u-4(b)(2);

12   *compare with* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's

13   mind may be alleged generally").  "Scienter can be established by intent, knowledge, or certain

14   levels of recklessness."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir.

15   2012) (citing *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010)).  The

16   sort of recklessness that qualifies as scienter is "either 'deliberate recklessness' or 'conscious

17   recklessness'—a 'form of intent rather than a greater degree of negligence.'"  *Id.* (quoting

18   *Platforms Wireless*, 617 F.3d at 1093).  While a defendant's objective unreasonableness may enter

19   into the scienter analysis, "the ultimate question is whether the defendant knew his or her

20   statements were false, or was consciously reckless as to their truth or falsity."  *Id.* (quoting

21   *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010)).

22         In ruling on a motion to dismiss for failure to plead a strong inference of scienter, the Court

23   must determine whether all the facts alleged, taken collectively, give rise to a strong inference of

24   scienter.  *See Tellabs*, 551 U.S. at 322-23, 326 ("[T]he court's job is not to scrutinize each

25   allegation in isolation but to assess all the allegations holistically.");  *S. Ferry LP, No. 2 v. Killinger*,

26   542 F.3d 776, 784 (9th Cir. 2008) ("The Supreme Court's reasoning in *Tellabs* permits a series of

27   less precise allegations to be read together to meet the PSLRA requirement.").  "When conducting

28   this holistic review . . . [a court] must also 'take into account plausible opposing inferences' that

United States District Court
Northern District of California

1   could weigh against a finding of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

2   1006 (9th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 323).  In the wake of the Supreme Court's

3   decision in *Matrixx*, the Ninth Circuit has clarified that a court may conduct the requisite holistic

4   review either (i) alone or (ii) as the second step of a "dual inquiry" wherein the court determines,

5   first, "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong

6   inference of scienter; [and] second, if no individual allegations are sufficient, . . . whether the

7   insufficient allegations combine to create a strong inference of intentional conduct or deliberate

8   recklessness." *VeriFone*, 704 F.3d at 702 (quoting *Zucco*, 552 F.3d at 992).  Under either

9   approach, to satisfy the scienter requirement, a plaintiff "must plead facts rendering an inference of

10  scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (emphasis

11  in original).  Here, the Court examines the CAC holistically and, for the reasons set forth below,

12  concludes that plaintiffs fail to raise the necessary "cogent and compelling" inference of scienter.

13  *Id.* at 324.

14          Plaintiffs' primary basis for alleging scienter is the Ritchie Declaration.  That declaration

15  contains data purporting to quantify the harm to Ubiquiti's business in Argentina caused by Hsu and

16  Kozumi's alleged encroachment on Ubiquiti's intellectual property rights.  Plaintiffs contend that

17  the data therein gives the lie to Ubiquiti's 1Q12 and 2Q12 10-Q statements describing (according to

18  plaintiffs) counterfeiting as a mere risk, as well as to Pera's January 31, 2012 statement that

19  Argentina was a "big hitter" driving Ubiquiti's growth, and the statements of Pera and Ritchie

20  issued May 1, 2012, referring to "solid momentum across all elements" of the company's product

21  lines and Argentina's "continu[ing] to do well" for the company.  (*See* Opp'n at 29.)  Plaintiffs

22  contend that documents filed in the Kozumi litigation "establish[] that [defendants] knew their

23  statements on November 14, 2011, January 31, 2012, February 1, 2012, and May 1, 2012 were

24  materially false and misleading when made."  (*Id.*)

25          The difficulty with plaintiffs' position is that the Ritchie Declaration was executed on May

26  18, 2012, *after* all of the accused statements issued.  To plead scienter, however, "the complaint

27  must contain allegations of specific *contemporaneous* statements or conditions that demonstrate the

28  intentional or the deliberately reckless false or misleading nature of the statements when made."

United States District Court
Northern District of California

*Metzler Inv. GMBH*, 540 F.3d at 1066 (emphasis supplied) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)); *see also Yourish*, 191 F.3d at 996 ("[A] complaint can establish that a statement was false when made by alleging a later statement by the defendant along the lines of 'I knew it all along.'" (internal quotation marks and brackets omitted)).  Here, the Ritchie Declaration contains no internal indicia of *when* Ritchie learned the information contained therein.  Accordingly, it falls short of adequately pleading that Ritchie (or, for that matter, Pera) had the required state of mind at the time they made the accused statements.  Any inference that they contemporaneously knew about declining sales or demand in Argentina strengthens as their statements approach the date Ritchie executed his declaration, May 18, 2012, but the Court has already held that the most recent statements, made May 1, 2012, are non-actionable puffery.  The Ritchie Declaration does not support a strong inference that Ritchie, Pera, or other Ubiquiti Defendants made any of the accused statements with knowledge of their falsity or reckless disregard of the truth.

Neither does the Ritchie Declaration establish that the Ubiquiti Defendants knew "all along" of the troubles in Argentina.  Ritchie specifically declared that he prepared his declaration at the request of counsel in the Kozumi litigation.  (Ritchie Decl. ¶ 3.)  Plaintiffs nowhere allege particular facts tending to establish that Ritchie knew the data contained in the Ritchie Declaration prior to being asked by his counsel, on an unstated date, to prepare it.  Viewing the allegations regarding the Ritchie Declaration and the declaration itself "with a practical and common-sense perspective," *S. Ferry*, 542 F.3d at 784, the allegations support an inference that Ritchie knew of the details contained in his declaration at *some* point prior to its execution, be it days, weeks, or months.  But plaintiffs proffer no answer the critical question: prior by how much?

Neither are plaintiffs materially aided by the core operations inference.  That inference, which suggests that company executives *must* know about the important activities of their companies, may bolster a plaintiff's allegations of scienter "in three circumstances."  *Reese*, --- F.3d ---, 2014 WL 555911, at *13 (citing *S. Ferry*, 542 F.3d at 786).

> First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the Tellabs standard. . . .  Second, the allegations may independently satisfy the PSLRA

United States District Court
Northern District of California

1
2
3

where they are particular and suggest that defendants had actual access to the disputed information . . . .  Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

4  *Id.* (citations and internal quotation marks omitted).[14]

5          The circumstances of this case do not fit squarely within either the second or third

6  circumstances described above: plaintiffs have not supplied "particular" allegations suggesting that

7  defendants had "actual access" to the information in the Ritchie Declaration at the time they made

8  the accused statements, nor are the allegations of the CAC such that it would be "absurd to suggest"

9  that Pera and Ritchie lacked knowledge of a material impact on Ubiquiti's business, in Argentina or

10 elsewhere, caused by counterfeiting.  On the contrary, as the Ubiquiti Defendants point out, the

11 company's 10Q forms for the first three quarters of fiscal year 2012 show Ubiquiti enjoying a

12 positive overall financial situation in which it saw strong growth and exceeded its revenue

13 projections on both gross and per-share bases.  In that regard, this case is plainly distinguishable

14 from *Berson*, where the adverse developments in the defendant's business were so prominent—

15 indeed, crippling—that it would be absurd to suggest that management was ignorant of them.  527

16 F.3d at 987-88.

17          As to the "holistic" analysis, the core operations inference does not combine with other facts

18 alleged in the CAC to raise a strong, compelling, and cogent inference of scienter.  On the contrary,

19 the Ubiquiti Defendants point to several allegations that undermine any inference of scienter, and

20 plaintiffs fail adequately to respond to any of them.  The Ubiquiti Defendants note, first, the lack of

21 allegations of insider trading, allegations which the Ubiquiti Defendants describe as a normal or

22

23  [14] The Court rejects the Ubiquiti Defendants' contention that the core operations inference only "applies" in limited circumstances.  (Ubiquiti Reply at 14-15.)  That is not the law.  As recognized

24  in *South Ferry*, a case the Ubiquiti Defendants themselves cite, the core operations inference can

25  always be drawn in aid of the holistic review mandated by *Tellabs*.  *See S. Ferry*, 542 F.3d at 786. Whether the inference, in combination with other facts, aids a plaintiff in raising a "strong"

26  inference of scienter is a separate question from whether the inference may be drawn at all.  The

27  two circumstances proffered by the Ubiquiti Defendants are simply the two situations where the core operations inference may satisfy the scienter requirement *by itself*, the situations supporting an

28  "actual access" analysis or an "absurdity" analysis.  *See Reese*, --- F.3d ---, 2014 WL 555911, at *13-14 (reviewing and applying the three analyses set forth in *South Ferry*).

1    general manner of demonstrating a defendant's motive to make knowingly false statements.

2    Plaintiffs respond that allegations concerning motive are not required to plead scienter and that

3    courts have recognized a variety of other motivations for making false or misleading statements.

4    (Opp'n at 30 (citing *Tellabs*, 551 U.S. at 325; *Daou*, 411 F.3d at 1022; *Makor Issues & Rights, Ltd.*

5    *v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).)  Plaintiffs accurately state the law but fail to

6    articulate any of the other motivations which, they say, the law recognizes.  This omission does

7    nothing to support an inference of scienter stronger than other plausible inferences.

8           Next, the Ubiquiti Defendants cite allegations in the CAC and documents incorporated

9    therein which establish that Ubiquiti's 1Q12, 2Q12, and 3Q12 financial results were, overall,

10   positive.  As the Court has discussed, these undermine the core operations inference: in light of the

11   company's overall positive financial results and broad-based business, spanning multiple countries

12   on multiple continents, any inference that the Officer Defendants must have known of poor

13   performance in one country among many is weak.  Plaintiffs do not meaningfully engage with the

14   implications of Ubiquiti's overall positive financial performance throughout the first three quarters

15   of fiscal year 2012 and thus fail to raise a competing inference, let alone a stronger inference.

16   Neither do plaintiffs wrestle with the fact, emphasized by the Ubiquiti Defendants, that the

17   company publicly divulged much of the information it allegedly meant to conceal via press releases

18   and, indeed, the Kozumi litigation itself.  Ubiquiti's revelation of details about the counterfeiting

19   scheme does not, without more, discount the possibility of scienter entirely.  However, it does raise

20   an inference that, while Ubiquiti knew of the bare existence of counterfeit products as early as

21   2009, it did not realize the extent of the threat posed by Hsu, Kozumi, Deng, and Hoky until later,

22   and took efforts to combat them commensurate with its perception of the scope of the problem, all

23   while making disclosures reflecting its assessment of the risk.  In view of the totality of the

24   allegations before the Court, that inference is more cogent and compelling than any inference of

25   scienter.[15]

26   _____

27   [15] Plaintiffs seek to augment their allegations of scienter by citing a host of facts involving Ubiquiti
     distributor Sajwani.  (Opp'n at 29-30 (citing CAC ¶¶ 88-106).)  As the Ubiquiti Defendants note,
28   however, the CAC does not incorporate those allegations into its Section 10(b) claim.  (*See* CAC ¶
     ¶ 217 (first paragraph in Section 10(b) claim, incorporating only paragraphs 14-54 and 115-188).)

United States District Court
Northern District of California

1    For all these reasons, the CAC fails to raise a "strong" inference of scienter, and, thus,

2  plaintiffs, to the extent that they satisfy the requirement of alleging a false or misleading statement

3  of fact, fail to plead the element of scienter.  Accordingly, the Court **DISMISSES** plaintiffs' Section

4  10(b) claim in its entirety.  The claim is dismissed **WITHOUT PREJUDICE** insofar as it is premised

5  on the 1Q12 10-Q filing, the 2Q12 10-Q filing, and Pera's January 31, 2012 statement, which suffer

6  from inadequate fact pleading.  However, the claim is dismissed **WITH PREJUDICE** insofar as it is

7  premised on the May 1, 2012 Ubiquiti press release or Ritchie's statements on the quarterly

8  conference call held that day.  As set forth above, those statements are mere puffing, and, as a

9  matter of law, cannot supply the basis for a securities fraud claim because no reasonable investor

10  would rely upon them.

11  **IV.    COUNTS 3 AND 5: SECTION 15 OF THE SECURITIES ACT AND SECTION 20(A) OF THE
12         EXCHANGE ACT**

13    Sections 15 and 20(a) "control person" claims both require, among other things, "underlying

14  primary violations of the securities laws."  *Rigel Pharm.*, 697 F.3d at 886 (citing 15 U.S.C. §§ 77*o*,

15  78t(a)).   Here, then, to state a claim under Section 15, plaintiffs would have to state viable claims

16  under Section 11 or Section 12(a), and to state a claim under Section 20(a), plaintiffs would have to

17  state a viable claim under Section 10(b).  Because the Court has determined that plaintiffs have not

18  stated any of these underlying claims, the Court **GRANTS** defendants' motions to the extent they

19  seek dismissal of plaintiffs' Section 15 and Section 20(a) claims.  Plaintiffs have leave to amend

20  their underlying claims to the same extent that they have leave to amend the underlying claims.

CONCLUSION

22    For the foregoing reasons, the Court **GRANTS** the pending motions to dismiss.

23    Plaintiffs' claims under Section 11 of the Securities Act, 15 U.S.C. § 77k, Section 12(a)(2)

24  of the Securities Act, 15 U.S.C. § 77*l*(a)(2), and Section 15 of the Securities Act, Act, 15 U.S.C. §

---

To the extent that it is appropriate or fair to consider those allegations, they do not lend meaningful support to an inference of scienter.  They merely bolster an impression that Ubiquiti had notice of the existence of counterfeit products in the marketplace.  That impression does not support a strong inference that Ubiquiti knew its accused statements regarding the risk of counterfeiting, or Pera and Ritchie's statements regarding strong performance or momentum in Argentina, were false, or were issued with such a degree of recklessness as to be practically akin to intent.

United States District Court
Northern District of California

1   77*o*, are **DISMISSED WITHOUT PREJUDICE** as insufficiently pled.  Plaintiffs have leave to amend

2   these claims.

3        Plaintiffs' claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-

4   5, 17 C.F.R. §240.10b-5, as well as their claim under Section 20(a) of the Exchange Act, 15 U.S.C.

5   § 78t(a), are **DISMISSED WITH PREJUDICE IN PART AND DISMISSED WITHOUT PREJUDICE IN PART**.

6   Plaintiffs have leave to amend these claims except to the extent that they are premised on the

7   statements of May 1, 2012 that the Court has held to be non-actionable puffing.

8        Plaintiffs have leave to file a second consolidated amended complaint within **twenty-one**

9   **days** of the signature date of this Order.  Any second consolidated amended complaint shall be filed

10  with an attachment that shows, in redline form, the changes made to plaintiffs' pleading.  Chambers

11  copies of any second amended complaint shall be delivered in Word format on a CD/DVD or other

12  digital medium.  Any citation to an exhibit attached to the pleading shall include a hyperlink to the

13  cited portion of the exhibit, which shall also be included on the digital medium delivered to

14  chambers.  Clicking on the hyperlink shall result in the pertinent portion of the exhibit opening as a

15  PDF document.  The label on the digital medium shall include the name of the parties, the case

16  number, and a description of the documents.

17       Any claims set forth within any second consolidated amended complaint shall clearly,

18  specifically, and consistently distinguish and incorporate by reference only those facts supporting

19  that particular claim.

20       This Order terminates Docket Nos. 56 and 57.

21       **IT IS SO ORDERED**.

22

23  Date: March  26, 2014

24       **YVONNE GONZALEZ ROGERS**
    **UNITED STATES DISTRICT COURT JUDGE**

25

26

27

28