ROBBINS GELLER RUDMAN
   & DOWD LLP
CHRISTOPHER P. SEEFER (201197)
DANIEL J. PFEFFERBAUM (248631)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
chriss@rgrdlaw.com
dpfefferbaum@rgrdlaw.com

LABATON SUCHAROW LLP
JONATHAN GARDNER
MICHAEL P. CANTY
ROGER W. YAMADA
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
mcanty@labaton.com
ryamada@labaton.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re UBIQUITI NETWORKS, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) | Master File No. 12-cv-04677-YGR |
| This Document Relates To: | | CLASS ACTION |
| ALL ACTIONS. | | CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | | DEMAND FOR JURY TRIAL |

1
2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................7

III.  PARTIES .................................................................................................................7

IV.   RELEVANT NONPARTIES..................................................................................9

V.    DEFENDANTS VIOLATED THE 1933 ACT BY ISSUING AN INACCURATE
AND MATERIALLY MISLEADING REGISTRATION STATEMENT AND
PROSPECTUS ......................................................................................................11

    A.    Ubiquiti's Business Model Made it Particularly Susceptible to Counterfeit
Product Sales that Could Harm the Company's Reputation and Financial
Results..........................................................................................................11

    B.    An International Counterfeiting Scheme that Had Grown in Size from
2009 to 2011 Was Adversely Affecting Ubiquiti's Business at the Time of
the IPO .........................................................................................................13

        1.    Pleadings and Documents Filed in the Kozumi Litigation Establish
that Kozumi and Others Were Making and Selling Millions of
Dollars of Counterfeit Ubiquiti Products that Were Causing
Substantial Harm to Ubiquiti at the Time of the IPO .............................13

        2.    A Former Ubiquiti Distributor Confirms the Counterfeiting
Problems and Claims They Were Much More Widespread than
Ubiquiti Alleges in its Lawsuit Against Kozumi......................................20

    C.    Defendants Failed to Disclose the International Counterfeiting Scheme in
the Registration Statement and Prospectus and Falsely Represented that
the Sale of Counterfeit Products Was Just a Possibility that Could
Adversely Affect Ubiquiti's Business .........................................................25

VI.   THE TRUTH IS REVEALED THROUGH A SERIES OF PARTIAL
DISCLOSURES....................................................................................................29

    A.    May 2012: Defendants Report Ubiquiti's 3Q12 Results and Reveal Some
of the Adverse Information..........................................................................29

    B.    August 9, 2012: Ubiquiti Reveals Additional Adverse Impacts from the
Counterfeiting, Which Causes Further Declines in the Company's Stock
Price .............................................................................................................31

VII.  ECONOMIC LOSS ..............................................................................................32

VIII. CLASS ACTION ALLEGATIONS .....................................................................35

IX.   PRAYER FOR RELIEF .......................................................................................39

1

2                                                                                              **Page**

3

X.      JURY DEMAND ................................................................................................40

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company; media reports about the Company; pleadings and documents filed in the Company's litigation against Kozumi USA Corp. ("Kozumi"); and information provided by former Ubiquiti distributors.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.   INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired shares of Ubiquiti common stock pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus issued in connection with its October 14, 2011 initial public offering ("IPO"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act").

2.     Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide. The Company offers a portfolio of wireless networking products and solutions, including systems, high performance radios, antennas and management tools, designed for wireless networking and other applications in the unlicensed radio frequency ("RF") spectrum.  The Company offers solutions that incorporate its RF technology, antenna design and firmware technologies, which it refers to as AirTechnologies and includes its proprietary AirMax systems.

3.     The Company sold a majority of its products in emerging markets outside the United States (70% in 2011) and reported increasing revenues from 2009 ($63.1 million) through 2011 ($197.9 million).[1]  The Company used contract manufacturers in China and Taiwan to manufacture its products.  In addition, the Company did not have a sales force and instead relied on distributors to

---

[1]     The Company's fiscal year ends on June 30, so its first fiscal quarter runs from July 1 to September 30, its second fiscal quarter runs from October 1 to December 31, its third fiscal quarter runs from January 1 to March 31 and its fourth fiscal quarter runs from April 1 to June 30.

1  sell its products.  Distributors accounted for 97% of the Company's revenues in fiscal 2011

2  ("FY11").

3         4.     On or about October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which

4  formed part of the Registration Statement and which became effective on October 13, 2011.  At least

5  7.038 million shares of Ubiquiti common stock were sold to the public at $15 per share, raising

6  $105.6 million in gross proceeds for the Company and the selling shareholders.  Ubiquiti's officers

7  and directors signed the Registration Statement.  The four Underwriter Defendants helped draft and

8  disseminate the Registration Statement and Prospectus.

9         5.     In the Registration Statement and Prospectus, defendants made materially inaccurate

10  and misleading statements and omissions about Ubiquiti's business practices and financial results.

11  They created the misleading impression that the sale of counterfeit Ubiquiti products was not a

12  current problem by representing that Ubiquiti's ability to sell its products at competitive prices and

13  to be the sole provider of its products *might* be adversely affected – and that its business, operating

14  results and financial condition *could* be materially and adversely affected – *if* the Company were

15  unsuccessful in stopping counterfeit products by monitoring and enforcing its intellectual property

16  rights in China.

17        6.     Other representations in the Registration Statement and Prospectus reinforced the

18  misleading impression that the sale of counterfeit products was not a current problem.  Defendants

19  represented that Ubiquiti's ability to compete *could* be impaired *if* the Company failed to protect its

20  intellectual property rights adequately, which in turn *could* reduce revenues and increase costs.

21  They also represented that sales of counterfeit products *could* continue largely unimpeded *if*

22  enforcement of the Company's intellectual property rights in China required an extensive amount of

23  time.  In addition, defendants represented that effective trademark protection *might* not be available

24  in every country in which the Company sold its products, that others *might* develop technologies that

25  infringed Ubiquiti's intellectual property and that the Company's legal efforts *might* not be

26  successful against possible infringers.

27        7.     These representations were important to investors because Ubiquiti was particularly

28  susceptible to counterfeiting for several reasons.  First, the Company had less control over the

1   manufacturing process because it did not manufacture its own products and instead used contract

2   manufacturers in China and Taiwan, where enforcement of intellectual property rights was more

3   difficult.  Second, the Company had less control over the sale and distribution of its products

4   because it did not have a direct sales force and instead used third-party distributors that acquired

5   Ubiquiti products from the contract manufacturers and then delivered them to resellers and end

6   users.  Third, a majority of the Company's products was sold in emerging markets outside the United

7   States, where it was more difficult to detect counterfeit products and enforce intellectual property

8   rights.  Fourth, the Company did not have registered trademarks for its name or all of its products in

9   the various countries in which its products were sold.  Fifth, the Company was an attractive

10  counterfeit target because it reported increasing sales and earnings from 2009 to 2011.

11       8.    Information provided by the Company in litigation against Kozumi and its owner,

12  Shao Wei Hsu ("Hsu"), establishes that, since November 2009 and at the time of the IPO, Ubiquiti

13  was unable to adequately protect and enforce its intellectual property rights in China and other

14  countries and that sales of counterfeit products by Kozumi and others were adversely affecting

15  Ubiquiti's ability to sell its products at competitive prices and to be the sole provider of its products,

16  which, in turn, adversely affected the Company's business, operating results and financial condition.

17       9.    In its lawsuit filed in May 2012, Ubiquiti stated that Kozumi and Hsu had

18  "masterminded an international counterfeiting scheme" by stealing source code and proprietary

19  designs, manufacturing and selling millions of dollars' worth of counterfeit products throughout the

20  world, demanding millions of dollars from Ubiquiti to stop the counterfeiting and spreading false

21  rumors about Ubiquiti and defendant Robert J. Pera ("Pera").  Exs. 1-10.[2]  *See Ubiquiti Networks,*

22  *Inc. v. Kozumi USA Corp.*, No. 12-cv-2582 CW (JSC) (N.D. Cal. 2012).  The Company also stated

23  that the international counterfeiting scheme was causing substantial and irreparable harm to

24

25

---

[2]   All "Ex. __" references are to Exhibits 1-11 included in the Appendix of Exhibits filed herewith.
Exhibits 1-10 are pleadings filed in the Kozumi litigation, including declarations filed by several
Ubiquiti executives, Ubiquiti's counsel and Hsu.  All "ex.__" references are to the exhibits attached
to the declarations filed in the Kozumi litigation.  Exhibit 11 is a compilation of e-mails provided by
Asim Sajwani ("Sajwani"), a former Ubiquiti distributor, and portions of his blog.

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                          - 3 -

1   Ubiquiti's financial results – including lost sales and increased costs – and devastating damage to the
2   Company's goodwill and reputation.

3         10.    Sworn declarations by Ubiquiti executives and internal Company documents filed in
4   that litigation establish that the counterfeiting problems were causing substantial, irreparable and
5   devastating harm at the time of the IPO.  Indeed, defendants had been taking numerous actions in an
6   attempt to stop the counterfeiting since 2009.  The counterfeiting was particularly important to Pera,
7   who e-mailed Hsu in December 2011 that he had "personally dedicated the last several months of
8   [his] time focusing on [Kenny Deng]," the owner of Hoky Technology ("Hoky"), who was
9   manufacturing thousands of counterfeit Ubiquiti products at a facility in Shenzhen, China.

10        11.    Defendants also knew the efforts to stop the counterfeiting were unsuccessful and that
11  increasing amounts of counterfeit product were being sold in more and more countries throughout
12  the world, including China, Argentina, Paraguay, Turkey, Greece, Iran, Iraq, Saudi Arabia, Ukraine,
13  Pakistan, Macedonia, Kosovo, India and Albania.  By the time of the IPO, the problem had become
14  so bad that Ubiquiti had retained Chinese counsel to prepare a criminal complaint and had made
15  arrangements with Chinese law enforcement officials – the Shenzhen Public Security Bureau
16  ("SPSB") – to raid and shut down the Hoky manufacturing facility.  The actual raid occurred on
17  November 17, 2011, a month after the IPO.  Thousands of counterfeit Ubiquiti products were found
18  at the Hoky plant during the raid along with documentation showing that thousands of additional
19  counterfeit products had already been shipped.

20        12.    Other pleadings and documents filed by Ubiquiti in its lawsuit against Kozumi and
21  Hsu establish that counterfeit products were being manufactured at the time of the IPO by at least
22  one other facility in Huizhou, China owned by Huizhou China Eagle Electronic Technology Co. Ltd.
23  According to Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, as many as 13
24  factories in China were manufacturing counterfeit Ubiquiti products.  Sajwani also said that resellers
25  told him there was a growing availability of counterfeit Ubiquiti products from 2010 to 2011 at
26  prices 20% to 25% lower than Ubiquiti's prices.

27        13.    Ubiquiti and its officers and directors were responsible for the content and
28  dissemination of the materially inaccurate and misleading Registration Statement.  The four

1  Underwriter Defendants were paid more than $7 million to underwrite the IPO and failed to require

2  disclosure of the international counterfeiting scheme, which was adversely impacting Ubiquiti's

3  business at the time of the IPO.  Public investors relied on the Underwriter Defendants to conduct a

4  reasonable investigation, to obtain and verify the information contained in the Registration Statement

5  and Prospectus and to make sure essential facts about the Company were disclosed.  Indeed, the

6  Underwriter Defendants had access to the adverse information at a critical time in Ubiquiti's

7  corporate life – the first time it sought to raise capital from the public.  The Underwriter Defendants

8  either knew about the international counterfeiting scheme and its adverse impacts on the Company's

9  business and failed to require disclosure or did not know by failing to conduct a reasonable

10 investigation and independently verifying the representations in the Registration Statement and

11 Prospectus.  Either way, the Underwriter Defendants failed to meet their "gatekeeper" function of

12 protecting investors.

13          14.     Following the IPO, the Company's stock price remained inflated due to the

14 undisclosed international counterfeiting problems.  On November 10, 2011 and January 31, 2012,

15 defendants reported Ubiquiti's results for the first and second quarters of fiscal 2012 ("1Q12" and

16 "2Q12," the quarters ending September 30, 2011 and December 31, 2012, respectively); repeated the

17 same false statements that were included in the Registration Statement and Prospectus; and did not

18 disclose the counterfeiting problems or their impact on the Company.

19          15.     The continued sale of counterfeit Ubiquiti products and other events forced

20 defendants to reveal some, but not all, of the counterfeiting problems and their impact on the

21 Company's business.  After the market closed on May 1, 2012, Ubiquiti announced disappointing

22 3Q12 results and publicly acknowledged the international counterfeiting scheme for the first time.

23 The Company revealed that it planned to increase its legal efforts and financial commitment to

24 aggressively defend its intellectual property and to protect its customers from counterfeiters.  After

25 this unexpected negative news, Ubiquiti's stock price declined $6.10 per share to close at $28.90 per

26 share on May 2, 2012, a one-day decline of 17.4% on volume of nearly 4.1 million shares.

27 However, the stock price continued to be artificially inflated because defendants assured investors

28

1  that the Company had the matter contained and minimized the effect the counterfeit activities would

2  have on the Company's operations.

3      16.    On August 9, 2012, Ubiquiti announced its 4Q12 financial results and disappointing

4  guidance for 1Q13.   Ubiquiti admitted that the international counterfeiting scheme was more

5  widespread than previously disclosed and would have a detrimental impact on the Company's future

6  results.   As a result of this unexpected negative news, Ubiquiti stock declined $6.30 per share to

7  close at $8.71 per share on August 10, 2012, a one-day decline of nearly 42%, on volume of over 7.6

8  million shares.   This represented a 42% decline in Ubiquiti's stock price from the IPO price of $15

9  per share.   Analysts downgraded the stock, lowered their price targets and reported that the

10  Company's revelations on August 9, 2012 showed that the earlier statements about the counterfeiting

11  had underestimated the magnitude of the challenges as it related to the prevalence of counterfeit

12  products and concerns regarding Ubiquiti's business model.

13      17.    The following chart illustrates the primary events before, during and after the

14  Relevant Period and their impact on Ubiquiti's stock price.

15



28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                          - 6 -

## II.        JURISDICTION AND VENUE

18.        The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o].   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

19.        Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

20.        In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III.       PARTIES

21.        Inter-Local Pension Fund GCC/IBT ("Inter-Local") and Bristol County Retirement System ("Bristol County") were appointed Lead Plaintiff by the Court on November 30, 2012.  Dkt. No. 30.  As set forth in the certifications filed with the Court on November 6, 2012, Inter-Local purchased 18,910 shares during the Relevant Period (Dkt. No. 24-2) and Bristol County purchased 16,079 shares during the Relevant Period (Dkt. No. 10-1) and were damaged thereby.

22.        Plaintiff Steven N. Bell, as set forth in the certification attached to a complaint filed on September 7, 2012, purchased the common stock of Ubiquiti during the Relevant Period and has been damaged thereby.

23.        Plaintiff Brian Goecker, as set forth in the certification attached to a complaint filed on September 13, 2012, purchased the common stock of Ubiquiti and has been damaged thereby.

24.        Defendant Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide.  Ubiquiti's principal executive offices are located at 2580 Orchard Parkway, San Jose, California 95131.  The Company's stock trades on the NASDAQ under the symbol UBNT.

25.        Defendant Robert J. Pera founded the Company and serves as Chief Executive Officer ("CEO") and a director of Ubiquiti.  Pera signed the false and misleading Registration Statement; was quoted in the Company's quarterly earnings releases issued on November 10, 2011,

1  January 31, 2012, May 1, 2012 and August 9, 2012; spoke during the Company's quarterly earnings

2  conference calls; and signed the Forms 10-Q and 10-K filed with the SEC.

3     26.    Defendant John Ritchie ("Ritchie") is the Chief Financial Officer ("CFO") of

4  Ubiquiti.  In the IPO, Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2

5  million.  Ritchie signed the false and misleading Registration Statement; signed the Forms 8-K filed

6  with the SEC that attached the Company's quarterly earnings releases issued on November 10, 2011,

7  January 31, 2012, May 1, 2012 and August 9, 2012; was quoted in the earnings releases issued on

8  November 10, 2011 and May 1, 2012; spoke during the Company's quarterly earnings conference

9  calls; and signed the Forms 10-Q and 10-K filed with the SEC.  On November 8, 2012, the Company

10  announced Ritchie had resigned and would leave Ubiquiti at the end of the year.  On December 28,

11  2012, the Company announced that Ritchie would stay through February 28, 2013.

12     27.    Defendant Peter Y. Chung ("Chung") serves as a director of Ubiquiti.  Chung signed

13  or authorized the signing of the false and misleading Registration Statement.

14     28.    Defendant Christopher J. Crespi ("Crespi") served as a director of Ubiquiti from

15  October 2010 to December 1, 2011.  Crespi signed or authorized the signing of the false and

16  misleading Registration Statement.

17     29.    Defendant Charles J. Fitzgerald ("Fitzgerald") serves as a director of Ubiquiti.

18  Fitzgerald signed or authorized the signing of the false and misleading Registration Statement.

19     30.    Defendant John L. Ocampo ("Ocampo") serves as a director of Ubiquiti.  Ocampo

20  signed or authorized the signing of the false and misleading Registration Statement.

21     31.    Defendant Robert M. Van Buskirk  ("Van Buskirk") serves as a director of Ubiquiti.

22  Van Buskirk signed or authorized the signing of the false and misleading Registration Statement.

23     32.    Pera and Ritchie are referred to herein as the "Officer Defendants."

24     33.    Chung, Crespi, Fitzgerald, Ocampo and Van Buskirk are referred to herein as the

25  "Director Defendants" and are named as defendants solely for violations of the 1933 Act.

26     34.    Defendant UBS Securities LLC ("UBS") is a leading global investment banking and

27  securities firm, and one of the largest global asset managers.  UBS acted as an underwriter for

28  Ubiquiti's IPO, helping to draft and disseminate the offering documents.

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                        - 8 -

35.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG.  Deutsche Bank provides investment banking products and services.  Deutsche Bank acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

36.     Defendant Raymond James & Associates, Inc. ("RJA") is a financial investment advisory firm.  RJA acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

37.     Defendant  Pacific Crest Securities LLC ("Pacific Crest") provides investment banking products and services.  Pacific Crest acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

38.     UBS, Deutsche Bank, RJA and Pacific Crest are referred to herein as the "Underwriter Defendants."

39.     Defendant Ubiquiti and the Officer and Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement.   The Underwriter Defendants drafted and disseminated the offering documents and were paid more than $7 million in connection therewith.  UBS, Deutsche Bank and RJA acted as joint book-running managers for the IPO.  Pursuant to an underwriting agreement, the four Underwriter Defendants agreed to purchase all of the shares in the IPO at a discounted price of $13.9875 per share and then sold them to the public.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## IV.     RELEVANT NONPARTIES

40.     Kozumi USA Corp. is a Florida corporation that was a Ubiquiti distributor from May 2008 until November 2009.

41.     Shao Wei Hsu (who also goes by the names William Wu Hsu, William Hsu Wu and Guillermo Hsu, among others) is the founder, sole owner and director of Kozumi.  As detailed below, Ubiquiti filed suit against Kozumi and Hsu in May 2012 alleging that Kozumi was substantially and irreparably harming Ubiquiti's business and goodwill by selling counterfeit

1   Ubiquiti products.  As also detailed below, Ubiquiti's allegations in its first amended complaint

2   against Kozumi and Hsu, sworn statements made by Ubiquiti executives in declarations filed with

3   the Court and internal Company documents filed as exhibits to the declarations establish that the

4   manufacture and sale of counterfeit products by Kozumi was occurring from 2009 through 2012.

5   Hsu filed a declaration in the Kozumi litigation, which included various exhibits.  Ex. 9.

6        42.    Kenny (Kai) Deng ("Deng") is the owner of Hoky and a manufacturing facility

7   located in Shenzhen, China.  As detailed below, Ubiquiti alleges in its lawsuit against Hsu and

8   Kozumi that Hsu worked with Deng to steal Ubiquiti's proprietary product designs from one of the

9   Company's approved contract manufacturers and then used the stolen designs to make counterfeit

10  Ubiquiti products at the Hoky manufacturing facility from 2009 through July 2012.  Ubiquiti also

11  alleges that it worked with Chinese law enforcement authorities to shut down the Hoky factory and

12  detain Deng in November 2011 and July 2012.  Ex. 1, ¶¶70-83.

13       43.    Benjamin Moore ("Moore") is the Vice President of Business Development at

14  Ubiquiti.  As detailed below, the sworn statements made by Moore in his May 18, 2012 declaration

15  filed in the litigation against Kozumi and Hsu, and the internal Company documents attached as

16  exhibits to the declaration, establish that the manufacture and sale of counterfeit Ubiquiti products

17  was occurring from 2009 through 2012.  Ex. 3.

18       44.    Yu Cheng Lin ("Lin") is a vice president of operations at Ubiquiti.  As detailed

19  below, Lin filed a declaration in the Kozumi litigation in which he stated that Pera told him in March

20  2011 that there was a potential counterfeit issue in China and asked him to assist in the investigation

21  of counterfeiting operations taking place at the Hoky factory in Shenzhen, China.  Ex. 4.

22       45.    Mike Taylor ("Taylor") is a Senior Software Engineer at Ubiquiti.  As detailed below,

23  Taylor filed a declaration in the Kozumi litigation in which he stated that in August 2011 he

24  analyzed products manufactured by Hoky and sold by Kozumi and confirmed they were counterfeit

25  Ubiquiti products.  Ex. 5.

26       46.    Patrick G. Jabbaz ("Jabbaz") is a Hardware Manager at Ubiquiti.  As detailed below,

27  Jabbaz filed a declaration in the Kozumi litigation and attached as exhibits e-mails between Pera and

28  Hsu in December 2011, April 2012 and May 2012.  Ex. 6.

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                         - 10 -

1    47.    Asim Sajwani ("Sajwani") is the founder, owner, President, Chief Executive Officer

2    and Chairman of X-Concepts.  X-Concepts is a company registered to do business in the United

3    Arab Emirates with a principal place of business in Dubai.  X-Concepts was a Ubiquiti distributor

4    from  March  2008  through  February  2011.    As  detailed  below,  in  his  blog

5    (http://ubntfacts.blogspot.com/) and during conversations with lead counsel, Sajwani stated that

6    multiple factories in China were manufacturing counterfeit Ubiquiti products that were sold to

7    customers in numerous countries from 2009 to the present.  Ex. 11.

8    **V.    DEFENDANTS VIOLATED THE 1933 ACT BY ISSUING AN
         INACCURATE AND MATERIALLY MISLEADING REGISTRATION**
9    **      STATEMENT AND PROSPECTUS**

10            **A.    Ubiquiti's Business Model Made it Particularly Susceptible to
                     Counterfeit Product Sales that Could Harm the Company's**
11           **      Reputation and Financial Results**

12            48.    Ubiquiti was particularly susceptible to counterfeiting for several reasons.  First, the

13    Company had less control over the manufacturing process because it did not manufacture its own

14    products and instead used contract manufacturers in China and Taiwan, where enforcement of

15    intellectual property rights was more difficult.

16            49.    Second, Ubiquiti had less control over the sale and distribution of its products

17    because it did not have a direct sales force and instead used a worldwide network of distributors to

18    market and distribute its products.  The distributors acquired Ubiquiti products from the contract

19    manufacturers and then delivered them to resellers and end users.  Distributors accounted for 93% of

20    total revenues in FY10, 97% of total revenues in FY11 and 98% of total revenues in FY12.

21            50.    Third, a majority of the Company's products were sold in emerging markets outside

22    the United States, where it was more difficult to detect counterfeit products and enforce intellectual

23    property rights.  The Company's products are offered in the United States and in over 65 other

24    countries, with a particular focus on emerging economies in South America, such as Argentina,

25    Brazil and Paraguay.  Ex. 1, ¶23.  As shown in the following chart, the amount of revenues from

26    outside North America grew from 55% in 2009 to 75% in 2012 ($s in 000s).

27

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                    - 11 -

| Region | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| North America[3] | $28,476 (45%) | $56,995 (42%) | $61,920 (31%) | $88,309 (25%) |
| South America | $3,916 (6%) | $13,520 (10%) | $50,824 (26%) | $88,325 (25%) |
| EMEA | $27,801 (44%) | $55,089 (40%) | $68,297 (35%) | $130,494 (37%) |
| APAC | $2,928 (5%) | $11,348 (8%) | $16,833 (8%) | $46,389 (13%) |
| Total | $63,121 | $136,952 | $197,874 | $353,517 |

51.     Fourth, the Company did not have registered trademarks for all its products in the various countries in which its products were sold.  In its lawsuit against Kozumi, Ubiquiti stated that it had made "substantial intellectual property investments" to protect its corporate name and product name, including the filing of numerous trademark applications in the United States and abroad.  Ex. 1, ¶¶24-35.  The Company alleged that it had registered various trademarks with the United States Patent and Trademark Office ("USPTO"), including AIROS, AIRMAX, UBNT, AIRGRID, AIRCONTROL, AIRVIEW, UNIFI and AIRVISION.  *Id.*, ¶¶25-33.  But it did not have approved trademarks in the United States for numerous other hardware and software products (Airblast, Aircam, Airfiber, Airmaxsync, Bullet 2, Edgemax, Innerstation, MFI, Msensor, Mpower, Mport, Nanobridge, Nanostation, Picostation, Powerbridge, Rocket and Unitel) or even the Company's name (Ubiquiti and Ubiquiti Networks).  *Id.*, ¶34.  The Company also did not have approved trademarks in the numerous countries outside the United States in which it sold a majority of its products.  *Id.*, ¶35.

52.     Fifth, as shown in the following chart, the Company reported increasing revenues and high margins, which made it an attractive target for counterfeiters.  Revenues more than tripled from $63.1 million in 2009 to $197.9 million in 2011.  The gross margin was approximately 40%, and the operating margin was about 30% excluding 2010.  Counterfeiters could potentially generate even higher margins because they would not incur research and development costs, which totaled $31.7 million in 2010 and $11.4 million in 2011 for Ubiquiti.  They could also produce counterfeit products at lower costs by using cheaper materials and not obtaining regulatory certifications for the products.  Ubiquiti's products were certified by Underwriters Laboratories.  *Id.*, ¶21.

---

[3]     Revenue from sales in the United States was $28.2 million in FY09, $56.2 million in FY10, $60.0 million in FY11 and $84.3 million in FY12.  During a November 17, 2011 presentation, Ritchie stated that about one-half of the product sold in the United States was subsequently shipped outside the United States.

| $ in 000s | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Revenues | $63,121 | $136,952 | $197,874 | $353,517 |
| Cost of Revenues | $37,181 | $82,404 | $117,062 | $202,514 |
| Gross Profit | $25,940 | $54,548 | $80,812 | $151,003 |
| Gross Margin | 41.1% | 39.8% | 40.8% | 42.7% |
| Operating Expenses | $8,112 | $49,866 | $18,732 | $25,711 |
| Operating Income | $17,828 | $4,682 | $62,080 | $125,292 |
| Operating Margin | 28.2% | 3.4% | 31.4% | 35.4% |

53.     Ubiquiti was also an attractive target for counterfeiters because sales of its flagship AirMax product line were growing significantly.  The AirMax product line consists of a number of products, including the Nanostation, NanoStation M, NanoStation Loco M, PowerBridge M series, PicoStation M series, AirGrid M series, Rocket M series, NanoBridge M series and Bullet M series. As shown in the following chart, Ubiquiti's AirMax product line generated an increasing amount of revenues and represented a majority of the Company's revenues in FY11 and FY12 ($ in 000s).

| Product | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| AirMax | $0 (0%) | $37,525 (27%) | $113,001 (57%) | $223,743 (63%) |
| Other Systems | $49,764 (79%) | $75,368 (55%) | $47,397 (24%) | $81,551 (23%) |
| Embedded Radio | $12,958 (20%) | $14,047 (10%) | $14,762 (7%) | $10,056 (3%) |
| Antennas/Other | $399 (1%) | $10,012 (8%) | $22,714 (12%) | $38,167 (11%) |
| Total | $63,121 | $136,952 | $197,874 | $353,517 |

**B.     An International Counterfeiting Scheme that Had Grown in Size from 2009 to 2011 Was Adversely Affecting Ubiquiti's Business at the Time of the IPO**

**1.     Pleadings and Documents Filed in the Kozumi Litigation Establish that Kozumi and Others Were Making and Selling Millions of Dollars of Counterfeit Ubiquiti Products that Were Causing Substantial Harm to Ubiquiti at the Time of the IPO**

54.     On May 18, 2012, Ubiquiti filed suit against Kozumi and Hsu claiming that they had been masterminding an international counterfeiting scheme by manufacturing and selling millions of dollars of counterfeit Ubiquiti products – primarily AirMax products – that caused substantial and irreparable harm to the Ubiquiti brand and business.  In the first paragraph of Ubiquiti's first amended complaint, the Company stated the following:

> Defendants have masterminded an international counterfeiting scheme to profit illegally from Ubiquiti's established trademarks and goodwill in the wireless and networking technology markets.  Using stolen source code and proprietary

1  designs, Defendants have been manufacturing millions of dollars' worth of
2  counterfeit Ubiquiti products, packaging them in boxes that are virtually identical to
   genuine Ubiquiti packaging, and selling them to unsuspecting customers throughout
3  the world.  These customers are deceived into believing that they are purchasing
   genuine Ubiquiti products when they are actually buying substandard counterfeit
4  goods.  The availability of these counterfeit products in the marketplace is causing
   substantial harm to the Ubiquiti brand and needs to be stopped immediately.

5  Ex. 1, ¶1.

6         55.    Ubiquiti stated in its lawsuit that each counterfeit product sold represented a lost sale

7  of a genuine Ubiquiti product and also directly harmed the Company's goodwill because the

8  counterfeit products experienced more malfunctions than genuine Ubiquiti products, which increased

9  complaints from customers who believed they were purchasing genuine Ubiquiti products.  The

10  Company stated that malfunctions and customer complaints could easily escalate and destroy

11  Ubiquiti's reputation while increasing costs because the Company processed all warranty claims on

12  counterfeit product to protect its goodwill:

13         Each counterfeit product sold by Defendants represents not only a lost sale of
       a genuine Ubiquiti product, but also direct harm to Ubiquiti's goodwill.  On
14     information and belief, the counterfeit products do not undergo testing and are made
       from low quality materials that are certain to cause a lot more product malfunctions
15     than genuine Ubiquiti products.  In fact, Ubiquiti recently received a report of a
       failure rate of 12% on counterfeit products purchased by a longstanding Ubiquiti
16     customer.  Because Ubiquiti is dependent on word of mouth promotion for many of
       its sales, increases in product complaints from customers who believe they are
17     purchasing genuine Ubiquiti products could easily escalate and destroy Ubiquiti's
       reputation.  Furthermore, customer who bought counterfeit products can send them
18     back back [sic] to Ubiquiti for warranty returns because they believe that such
       products are genuine products.  To protect its goodwill, Ubiquiti processes all
19     warranty returns in the same fashion – regardless of whether the products are genuine
       Ubiquiti products or Defendants' counterfeit products.  Each "return" of a counterfeit
20     product thus results in an additional out-of-pocket cost to Ubiquiti [when]
       Defendants are the ones to have reaped the profits.
21
22  Id., ¶69.

23         56.    In a brief filed in support of the Company's application for a temporary restraining

24  order ("TRO"), Ubiquiti stated that the international counterfeiting scheme stretched far beyond the

25  United States, was growing like an epidemic and causing irreparable harm to the Company each day,

   including significant lost revenue and devastating damage to its goodwill and reputation.
26
27         This is no ordinary trademark infringement action.  This case is about an
       international counterfeiting scheme with a U.S.-based ringleader who has stolen,
       defamed, blackmailed, and is willing to do anything to further his illegal agenda,
28     including manipulating the U.S. stock market. Through this application for a [TRO],

> Ubiquiti . . . is seeking to stop the irreparable harm being caused to it each day. The ring leader is [Hsu], who is orchestrating the counterfeiting together with his wife Lilia Kung and through his company Kozumi USA Corp. The counterfeiting is masterminded by Hsu but stretches far beyond the U.S. borders and is growing like an epidemic. In addition to significant lost revenue, it is causing devastating damage to the good will and reputation of San Jose-based Ubiquiti.

Ex. 2 at 1.

57.     Sworn statements made by Ubiquiti executives in the Kozumi litigation and internal Company documents filed therein establish that the international counterfeiting scheme was causing substantial, irreparable and devastating harm to Ubiquiti's brand and business in 2010 and 2011. They also show that Company executives were making substantial efforts to stop the counterfeiting, including defendant Pera, who wrote in December 2011 that he had "personally dedicated the last several months of [his] time focusing on [Kenny Deng]," the owner of the Hoky facility in Shenzhen, China that was manufacturing thousands of counterfeit Ubiquiti products. Ex. 6, ¶3 & ex. A. The counterfeiting had become such a problem at the time of the October 14, 2011 IPO that defendants had retained Chinese counsel to prepare a criminal complaint and had made arrangements with law enforcement authorities in China – the SPSB – to raid the Hoky manufacturing facility. The raid occurred on November 17, 2011, just one month after the IPO.

58.     **Ubiquiti terminates distributor agreement with Kozumi in November 2009 after learning Kozumi was selling counterfeit products.** According to Moore, Ubiquiti's Vice President of Business Development, in May 2008 Ubiquiti and Kozumi entered into a distribution agreement under which Kozumi was a nonexclusive distributor of Ubiquiti products in Latin America. Ex. 3, ¶¶41-42 & ex. L. In addition to its office in Florida, Kozumi had offices in Argentina, Paraguay, Peru, Europe, Taiwan, Colombia and Brazil. Ex. 1, ¶41. Hsu also owned, managed and/or operated Syntronic S.A. ("Syntronic"), Tech Depot S.A. ("Tech Depot") and Omega Technology, companies in Argentina; Redemax S.A. ("Redemax"), a company in Paraguay; and Netcom, Inc. ("Netcom"), a company in Asia. *Id.*, ¶¶51, 64.

59.     While a Ubiquiti distributor, Kozumi sold the Company's products in Argentina, Paraguay and Brazil through Syntronic and Redemax. *Id.*, ¶¶50-51. Kozumi placed 12 orders with Ubiquiti for $1,487,891.50 of product while a distributor. Ex. 3, ¶50 & ex. R.

60.     In November 2009, however, Moore terminated the distribution agreement after learning Kozumi was offering copycat Ubiquiti products under the Kozumi name. Ex. 3, ¶48; Ex. 9, ¶10 & ex. I. Moore stated that he terminated the distributor relationship with Kozumi because he was concerned Hsu would use the strength of the Ubiquiti brand to draw resellers to its product offerings but then actually sell them Kozumi-branded products. *Id.*

61.     **Ubiquiti executives learn that Kozumi and others continue to sell counterfeit products in 2010.** According to the Company, Kozumi and Hsu devised a worldwide scheme to sell counterfeit Ubiquiti products after Ubiquiti terminated Kozumi's distributor agreement in November 2009. Ex. 1, ¶56. Hsu worked with Deng, the owner of the Hoky Technology manufacturing facility located in Shenzhen, China, and their scheme involved: (a) stealing Ubiquiti's proprietary product designs from one of its approved contract manufacturers; (b) manufacturing counterfeit Ubiquiti products at the Hoky manufacturing facility; (c) selling the counterfeit Ubiquiti products in South America; and (d) fraudulently obtaining the trademark rights to the Ubiquiti brand in South America and the United States. *Id.*, ¶¶56-57.

62.     Throughout 2010, Ubiquiti executives were told by the Company's distributors that counterfeit products were being sold throughout the world. On February 12, 2010, Moore received an e-mail from Pushker Tiwari, a Ubiquiti distributor in India, informing him that a company called GO.IP Global Services was advertising a Kozumi product that was very similar to Ubiquiti products. Ex. 3, ¶49 & ex. Q.

63.     On March 13, 2010, Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, blind carbon copied Moore on his e-mail response to Hsu in which Sajwani wrote that X-Concepts could not sell Ubiquiti products to Kozumi because Kozumi was outside its distribution territory. *Id.*, ¶52 & ex. S. In addition, Sajwani wrote that X-Concepts had been receiving e-mails from clients inquiring why "the shape of [Kozumi's] devices looks like [Ubiquiti's] M Series a lot so most of our resellers have returned devices to us." *Id.*

64.     On May 7, 2010, Moore noticed that Netcom WISP, a company that placed an order for Ubiquiti products, had the same bank information for wire transfers that was used by Kozumi when Kozumi was a Ubiquiti distributor. *Id.*, ¶53 & ex. T. Moore e-mailed Steve Shaw, Ubiquiti's

1   contact with Netcom WISP, and asked him if he were affiliated with Hsu.  Shaw responded that

2   Netcom WISP was not an affiliate of Hsu but did business with Hsu's Asian company, Netcom; that

3   Hsu introduced him to Ubiquiti; and that Hsu was no longer with Kozumi.  *Id.*  Moore believed

4   Shaw and fulfilled the order.  *Id.*

5         65.     On May 27, 2010, Moore received an e-mail forwarded from Dimitrios Sidiropoulos

6   of Aerial, a Ubiquiti distributor in Greece.  *Id.*, ¶54 & ex. U.  The forwarded e-mail was from a

7   Kozumi sales manager inquiring whether Aerial would be interested in helping Kozumi establish a

8   market presence in Greece.  *Id.*

9         66.     Moore stated that he contacted Ubiquiti distributors and asked them not to do

10  business with Kozumi in response to Hsu's attempts to covertly and improperly acquire Ubiquiti

11  products through authorized Ubiquiti distributors.  *Id.*, ¶55.  However, Kozumi and others continued

12  to engage in the counterfeiting scheme.

13        67.     In the second half of 2010, Hsu and his affiliates filed various Ubiquiti trademark

14  applications in Argentina.  On August 20, 2010, Jung Hsin Ping (a relative of Hsu, former Syntronic

15  employee and shareholder of Tech Depot) filed three trademark applications in Argentina for the

16  marks NANOSTATION, NANOBRIDGE and AIRGRID.  Ex. 1, ¶87; Ex. 8, ex. E.

17        68.     On October 20, 2010, Hsu acquired the Argentinean registration for UBIQUITI

18  NETWORKS & Design from Ditelco Informatica S.R.L. ("Ditelco"), which had registered the

19  trademark in May 2008.  Ex. 1, ¶¶85-86; Ex. 8, exs. C-D.  The next month, Hsu filed documents

20  with the Argentina Trademark Office to record the assignment of the UBIQUITI NETWORKS &

21  Design trademark.  Ex. 1, ¶86.

22        69.     **In 2011, the counterfeiting problems escalate, and Ubiquiti works with Chinese**

23  **law enforcement authorities to raid the Hoky factory.**   After obtaining the UBIQUITI

24  NETWORKS & Design trademark in October 2010, Hsu sent a letter to Chinese customs authorities

25  from Syntronic on January 1, 2011, in which he wrote that "We request that this letter serve as

26  notification to all customs authorities that Syntronic S.A. has authorized Hoky Technology Ltd. to

27  manufacture and export Ubiquiti Networks and UBNT products."  Ex. 10, ex. D; Ex. 1, ¶62.

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                      - 17 -

70.     On January 19, 2011, Moore received an e-mail from Federico Sanguinetti ("Sanguinetti") of Laufquen Internet, a Ubiquiti distributor in Argentina, informing him that a competitor of Laufquen Internet in Argentina was selling Ubiquiti products with "Kozumi" labels on them that were made with a cheaper Power Over Ethernet ("POE") adapter and were offered for sale at lower prices. Ex. 3, ¶56 & ex. V. Sanguinetti said the Kozumi products created confusion among consumers, expressed concern that the Kozumi products were harming his business and asked if Ubiquiti could do something about it. *Id*. Moore responded that the "Kozumi guys have been doing all sorts of sneaky stuff" and that Ubiquiti would try to get it stopped. *Id*.

71.     On March 4, 2011, Moore received an e-mail from Sebastian Tabellione ("Tabellione") of Microcom, another Ubiquiti distributor in Argentina. *Id*., ¶57 & ex. W. Tabellione asked whether Ubiquiti had an agreement with Kozumi because Kozumi was selling Ubiquiti products in Argentina at much lower prices than Tabellione was able to offer for Ubiquiti products. *Id*. He also wrote that the Kozumi sales were "causing huge discredit to the [Ubiquiti] brand." *Id*. Tabellione attached a spreadsheet of imports from Syntronic that showed the price differences. *Id*. Moore responded that Ubiquiti was not supplying products to Syntronic and that ***Ubiquiti was doing everything it could to stop the sale of Kozumi's knockoff products***. *Id*.

72.     The increase in counterfeiting activities being communicated to Ubiquiti by its distributors caused Company executives to take additional steps to address the problem. In March 2011, Ubiquiti hired Lin as a vice president of operations. He previously worked at Cameo, a Ubiquiti contract manufacturer located in Taiwan. Ex. 4, ¶2. Lin stated that, after he joined Ubiquiti, Pera told him there was a potential counterfeit issue in China and asked him to assist in the investigation of counterfeiting operations taking place at the Hoky factory in Shenzhen, China. *Id*.

73.     As Ubiquiti was increasing its efforts to address the growing counterfeiting problems, its distributors continued to inform the Company's executives that counterfeit products were being manufactured in China and sold throughout the world. In late March 2011 or early April 2011, Moore was contacted by an employee at Lanbowan, a Ubiquiti distributor in China, and was informed that Hoky was manufacturing counterfeit Ubiquiti products at its factory and using the Ubiquiti brand on the products. Ex. 1, ¶70; Ex. 3, ¶58.

74.     Moore and Pera visited the Hoky factory in April 2011 to investigate the counterfeiting allegations and were initially told by Hoky owner Deng that Hoky was not making counterfeit Ubiquiti goods. Ex. 3, ¶¶59-60. However, Deng then told them that "everybody does it." *Id*. Moore and Pera suspected counterfeit Ubiquiti products were being manufactured by Hoky because, during their taxi ride to the Hoky factory, the taxi driver called the factory and warned them that he was bringing two Americans to the factory. *Id*.

75.     According to Moore, those suspicions were confirmed in late summer 2011, when Ubiquiti sent someone to the Hoky factory who reported that Hoky was making counterfeit Ubiquiti products. *Id*., ¶61. Ubiquiti then arranged for a person to pose as a potential distributor for Hoky's Ubiquiti products and received Hoky-manufactured Ubiquiti products. *Id*. Moore also worked with authorized Ubiquiti distributors in Argentina to acquire fake products for inspection. *Id*., ¶62. On August 30, 2011, Moore provided the products manufactured by Hoky and sold by Kozumi to Taylor, Ubiquiti's Senior Software Engineer. *Id*., ¶63; Ex. 5, ¶2. Taylor analyzed the products and confirmed they were counterfeit Ubiquiti products. *Id*.

76.     In October 2011, Lin acquired counterfeit products from Tech Depot, an Argentinean company affiliated with Hsu, and determined that they were produced at another factory in Huizhou, China owned by Huizhou China Eagle Electronic Technology Co., Ltd. ("CEE"). Ex. 4, ¶¶3-4. CEE told Lin that it produced four different models of Ubiquiti printed circuit boards ("PCBs") for Hoky and that CEE produced 30,000 Ubiquiti PCBs for Hoky from June 2011 to August 2011. *Id*. Lin then sent someone to investigate the Hoky facility, and she sent Lin pictures of products made at that facility. *Id*., ¶5 & ex. A.

77.     According to the Company and Moore, in September 2011, Hoky shipped 15,000 counterfeit Ubiquiti products to Syntronic with a total value of $680,000; and in October 2011, Hoky shipped 31,000 counterfeit products with a total value of about $1 million to various countries in the Middle East and to Paraguay, Turkey, Ukraine and China. Ex. 1, ¶72; Ex. 3, ¶64.

78.     Moore stated that after Ubiquiti confirmed the products manufactured by Hoky and sold by Kozumi were counterfeit, Ubiquiti retained a law firm in China that worked with the SPSB to shut down the Hoky facility. Ex. 3, ¶63. Lin stated the products obtained from Hoky were

1    "virtually indistinguishable" from genuine Ubiquiti products. Ex. 4, ¶8.  The actual raid on the Hoky

2    factory occurred on November 17, 2011.

3         79.    As he had done in 2010, Hsu registered Ubiquiti trademarks in Argentina and the

4    United States in 2011.  In June 2011, Lilia Kung, Hsu's former wife, filed an application in the

5    United States for the UBIQUITI trademark.  Ex. 1, ¶94; Ex. 8, ex. G.  The next month, Hsu filed

6    another trademark application in Argentina for UBNT in International Class 9. Ex. 1, ¶88; Ex. 8, ex.

7    F.

8         80.    Thus, at the time of the IPO, the international counterfeiting scheme had become such

9    a problem that Ubiquiti had retained Chinese counsel and was working with the SPSB to shut down

10   the Hoky facility.  Further, there were other facilities manufacturing and distributing counterfeit

11   Ubiquiti products.  Defendants misled investors by concealing the counterfeiting problems and their

12   adverse impact on Ubiquiti's business and representing in the Registration Statement and Prospectus

13   that the sale of counterfeit products was only a risk that could adversely impact the Company's

14   business.

15          **2.    A Former Ubiquiti Distributor Confirms the Counterfeiting**

16   **Problems and Claims They Were Much More Widespread**
     **than Ubiquiti Alleges in its Lawsuit Against Kozumi**

17        81.    Sajwani, the owner and CEO of former Ubiquiti distributor X-Concepts, knew about

18   the counterfeiting problems.  Information provided by Sajwani indicates the counterfeiting problems

19   were even more widespread than Ubiquiti claims in its lawsuit against Kozumi.  X-Concepts was an

20   exclusive master distributor for Ubiquiti from 2008 until February 2011 and sold over $40 million of

21   Ubiquiti products in 27 countries in the Middle East.

22        82.    Sajwani said that Pera told him in 2009 to not sell Ubiquiti products to Kozumi

23   because Ubiquiti had terminated its distributor agreement with Kozumi after learning Kozumi was

24   selling copycat products.  According to Sajwani, however, Kozumi was just one of many companies

25   in a counterfeiting ring that had registered a Ubiquiti trademark in Argentina and sold counterfeit

26   products there beginning in 2009.  Sajwani said that Hoky sold Ubiquiti product designs to two other

27   factories in China and that there were as many as 13 factories in China manufacturing counterfeit

28

1    Ubiquiti products.  Sajwani also said that he discussed counterfeiting with Pera and Moore in 2010

2    and 2011 and with Ritchie during a face-to-face meeting in April 2011 at Ubiquiti's San Jose offices.

3         83.      Sajwani said that the owner of Airlink Systems, a distributor in Pakistan, told him in

4    mid-2009 that duplicate Ubiquiti products were available in China for 75% of the price at which

5    Ubiquiti sold product to X-Concepts.  Sajwani reviewed the product, determined it was identical to

6    Ubiquiti's product and immediately e-mailed Pera and Moore.  Sajwani also said that from 2009 to

7    2010, he continued to hear from resellers in Iraq, Saudi Arabia, Turkey and Europe that there was a

8    growing availability of counterfeit Ubiquiti products in China and that he had telephone

9    conversations with Pera and Moore throughout 2009 and 2010 about the problem.  Sajwani also said

10    that, in 2010, duplicates of Ubiquiti's AirMax products became available for the Nano Station, Nano

11    Station Loco and NanoBridge, and cost 20% to 25% less than Ubiquiti's products.  Sajwani said the

12    counterfeiting problems became so severe that Ubiquiti approached internet service providers

13    ("ISPs") directly rather than through its distributors and offered the ISPs reduced pricing.

14         84.      Emails provided by Sajwani (and the Company in the Kozumi litigation) show that he

15    discussed counterfeiting with Ubiquiti executives in 2010.  On March 3, 2010, Moore sent an e-mail

16    to Sajwani in which he wrote that he saw Kozumi products at a trade show and that it made him sick

17    seeing how similar the packaging and designs were. Ex. 11 at 25.  Moore sent Sajwani a follow-up

18    e-mail the next day and wrote that it did not look good for a Ubiquiti partner to support companies

19    that were intentionally copying Ubiquiti products. *Id*. at 27.

20         85.      Pera also sent Sajwani an e-mail on March 4, 2010, writing that he had been receiving

21    "more and more information confirming [Sajwani was] supporting the introduction of Ubiquiti clone

22    competitors" and that Sajwani should protect Ubiquiti's market interests, "especially against

23    companies who steal and copy our product designs." *Id*. at 26.

24         86.      On March 8, 2010, Sajwani emailed Moore that he had a serious complaint about

25    Lanbowan, a Ubiquiti distributor in China, because Lanbowan was e-mailing customers that it could

26    supply Ubiquiti product at very low prices. Ex. 11 at 28.  He also wrote that one of his customers,

27    Pakistan Airlinxsys, went to Lanbowan's warehouse and was offered original and "duplicate"

28

1    Ubiquiti products.  *Id.*  Sajwani reported that the "duplicate" products were almost 30% cheaper than

2    the original products.  *Id.*  Moore responded that he would look into it.  *Id.*

3         87.    On March 13, 2010, Sajwani emailed Hsu (and blind copied Moore) that X-Concepts

4    would not sell Ubiquiti product to Kozumi because Sajwani did not want any problems with

5    Ubiquiti.  Ex. 3, ¶52 & ex. S.  Sajwani also wrote that he had been getting e-mails from clients in

6    Iraq and Iran that the shape of Kozumi devices looked like Ubiquiti products and that it was a big

7    problem.  *Id.*  In addition, Sajwani wrote that his sales team had complained that Kozumi's products

8    looked exactly the same as Ubiquiti products.  *Id.*

9         88.    Sajwani posted documents to his blog showing that Pera and other Ubiquiti

10   executives knew counterfeit products were also being sold in Iran.  According to Sajwani, a

11   company named Lavan Network ("Lavan") registered the Ubiquiti logo in Iran in November 2009.

12   At that time, X-Concepts was Ubiquiti's exclusive distributor in Iran and sold product in Iran though

13   a company named Alfa Technologies ("Alfa").  In November 2009, Iranian authorities confiscated

14   Ubiquiti products Alfa tried to sell in Iran because of the Ubiquiti logo registered by Lavan.

15        89.    As a result, Ubiquiti took steps to register its name and logo in Iran, as reflected in

16   e-mail communications between Pera and others in 2009 and 2010.  On December 24, 2009, Sajwani

17   e-mailed Don Gibson at dgibson@patent-tech.com (and copied Pera and Moore) that Ubiquiti and

18   X-Concepts wanted to file a complaint against a company that Senao/Engenius was supporting in

19   Iran.  Ex. 11 at 1.  Pera authorized Gibson to conduct an Iranian trademark search on December 25,

20   2009.  *Id.*  Two days later, Pera forwarded to Gibson (and copied Sajwani and Moore) an e-mail

21   received from Ariya, the manager of Alfa, asking Gibson to prepare documents for Ubiquiti to

22   register its trademark in Iran and to prove Alfa was an authorized reseller of Ubiquiti product in Iran.

23   *Id.* at 2.

24        90.    On January 8, 2010, Ariya emailed the law offices of Dr. Laghaee & Associates Inc.

25   Int'l located in Tehran, Iran and provided the firm with the Ubiquiti brand and trademark registration

26   history.  *Id.* at 3.  On January 12, 2010, the Laghaee law firm responded that the documents were of

27   no use in Iran and that the trademark owner must file a trademark application in Iran and then

28   provide a certified and legalized version of the trademark certifications.  *Id.* at 4.  Ariya forwarded

1   the Laghaee response to Moore on January 14, 2010 and told him to contact the firm directly if he

2   had any questions.  *Id*. at 7.  He also wrote that the person who had registered Ubiquiti's logo in Iran

3   was trying to use it on low quality products, such as hub switches, passive products, etc., and that

4   everyone was worried because this "scenario [was] becoming public all around the region & world,"

5   and that Ubiquiti needed to take "fast action" to "keep [its] brand top & clean from these types of

6   dirty competition."  *Id*.

7        91.     On January 14, 2010, Sajwani emailed Moore and Ariya that all clients in the region

8   were getting worried, suggested Ubiquiti hire a law firm to handle the case and noted that Ariya

9   recommended the Laghaee law firm.  *Id*. at 5.  On January 15, 2010, Moore e-mailed Ariya that

10   Ubiquiti's lawyers were preparing documents and asked why "they are stopping sale of products in

11   Iran for this" and whether the next step was to register in Iran right away.  *Id*. at 11.  The next day,

12   Ariya e-mailed Moore and Sajwani contact information for the Laghaee law firm and a list of

13   documents needed from Ubiquiti.  *Id*. at 13-14.

14        92.     On January 19, 2010, Ariya e-mailed Moore and Sajwani to clarify the problem and

15   explain what needed to be done.  *Id*. at 16-17.  Ariya wrote that a company named Lavan had

16   registered the Ubiquiti brand name and logo in Iran to take advantage of Ubiquiti's name

17   recognition.  *Id*.  He wrote that Ubiquiti product shipped to Iran by his company and X-Concepts

18   was being held by the Iranian court because of the Ubiquiti registration by Lavan and that Ubiquiti

19   needed to pursue the illegal registration so Ubiquiti could sell product in Iran and protect its name

20   and reputation in Iran and the entire Middle East.  *Id*.  Moore responded that Ubiquiti would do what

21   was necessary to get the problem resolved and had already started the process of getting registered in

22   Iran.  *Id*. at 18.

23        93.     According to Sajwani, he, Moore, Ariya and representatives from Lavan met at the

24   Atlantis Hotel in Dubai in January 2010 in an attempt to negotiate an agreement, but the parties were

25   unable to reach an agreement.  As a result, Ubiquiti, X-Concepts and Alfa retained legal counsel to

26   invalidate the logo registered by Lavan.

27        94.     On March 10, 2010, Pera, Moore and others received an e-mail from Ariya informing

28   them that he had visited Ubiquiti's lawyer in Tehran and that "UBNT" had been registered in Iran

1    instead of Ubiquiti's known logo, which Ubiquiti needed to register.  *Id*. at 29.  Ariya also wrote that

2    he was not getting cooperation from Ubiquiti's Tehran lawyer to get his goods released.  Ariya

3    concluded the e-mail by stating that Alfa had sold a huge quantity of Ubiquiti products and now felt

4    that no one cared about it.

5         95.    On April 12, 2010, Ariya e-mailed Moore steps that could be taken to get Ubiquiti's

6    known logo registered in Iran.  *Id*. at 30.  On June 8, 2010, Ariya emailed Sajwani that Alfa was still

7    trying to solve the problem, was asked by the Laghaee law firm to provide Ubiquiti invoices for Alfa

8    purchases in 2008 and asked if Sajwani could provide the invoices.  *Id*. at 31.  On August 11, 2010,

9    Moore e-mailed Sajwani that Ubiquiti had received confirmation that all was complete and that the

10   Company was just waiting for certifications.  *Id*. at 32.  On September 3, 2010, Ariya e-mailed

11   Moore (and copied Sajwani, Gibson and Fitzgerald) and asked for an update on the Ubiquiti

12   registration in Iran.  *Id*. at 33.

13        96.    Sajwani stated that Pera and Moore stopped communicating with him at the end of

14   2010 and that Ritchie became his Ubiquiti contact.  Ubiquiti terminated its distribution agreement

15   with X-Concepts in February 2011 and reported in the Registration Statement and Prospectus that it

16   did so after discovering X-Concepts was selling Ubiquiti's products in Iran in violation of U.S.

17   export controls and economic sanctions laws.  The Company acknowledged in the Registration

18   Statement and Prospectus that it allowed sales to Iran until early 2010 and that it "overlooked"

19   various emails from X-Concepts that showed X-Concepts (and another distributor) continued to sell

20   Ubiquiti product in Iran in 2010 and 2011.

21        97.    Sajwani stated that Pera and Ritchie knew X-Concepts was selling Ubiquiti product in

22   Iran in 2010 and 2011 and that he personally discussed the sales with Ritchie in April 2011 at

23   Ubiquiti's offices in San Jose.  He received an e-mail from Ritchie on April 26, 2011 in which

24   Ritchie claimed he was surprised about sales of Ubiquiti product in Iran.  *Id*. at 34.

25        98.    Sajwani also stated that Pera met him in Dubai in October 2011 and told him that:

26   (a) Ubiquiti "played innocent" during the federal investigation of the Company's sales to Iran;

27   (b) Ubiquiti blamed X-Concepts for the illegal sales to Iran; and (c) Pera would destroy X-Concepts,

28   Sajwani and his family if Sajwani did not agree to shut down X-Concepts or if he disputed

1  Ubiquiti's claims that it was not aware of the sales to Iran.  Sajwani said he reported the incident to

2  Dubai authorities and that he was interviewed by the SEC and FBI in July 2012 about Ubiquiti's

3  sales in Iran.

4         99.     Although Ubiquiti terminated X-Concepts' distributorship in February 2011, the

5  information provided by Sajwani shows that he and Ariya discussed the sale of counterfeit products

6  in Iran and other countries with Pera, Ritchie and Moore in 2010 and 2011.

7        **C.**     **Defendants Failed to Disclose the International Counterfeiting**

8               **Scheme in the Registration Statement and Prospectus and Falsely**
             **Represented that the Sale of Counterfeit Products Was Just a**
             **Possibility that Could Adversely Affect Ubiquiti's Business**

9        100.     Defendants began preparing the Registration Statement and Prospectus months before

10  the October 14, 2011 IPO while the international counterfeiting scheme was adversely affecting

11  Ubiquiti's business.  On June 17, 2011, Ubiquiti filed with the SEC a Form S-1 Registration

12  Statement ("Registration Statement").  The Registration Statement was subsequently amended on

13  July 28, 2011, August 12, 2011, September 16, 2011, October 4, 2011 and October 13, 2011.  The

14  October 13, 2011 amendment that Ubiquiti filed with the SEC on Form S-1/A was the fifth and final

15  amendment to the Registration Statement and was signed by Ubiquiti's officers and directors.  The

16  four Underwriter Defendants helped draft and disseminate the Registration Statement and

17  Prospectus.

18        101.     The Registration Statement incorporated by reference all subsequently filed

19  prospectuses.  On October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which formed part of

20  the Registration Statement and which became effective on October 14, 2011.

21        102.     The IPO was successful for the Company, its insiders and the underwriter.  At least

22  7.038 million shares of Ubiquiti common stock were sold to the public at $15 per share, raising

23  $105.6 million in gross proceeds for the Company and the selling shareholders.  In the IPO, several

24  of Ubiquiti's officers and directors sold shares of their personally held Ubiquiti stock.  Defendant

25  Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2 million.  John Sanford,

26  the Company's Chief Technology Officer, sold 123,145 shares of his Ubiquiti stock for gross

27

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR      - 25 -

proceeds of $1.8 million.  Moore, Vice President of Business Development, sold 374,370 shares of his Ubiquiti stock for gross proceeds of $5.6 million.

103.    However, defendants misled investors by failing to disclose the international counterfeiting scheme that had been adversely affecting Ubiquiti's business for two years and by falsely representing that the sale of counterfeit products was just a possibility that could adversely affect the Company's business.  Those material misrepresentations and omissions created the false impression that counterfeiting was not a current problem in October 2011 but merely a potential risk.  Specifically, defendants created that false impression by representing that Ubiquiti's ability to sell its products at competitive prices and to be the sole provider of its products *might* be adversely affected – and that its business, operating results and financial condition *could* be materially and adversely affected – *if* the Company were unsuccessful in stopping counterfeit products by monitoring and enforcing its intellectual property rights in China:

> *If our contract manufacturers do not respect our intellectual property and trade secrets and if they or others produce competitive products reducing our sales or causing customer confusion, our business, operating results and financial condition could be materially adversely affected*.

> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge.  Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, *we may be unsuccessful in monitoring and enforcing our intellectual property rights in China.  We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products.  Although we take steps to stop counterfeits, we may not be successful* and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand may be harmed.  *If such an impermissible use of our intellectual property or trade secrets were to occur, our ability to sell our products at competitive prices and to be the sole provider of our products may be adversely affected and our business, operating results and financial condition could be materially and adversely affected*.

104.    Defendants also misled investors by representing that Ubiquiti's ability to compete effectively and to defend the Company from litigation *could* be impaired *if* the Company failed to protect its intellectual property rights adequately.  They further perpetuated the false impression that counterfeiting was not a current problem by stating that unauthorized use of the Company's

1    intellectual property had occurred in the past, that it might occur in the future without the Company's

2    knowledge and that the steps Ubiquiti had taken might not prevent unauthorized use of its

3    intellectual property:

4            ***If we fail to protect our intellectual property rights adequately, our ability to
         compete effectively or to defend ourselves from litigation could be impaired, which***

5    ***could reduce our revenues and increase our costs***.

6            ***We rely primarily on patent, copyright, trademark and trade secret laws, as
         well as confidentiality and non-disclosure agreements and other methods, to***

7    ***protect our proprietary technologies and know-how***.  As of June 30, 2011, we had
     six patents pending in several countries, including the United States, and two issued

8    patents.  The prospective rights sought in our pending patent applications may not be
     meaningful or provide us with any commercial advantage and they could be opposed,

9    contested, circumvented or designed around by our competitors or be declared
     invalid or unenforceable in judicial or administrative proceedings.  Any failure of our

10   patents to adequately protect our technology might make it easier for our competitors
     to offer similar products or technologies.  In addition, patents may not issue from any

11   of our current or future applications.

12           Monitoring unauthorized use of our intellectual property is difficult and
     costly.  ***Unauthorized use of our intellectual property has occurred in the past and***

13   ***may occur in the future without our knowledge.  The steps we have taken may not***
     ***prevent unauthorized use of our intellectual property***.  Further, we may not be able

14   to detect unauthorized use of, or take appropriate steps to enforce our intellectual
     property rights.   Our competitors may also independently develop similar

15   technology. ***Our failure to effectively protect our intellectual property could reduce***
     ***the value of our technology in licensing arrangements or in cross-licensing***

16   ***negotiations, and could impair our ability to compete.  Any failure by us to***
     ***meaningfully protect our intellectual property could result in competitors offering***

17   ***products that incorporate our most technologically advanced features, which could***
     ***seriously reduce demand for our products***.  We may in the future need to initiate

18   infringement claims or litigation.  Litigation, whether we are a plaintiff or a
     defendant, can be expensive and time-consuming and may divert the efforts of our

19   technical staff and managerial personnel, which could result in lower revenues and
     higher expenses, whether or not such litigation results in a determination favorable to

20   us.

21           105.    Similarly, defendants misled by representing that enforcement of Ubiquiti's

22   intellectual property rights abroad, particularly in China, was limited and often difficult, which ***could***

23   allow intellectual property infringers to continue unimpeded:

24           ***Enforcement of our intellectual property rights abroad, particularly in***
         ***China, is limited and it is often difficult to protect and enforce such rights***.

25

26           Patent protection outside the United States is generally not as comprehensive
     as in the United States and may not protect our intellectual property in some
     countries where our products are sold or may be sold in the future.  Even if patents

27   are granted outside the United States, effective enforcement in those countries may
     not be available.  Many companies have encountered substantial intellectual property

28

infringement in countries where we sell, or intend to sell, products or have our products manufactured:

> *In particular, the legal regime relating to intellectual property rights in China is limited and it is often difficult to protect and enforce such rights*.  The regulatory scheme for enforcing China's intellectual property laws may not be as developed as regulatory schemes in other countries.  *Any advancement of an intellectual property enforcement claim through China's regulatory scheme may require an extensive amount of time, allowing intellectual property infringers to continue largely unimpeded, to our commercial detriment in the Chinese and other export markets*.  In addition, rules of evidence may be unclear, inconsistent or difficult to comply with, making it difficult to prove infringement of our intellectual property rights.  As a result, enforcement cases involving technology, such as copyright infringement of software code, or unauthorized manufacture or sale of products containing patented inventions, may be difficult or not possible to sustain.

> These factors may make it increasingly complicated for us to enforce our intellectual property rights against parties misappropriating or copying our technology or products without our authorization, allowing competing enterprises to harm our business in the Chinese or other export markets by affecting the pricing for our products, reducing our own sales and diluting our brand or product quality reputation.

106.  Defendants also misled by representing that effective trademark protection *might* not be available in every country in which the Company sold its products, that others *might* develop technologies that infringed Ubiquiti's intellectual property and that the Company's legal efforts *might* not be successful against possible infringers:

> We rely on a combination of patent, copyright, trademark and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect our proprietary rights.  These laws, procedures and restrictions provide only limited protection and the legal standards relating to the validity, enforceability and scope of protection of intellectual property rights are uncertain and still evolving.  Furthermore, *effective patent, trademark, copyright and trade secret protection may not be available in every country in which our services and products are available*.

> \*       \*       \*

> We endeavor to enter into agreements with our employees and contractors and with parties with whom we do business in order to limit access to and disclosure of our proprietary information.  *We cannot be certain that the steps we have taken will prevent unauthorized use or reverse engineering of our technology.  Moreover, others may independently develop technologies that are competitive with ours or that infringe on our intellectual property.  The enforcement of our intellectual property rights also depends on the success of our legal actions against these infringers, but these actions may not be successful, even when our rights have been infringed.*

107.  Each of the above representations was materially inaccurate and misleading, contained untrue statements of material fact and omitted other facts necessary to make the

1    representations not misleading.  Specifically, the representations were materially inaccurate and

2    misleading because they failed to disclose that: (a) Ubiquiti's business had already been adversely

3    impacted by the growing international counterfeiting scheme occurring in China and elsewhere;

4    (b) Kozumi and others were using the Company's intellectual property to manufacture and sell

5    thousands of counterfeit Ubiquiti products at prices substantially lower than Ubiquiti's prices; and

6    (c) Ubiquiti's efforts to enforce its intellectual property rights had not prevented the unauthorized

7    use of its intellectual property by Kozumi and others that were selling counterfeit products largely

8    unimpeded.

9    **VI.    THE TRUTH IS REVEALED THROUGH A SERIES OF PARTIAL**
     **DISCLOSURES**

10

11        108.    Following the IPO, the inflation introduced into the stock price remained due to the

12   still-undisclosed international counterfeiting problems.  On November 10, 2011 and January 31,

13   2012, defendants reported Ubiquiti's results for the first and second quarters of fiscal 2012 ("1Q12"

14   and "2Q12," the quarters ending September 30, 2011 and December 31, 2012, respectively);

15   repeated the same false statements that were included in the Registration Statement and Prospectus;

16   and did not disclose the counterfeiting problems or their impact on the Company.[4]

17        **A.    May 2012: Defendants Report Ubiquiti's 3Q12 Results and Reveal**
          **Some of the Adverse Information**

18        109.    On May 1, 2012, after the market closed, defendants reported the Company's 3Q12

19   results and began to reveal some of the information about the counterfeiting and its adverse impact

20   on the Ubiquiti's business.  The press release reporting Ubiquiti's 3Q12 results was filed with the

21   SEC on a Form 8-K signed by Ritchie.  During the conference call, Pera told investors that Ubiquiti

22   _____

23   [4]    Pursuant to the Court's January 24, 2017 Order (Dkt. No. 93), plaintiffs have removed the post-
     IPO allegations of fraud brought under the Securities Exchange Act of 1934.  Dkt. No. 54, ¶¶115-
24   171.  Though false for the same reasons as the IPO statements, the post-IPO statements were held to
     be inactionable on grounds that the Consolidated Amended Complaint failed to plead scienter.  Dkt.
25   No. 75 at 28-33; *In re Ubiquiti Networks Sec. Litig.*, No. 14-15962, 2016 U.S. App. LEXIS 19141, at
     *3 (9th Cir. Oct. 24, 2016).  The allegations which remain regarding post-IPO events have been set
26   forth with brevity in compliance with Fed. R. Civ. P. 8(a), as directed by the Court, and contain no
     allegations of knowledge or mental state.  The events which occurred after the IPO remain relevant
27   to the elements of falsity, materiality and damages and plaintiffs reserve the right to seek discovery
     relating to these events.  Further, consistent with the Court's order that no new allegations be added,
28   the post-IPO allegations contained herein were previously referenced in paragraphs incorporated into
     plaintiffs' 1933 Act claims.  *See* Dkt. No. 54, ¶¶172-179, 189, 210.

1   planned to increase its legal efforts and aggressively defend its intellectual property to protect the

2   Company's brand and customers from counterfeiters, and Ritchie reported that operating expenses

3   would increase by approximately $1.5 million as a result.  In response to this unexpected negative

4   news, Ubiquiti's stock price declined $6.10 per share or 17.4% from $35 on May 1, 2012 to $28.90

5   on May 2, 2012, on volume of nearly 4.1 million shares.

6           110.   Wunderlich Securities analyst Matthew Robison issued a report on May 2, 2012 in

7   which he downgraded Ubiquiti's stock from Buy to Hold due to aggressive product line and

8   intellectual property rights initiatives that were stunting prospects for continued operating margin

9   expansion.  Robison reported that the expense increases were a function of formalizing and

10  enforcing intellectual property rights.

11          111.   On May 2, 2012, an article accusing Pera of sending the Chinese mafia to

12  competitors' factories to intimidate, harass and threaten them appeared in the United States on sites

13  like Yahoo! Finance.  Ex. 1, ¶97.  After the market closed on May 2, 2012, Forbes reported that

14  rumors were swirling on various blogs that Ubiquiti was mixed up with the Chinese mafia.  Forbes

15  also reported that Pera denied the allegations in an internal memorandum to employees.  That

16  memorandum was leaked and disclosed that the counterfeiting problems had existed since before the

17  IPO and that the counterfeiting problems were worse than reported:

18          As you know, we have been battling counterfeiters in China. The criminals
        are very clever; both former Ubiquiti distributors. One is Chinese living in
19      DongGuan, China where are [sic] contract manufacturers (CM's) are based, the other
        is Taiwanese living in the United States running a WISP distributor in Argentina.
20      They are working as a team.

21          In 2011, we stopped doing business with both individuals because they broke
        our distributor agreement rules.
22

23          Later that year, we discovered they had setup a factory in DongGuan
        producing exact 100% identical versions of our products.  We believe they had paid
24      someone inside our CM's, stole our PCB design files, schematics, BOM's, artwork,
        Factory CD; everything.  They even hired former production engineers from LIteOn
25      (our largest CM) to setup their manufacturing testing and processes.  And, they used
        their Ubiquiti reseller connections to blend the counterfeit products into the Ubiquiti
26      sales channel.  Because the counterfeit products were based on our designs, artwork,
        and manufacturing processes; customers were not able to tell the products were
27      counterfeit.  They thought they were buying genuine Ubiquiti products.

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                    - 30 -

When we discovered what was going on, we hired legal counsel in China to aggressively shut them down.  We were successful and the Chinese individual (based in DongGuan, China) went to jail where he stayed awaiting trial.

We tried our best to make the case public to remove the possibility the criminal could pay his way out of trouble, but unfortunately, the criminal was able to pay off the judge in DongGuan and was released early this year.

Following the release, the criminals now feel empowered and are attempting to ramp up their operations.  We also have ramped up our legal efforts to fight them. Jessica Zhou (our new General Counsel) was hired in March and she has been very aggressive in building a team in China and putting legal pressure on the criminals and their supply chains.

112.   On May 3, 2012, Ubiquiti issued a press release in which it reported that it had reiterated to its customers the discovery of counterfeit products and its worldwide campaign to aggressively defend its intellectual property and protect its customers.

113.   In response to this new negative news, Ubiquiti's stock price declined another 14% over the next three days, declining from $28.90 on May 2, 2012 to $24.91 on May 7, 2012.  By comparison the CCMP declined 3.2% and the IXK declined 3.9%.  However, the Company's stock price continued to trade at artificially inflated prices because the true extent of the problems caused by the counterfeiting had not been revealed.

**B.     August 9, 2012: Ubiquiti Reveals Additional Adverse Impacts from the Counterfeiting, Which Causes Further Declines in the Company's Stock Price**

114.   On August 9, 2012, investors learned that the international counterfeiting scheme caused additional adverse impacts on Ubiquiti's business and would continue to adversely impact the business in the future.  That day, Ubiquiti issued a press release announcing its 4Q12 and FY12 financial results for the year ended June 30, 2012.  Pera acknowledged that the international counterfeiting scheme had adversely affected Ubiquiti's business:

Added Mr. Pera: "The Ubiquiti brand is dominant in our markets and demand for our technology is stronger than ever.  This dominance has led to an unfortunate side effect whereby a few *previously terminated distributors setup counterfeit AirMax manufacturing operations.  Although they have impacted our sales channel and caused some marketplace confusion, we have made substantial and tangible progress in diminishing their activities through a comprehensive legal strategy that has resulted in imprisonment, injunctions, and asset freezes of the counterfeiters*.  In addition, Ubiquiti has implemented sophisticated anti-counterfeit manufacturing processes to substantially protect all of our new platforms and new AirMax products against any future counterfeit attempts."

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 12-cv-04677-YGR                                                    - 31 -

115.     During the conference call on August 9, 2012, Pera acknowledged that the counterfeiting had damaged Ubiquiti for the entire year, stating the counterfeiters had "made damage for three or four quarters that culminated into the situation we have now."  He also acknowledged that the damage could continue for more than the next two quarters.

116.     As a result of this unexpected negative news, Ubiquiti stock declined $6.30 per share to close at $8.71 per share on August 10, 2012, a one-day decline of nearly 42%, on volume of over 7.6 million shares.

117.     Analysts reported that the Company's revelations showed they had underestimated the magnitude of the international counterfeiting scheme's impact on Ubiquiti's business.  On August 9, 2012, Deutsche Bank downgraded its rating on the stock to Hold, lowered its stock price target from $30 to $12 and reported that it was disappointed by the guidance and felt there was long-term risk surrounding the counterfeiting issues.

118.     On August 10, 2012, Wedbush Securities downgraded its rating on Ubiquiti from Outperform to Neutral, lowered its price target from $17.00 to $8.00 and reported that it "clearly underestimated the magnitude of the company's challenges as it relates to the prevalence of counterfeit products in the channel and concerns regarding Ubiquiti's distribution model." Capstone Investments and Wunderlich Securities also issued reports downgrading the stock and lowering price targets due to the uncertainty surrounding the counterfeiting issues.

## VII.    ECONOMIC LOSS

119.     As detailed above, defendants' false representations and omissions of material facts about the sales of counterfeit products caused Ubiquiti's stock to issue and trade at artificially inflated prices.  After closing at $17.50 on October 14, 2011, Ubiquiti's stock price traded between $17.44 and $34.35, reaching its Relevant Period high of $35 on May 1, 2012.  After the market closed on May 1, 2012, Ubiquiti began to reveal some of the previously concealed adverse facts regarding the international counterfeiting scheme and its adverse impact on Ubiquiti's business and financial results.  When Ubiquiti revealed additional adverse facts on May 2-3, 2012 and August 9, 2012, Ubiquiti's stock price declined further.  Ubiquiti's stock price declined 75% from its $35 peak to $8.71 on August 10, 2012 as the artificial inflation was removed from the Company's stock price.

1    Class members who purchased Ubiquiti stock pursuant or traceable to the IPO suffered economic

2    loss, *i.e.*, damages, under the federal securities laws.

3           120.    Defendants' false and misleading statements were made without any reasonable basis

4    and caused Ubiquiti's common stock to trade at artificially inflated levels through the Relevant

5    Period.  As a direct result of Defendants' disclosures set forth above, and a materialization of the

6    undisclosed risk of investing in Ubiquiti, the price of Ubiquiti's common stock declined.  These

7    drops removed the inflation from the price of Ubiquiti common stock, causing real economic loss to

8    investors who had acquired Ubiquiti common stock pursuant or traceable to the IPO.

9           121.    After defendants made materially false and misleading statements and omissions

10   about Ubiquiti on November 10, 2011, the Company's stock price increased $0.86, or 4.6%, from

11   $18.60 on November 10, 2011 to $19.46 on November 11, 2011.[5]  By comparison, the NASDAQ

12   Composite Index ("CCMP") and NASDAQ Computer Index ("IXK") each increased by only 2.0%.[6]

13   The Company's stock continued to trade at artificially inflated prices after Ubiquiti filed its 1Q12

14   Form 10-Q on November 14, 2011, which included representations that perpetuated the false

15   impression that counterfeiting was not a current problem.

16          122.    After defendants reported the Company's 2Q12 results on January 31, 2012,

17   Ubiquiti's stock price declined 0.7% on February 1, 2012, compared to a 1.2% increase in the

18   CCMP and a 1.3% increase in the IXK.  The stock price was still artificially inflated by defendants'

19   materially false and misleading statements and their failure to disclose the counterfeiting problems

20   and their adverse impact on Ubiquiti's business.

21          123.    On May 1, 2012, Ubiquiti reported its 3Q12 financial results and began to reveal

22   some of the previously concealed adverse information about the counterfeiting problems.  The

23   Company reported that Ubiquiti planned to increase its legal efforts and aggressively defend its

24   intellectual property to protect the Company's brand and customers from counterfeiters, and Ritchie

---

[5]    The inactionable post-IPO false statements which maintained the inflation introduced by the
actionable false statements in the IPO are set forth in full in the Consolidated Amended Complaint
with respect to November 10, 2011(Dkt. No. 54, ¶¶117-118) and January 31, 2012 (*id.*, ¶¶133, 135-
136), as well as the reasons why false.

[6]    In Ubiquiti's 2012 Form 10-K, the Company compared its stock price to the CCMP and the IKX.

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                                    - 33 -

1  reported that operating expenses would increase by approximately $1.5 million as a result.  In

2  response to this unexpected negative news, Ubiquiti's stock price declined $6.10 per share, or

3  17.4%, from $35 on May 1, 2012 to $28.90 on May 2, 2012 on volume of nearly 4.1 million shares.

4  By comparison, the CCMP and IXK each increased 0.3%.

5          124.    On May 2, 2012, investors learned that the counterfeiting problems were worse than

6  reported the previous day when an internal memorandum prepared by Pera was leaked.  Pera wrote

7  in the memorandum that Ubiquiti had been battling counterfeiters in China, that they were former

8  distributors, that one of the counterfeiters had been released from custody and that the counterfeiters

9  were attempting to ramp up their operations and threatening to damage the Company's public

10  reputation.  On May 3, 2012, Ubiquiti issued a press release in which it reported that it had reiterated

11  with its customers the discovery of counterfeit products and its worldwide campaign to aggressively

12  defend its intellectual property and protect its customers.  In response to these disclosures that

13  revealed the counterfeiting problems were more severe than reported by the Company during the

14  May 1, 2012 conference call, Ubiquiti's stock price declined $3.99 per share, or 14%, from $28.90

15  on May 2, 2012 to $24.91 on May 7, 2012.  By comparison, the CCMP declined 3.2% and the IXK

16  declined 3.9%.

17          125.    On August 9, 2012, Ubiquiti reported its 4Q12 and FY12 results and revealed more of

18  the previously concealed information, including that the counterfeit products had impacted sales and

19  would continue to do so for the next two quarters.  As a result of disclosing the true condition of the

20  effects of the counterfeiting scheme on Ubiquiti's business, the Company's stock price declined

21  $6.30 per share or 42%, from $15.01 on August 9, 2012 to $8.71 on August 10, 2011.  By

22  comparison, the CCMP rose 0.1% and the IXK rose 0.2%

23          126.    The declines in Ubiquiti's stock price following the partial disclosures compared to

24  the changes in the CCMP and the IXK indices negate any inference that the losses suffered by class

25  members were caused by changed market or industry conditions or Company-specific facts unrelated

26  to the fraudulent conduct.

27

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR                                                    - 34 -

1  **VIII.   CLASS ACTION ALLEGATIONS**

2      127.    Plaintiff bring this action as a class action pursuant to Rule 23 of the Federal Rules of

3  Civil Procedure on behalf of all persons who acquired Ubiquiti common stock pursuant or traceable

4  to the IPO and were damaged thereby (the "Class").  Excluded from the Class are defendants,

5  directors and officers of Ubiquiti and their families and affiliates.

6      128.    The members of the Class are so numerous that joinder of all members is

7  impracticable.  The Company issued more than seven million shares in the IPO, which were owned

8  by hundreds or thousands of persons and institutions.  Thus, the disposition of their claims in a class

9  action will provide substantial benefits to the parties and the Court.

10     129.    There is a well defined community of interest in the questions of law and fact

11  involved in this case.  Questions of law and fact common to the members of the Class that

12  predominate over questions that may affect individual Class members include:

13          (a)      Whether the federal securities laws were violated by defendants;

14          (b)      Whether the Prospectus and Registration Statement issued by defendants to

15  the investing public in connection with the IPO negligently omitted and/or misrepresented material

16  facts about Ubiquiti and its business;

17          (c)      Whether defendants' statements omitted material facts necessary to make the

18  statements made, in light of the circumstances under which they were made, not misleading; and

19          (d)      the extent of damages sustained by Class members and the appropriate

20  measure of damages.

21     130.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

22  purchased Ubiquiti common stock pursuant or traceable to the IPO and sustained damages from

23  defendants' wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has

24  retained counsel who are experienced in class action securities litigation.  Plaintiff has no interest

25  that conflict with those of the Class.

26     131.    A class action is superior to other available methods for the fair and efficient

27  adjudication of this controversy.  A class action will achieve economies of time, effort and expense

28  and provide uniformity of decision to the similarly situated members of the Class without sacrificing

1   procedural fairness or bringing about other undesirable results.  Class members have not indicated an

2   interest in prosecuting separate actions as none have been filed.  The number of Class members and

3   the relatively small amounts at stake for individual Class members make separate suits

4   impracticable.  No difficulties are likely to be encountered in the management of this action as a

5   class action.

6        132.   In addition, a class action is superior to other methods of fairly and efficiently

7   adjudicating this controversy because the questions of law and fact common to the Class

8   predominate over any questions affecting only individual Class members.  Although individual Class

9   members have suffered disparate damages, the misrepresentations and omissions causing damages

10  are common to all Class members.  Further, there are no individual issues of reliance that could

11  make this action unsuited for treatment as a class action because all Class members relied on the

12  integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

13       133.   The market for Ubiquiti's common stock was open, well developed and efficient at all

14  relevant times.  Ubiquiti's stock met the requirements for listing, and was listed and actively traded,

15  on the NASDAQ, a highly efficient and automated market.  As a regulated issuer, Ubiquiti filed

16  periodic public reports with the SEC.  Ubiquiti regularly communicated with public investors via

17  established market communication mechanisms, including through regular disseminations of press

18  releases on the national circuits of major newswire services and through other wide-ranging public

19  disclosures, such as communications with the financial press and other similar reporting services.

20       134.   As alleged above, the change in the price of Ubiquiti's stock – compared to the

21  changes in the two indices – in response to the release of unexpected material positive and negative

22  information about the Company shows there was a cause-and-effect relationship between the public

23  release of the unexpected information about Ubiquiti and the price movement in the Company's

24  stock.  The average weekly trading volume of Ubiquiti's stock during the Relevant Period was

25  approximately 2.4 million shares, or approximately 2.6% of the average total outstanding shares.

26  Ubiquiti was followed by analysts who attended the Company's conference calls and issued reports

27  throughout the Relevant Period.  The average market capitalization of Ubiquiti was $1.793 billion.

28  Institutional investors owned between 29 million and 33 million of Ubiquiti's shares during the

1   Relevant Period, or between 31% and 36% of the average total outstanding shares.  The "float" or

2   shares not owned by insiders comprised 7.9%.  The Relevant Period bid/ask spread median was

3   $0.03.

4   135.    As a result of the foregoing, the market for Ubiquiti common stock promptly digested

5   current information regarding Ubiquiti from all publicly available sources and reflected such

6   information in the Company's stock price.  Under these circumstances, all purchasers of Ubiquiti

7   common stock pursuant or traceable to the IPO suffered similar injury through their purchases of

8   Ubiquiti common stock at artificially inflated prices and the subsequent revelations concerning

9   declines in price, and a presumption of reliance applies.

## COUNT I

### For Violation of Section 11 of the 1933 Act
### Against All Defendants

136.    Plaintiff incorporates ¶¶1-135 by reference.

137.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of
the Class, against all defendants.

138.    This Count does not sound in fraud.  Plaintiff does not allege that the Officer
Defendants, Director Defendants or the Underwriter Defendants had scienter or fraudulent intent,
which are not elements of a §11 claim.

139.    The Registration Statement for the IPO was inaccurate and misleading, contained
untrue statements of material facts, omitted to state other facts necessary in order to make the
statements made not misleading, and omitted to state material facts required to be stated therein.

140.    Ubiquiti is the registrant for the IPO.  The defendants named herein were responsible
for the contents and dissemination of the Registration Statement.

141.    As issuer of the shares, Ubiquiti is strictly liable to Plaintiff and the Class for any
misstatements and omissions.

142.    None of the defendants named herein made a reasonable investigation or possessed
reasonable grounds for the belief that the statements contained in the Registration Statement were
true and without omissions of any material facts and were not misleading.

1    143.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a

2    person who violated, §11 of the 1933 Act.

3    144.    Plaintiff acquired Ubiquiti shares pursuant and/or traceable to the Registration

4    Statement for the IPO.

5    145.    Plaintiff and the Class have sustained damages.  The value of Ubiquiti common stock

6    has declined substantially subsequent to and due to defendants' violations.

7    146.    At the time of their purchases of Ubiquiti shares, Plaintiff and other members of the

8    Class were without knowledge of the facts concerning the wrongful conduct alleged herein and

9    could not have reasonably discovered those facts prior to May 1, 2012.  Less than one year has

10   elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon

11   which this complaint is based to the time that Plaintiff filed the Consolidated Amended Complaint.

12   Less than three years elapsed between the time that the securities upon which this Count is brought

13   were offered to the public and the time Plaintiff filed the Consolidated Amended Complaint.

14                                        **COUNT II**

15                          **For Violation of Section 15 of the 1933 Act**
                  **Against Ubiquiti and the Officer and Director Defendants**
16

17   147.    Plaintiff repeats and realleges ¶¶1-146 by reference.

18   148.    This Count is brought pursuant to §15 of the 1933 Act against Ubiquiti, the Officer

19   Defendants and the Director Defendants.

20   149.    The Officer Defendants and the Director Defendants each were control persons of

21   Ubiquiti by virtue of their positions as a director and/or senior officer of Ubiquiti.  The Officer

22   Defendants and the Director Defendants each had a series of direct and/or indirect business and/or

23   personal relationships with other directors and/or officers and/or major shareholders of Ubiquiti.

24   Ubiquiti controlled the Officer Defendants, the Director Defendants and all of Ubiquiti's employees.

25   150.    Defendants each were culpable participants in the violations of §11 of the 1933 Act

26   alleged in the Count above, based on their having signed or authorized the signing of the

27   Registration Statement and having otherwise participated in the process which allowed the IPO to be

28   successfully completed.

1    151.    Pera controlled Ritchie and Ubiquiti though his position of power and control as the

2    Company's founder, director and CEO.   He had supervisory authority over other Ubiquiti

3    executives, including Ritchie.  He also had the power to control Ubiquiti and exercised that power by

4    signing the Registration Statement.

5    152.    Ritchie controlled Ubiquiti through his position of power and control as the

6    Company's CFO.  He had supervisory authority over other Ubiquiti executives.  He also had the

7    power to control Ubiquiti and exercised that power by signing the Registration Statement.

8    153.    The Director Defendants had the power to control and influence Ubiquiti, Pera,

9    Ritchie and other Company executives through their powers set forth in the Company's Amended

10   and Restated Bylaws adopted on June 25, 2010.  It is stated in the Amended and Restated Bylaws

11   that the business and affairs of Ubiquiti shall be managed by or under the direction of the board of

12   directors and its committees.  The Amended and Restated Bylaws also give the board the power to

13   appoint, remove and designate the authority of the Company's officers.  The Director Defendants

14   exercised their power by appointing officers and signing the Registration Statement.

15   **IX.    PRAYER FOR RELIEF**

16   WHEREFORE, Plaintiff prays for relief and judgment, as follows:

17   A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

18   B.    Awarding Plaintiff and the members of the Class damages and interest;

19   C.    Awarding Plaintiff's reasonable costs, including attorneys' fees;

20   D.    Awarding rescission or a rescissory measure of damages; and

21   E.    Awarding such equitable/injunctive or other relief as the Court may deem just and

22   proper.

23

24

25

26

27

28

1    X.    **JURY DEMAND**

2         Plaintiff hereby demands a trial by jury.

3    DATED:  January 30, 2017                  ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
4                                              CHRISTOPHER P. SEEFER
                                               DANIEL J. PFEFFERBAUM
5

6
                                               _____s/ Daniel J. Pfefferbaum_____
7                                              DANIEL J. PFEFFERBAUM

8                                              Post Montgomery Center
                                               One Montgomery Street, Suite 1800
9                                              San Francisco, CA  94104
                                               Telephone:  415/288-4545
10                                             415/288-4534 (fax)

11                                             LABATON SUCHAROW LLP
                                               JONATHAN GARDNER
12                                             MICHAEL P. CANTY
                                               ROGER W. YAMADA
13                                             140 Broadway, 34th Floor
                                               New York, NY  10005
14                                             Telephone:  212/907-0700
                                               212/818-0477 (fax)
15
                                               Lead Counsel for Plaintiffs
16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 12-cv-04677-YGR

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 30, 2017, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on January 30, 2017.

9

s/ Daniel J. Pfefferbaum

DANIEL J. PFEFFERBAUM

10

11

ROBBINS GELLER RUDMAN
&  DOWD LLP

12

Post Montgomery Center
One Montgomery Street, Suite 1800

13

San Francisco, CA  94104
Telephone:  415/288-4545

14

415/288-4534 (fax)
E-mail: dpfefferbaum@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 4:12-cv-04677-YGR In re Ubiquiti Networks, Inc. Securities Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael P. Canty**
  mcanty@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,rmcbain@gibsondunn.com

- **Iona M Evans**
  ievans@labaton.com

- **Jonathan Gardner**
  jgardner@labaton.com,jjohnson@labaton.com,cvillegas@labaton.com,tdubbs@labaton.com,ryamada@labaton.com,acoquin@labaton.com,lmehringer@labaton.com,fm

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  michael@goldberglawpc.com

- **Matthew Douglas Harrison**
  matt.harrison@lw.com,ruby.ordonio@lw.com,#sfdocket@lw.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Gavin Masuda**
  gavin.masuda@lw.com,#sflitigationservices@lw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Ashley Price**
  aprice@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Christopher Paul Seefer**
  chriss@rgrdlaw.com,ptiffith@rgrdlaw.com,dhall@rgrdlaw.com,e_file_sd@rgrdlaw.com,tcraig@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Noah F. Stern**
  NStern@gibsondunn.com,VYu@gibsondunn.com

- **Michael Walter Stocker**
  mstocker@labaton.com,ravan@labaton.com,lmehringer@labaton.com

- **Danielle A. Stoumbos**
  dstoumbos@finkelsteinthompson.com

- **Carol C. Villegas**
  cvillegas@labaton.com,thoffman@labaton.com,jchristie@labaton.com,mpenrhyn@labaton.com,acoquin@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.cor

- **Peter Allen Wald**
  peter.wald@lw.com,caroline.yu@lw.com,#sflitigationservices@lw.com,john.eastly@lw.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Roger W Yamada**
  ryamada@labaton.com,lmehringer@labaton.com,fmalonzo@labaton.com,acarpio@labaton.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Catherine        J. Kowalewski
Robbins Geller Rudman & Dowd LLP

655 W Broadway
Suite 1900
San Diego, CA 92101